Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

Seattle Division

Stephanie C Farler

25-CV-01853-TL

Case No.

*(to be filled in by the Clerk's Office)*

### Plaintiff(s)
*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

-v-

SNOHOMISH COUNTY WASHINGTON;
SKAGIT COUNTY WASHINGTON,
MARLENE SPRAGUE, JUSTICE CLARK,
DARLENE ROSENQUIST, DOES 1-10

### Defendant(s)
*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.)*

Jury Trial: *(check one)* ✔Yes ☐No

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

SEP 2 4 2025   LS

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Non-Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

I.    **The Parties to This Complaint**

   A.    **The Plaintiff(s)**

   Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Stephanie C Farler |
| Address | 4232 142nd Ave NE |
| | Lake Stevens     WA     98258 |
| | *City*     *State*     *Zip Code* |
| County | Snohomish County |
| Telephone Number | 425-268-0129 |
| E-Mail Address | Farler3030@gmail.com |

   B.    **The Defendant(s)**

   Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | SNOHOMISH COUNTY WASHINGTON |
| Job or Title *(if known)* | Municipal entity   Prosecuting Attorney |
| Address | 3000 Rockefeller Ave, M/S 504 |
| | Everett     WA     98201 |
| | *City*     *State*     *Zip Code* |
| County | Snohomish county |
| Telephone Number | 425-388-3333 |
| E-Mail Address *(if known)* | |

   ☐ Individual capacity   ☑ Official capacity

Defendant No. 2

| | |
|---|---|
| Name | Skagit County Washington |
| Job or Title *(if known)* | Munucupal entity   Skagit County prosecuting attorney |
| Address | 605 South 3rd Street |
| | Mount Vernon     WA     98273 |
| | *City*     *State*     *Zip Code* |
| County | |
| Telephone Number | |
| E-Mail Address *(if known)* | |

   ☐ Individual capacity   ☑ Official capacity

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

*(Handwritten margin text, read bottom to top:)* Name: Darlene Rosenquist Name No.5 Defendant Job title: retired Address: 19006 26th Ave NW Stanwood WA 98292 County: Snohomish sn Phone Number: Email: Individual (checked) Official capacity

**Defendant No. 3**

| Name | Marlene Sprague | | |
|---|---|---|---|
| Job or Title (if known) | retired | | |
| Address | 1805 Rainier Ave Everett wa 98201 | | |
| | Everett | WA | 9820l |
| | *City* | *State* | *Zip Code* |
| County | Snohomish County WA | | |
| Telephone Number | | | |
| E-Mail Address (if known) | | | |

[✓] Individual capacity    [ ] Official capacity

**Defendant No. 4**

| Name | Justice Clark | | |
|---|---|---|---|
| Job or Title (if known) | Supervisor | | |
| Address | 4220 142nd Ave NE | | |
| | Lake Stevens | WA | 98258 |
| | *City* | *State* | *Zip Code* |
| County | | | |
| Telephone Number | | | |
| E-Mail Address (if known) | | | |

[✓] Individual capacity    [ ] Official capacity

## II.    Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

[ ] Federal officials (a *Bivens* claim)

[✓] State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?
Civil Rights Under 42 U.S.C. 1983, 1985 (2) and (3); (RICO) Under 18 U.S.C. 1962 (c); First Amendment, Fourth Amendment, and Fourteenth Amendments, as well as Supplemental State-Law Claims; Intentional Infliction of Emotional Distress, Abuse of process, Malicious Prosecution, Violation of RCW 49.60, Violation of RCW 59.18

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

D.    Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

each defendant acted under color of law by misusing police, judicial, and administrative processes to suppress the plaintiff's constitutional rights. All engaged in joint action and coordinated with public officials. All acting pursuant to official policies, customs, or with deliberate indifference to my rights. (See Attached)

## III.    Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?
At all relevant times, the situations giving rise to my claims happened within Snohomish County and Skagit County, Washington.

B.    What date and approximate time did the events giving rise to your claim(s) occur?
Most situations happened at my home in Lake Stevens, WA. I have over 100 different documents to attach during discovery to support every claim that I make here. There is a paper trail through the court system of over ten different civil cases between the defendants and myself, and the sheriffs have also acted on the harassment calls and pulled me over and arrested me more then one time because of this conspiracy. (See Attached)

C.    What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*
Snohomish County, Washington, is responsible for acting under the color of law through customs policies and deliberate indifference to my constitutional rights. specifically, the county failed to train law enforcement, court staff, and judicial officers on the rights of pro se litigants, victims of harassment, and protected classes. they fostered systemic misconduct by enabling coordinated retaliation, suppressing protection orders, and permitting procedural abuse by private actors. the county's omissions and institutional hostility constitute municipal liability under Monell.                      (See Attached)

Skagit County, Washington, is a municipal entity liable under monell for malicious prosecution and unlawful character-based legal actions arising from its prosucatoral and law enforcmant functions. Skagit County ignored exculpatory evidence, failed to investigate fraudulent allegations, and coordinated with Snohomish County actors to inflict ongoing retaliation. these acts directly contributed to plaintiffs coerced plea, felony record, and career loss- despite documention establishing paintiffs innocence. and for the suppression of credibility-based documentation, prosecutorial evidence and discriminatory charge decisions

## IV.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

I have been deprived of real property and fundamental fairness without meaningful notice, a fair hearing, or an impartial opportunity to be heard.

I have been subjected to arbitrary, unjustified, and discriminatory treatment compared to similarly situated persons and defendants imposing greater procedural burdens and denying rights afforded to others.

I have not been given my right to petition, and access to the courts has been systematically challenged. I have been penalized and retaliated against for seeking redress and court protection, and have been unreasonably denied fair access to the court

I have suffered government-enabled seizure and deprivation of my home and property without legal justification, probable cause, or fair process

By their actions and deliberate indifference, officials created or worsened foreseeable harm and danger to me, permitting threats, intimidation, and physical harm after being repeatedly notified and failing to intercede.

My right to equal protection had been further violated by a conspiracy among private individuals and Officials to use court process, fraudulent documents, and other means to deprive me of my rights.

Repeated claims about direct violence(SHooting my car, threats to myself and family) were ignored. When asserting my need for basic safety, the court responses are procedural (Burden of proof), generalized credibility, not substantive or protective.

Real world harm has stretched further just just affecting me. the safety-related threats and gun violence have endangered my entire family, including my young children, my mother, and a vulnerable adult   (See attached)

## V.   Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

Require Snohomish County to implement oversight and procedural safeguards to prevent future abuse of protection order and property transfer processes.

Issue injunctive relief to protect me from imminent danger of criminal charges and retaliation by police officers, including unlawful surveillance, intimidation, and misuse of legal processes.

Require Snohomish County to implement oversight and procedural safeguards to prevent future abuse of protection order and property transfer processes.

Remove the felony charge from my record in Skagit County, which was obtained through unlawful and retaliatory means.

Intervene in the current Snohomish County criminal proceedings, where charges are based on evidence obtained through illegal search warrants and coordinated misconduct.

Award monetary damages for the emotional distress, reputational harm, and economic losses I have suffered due to the Defendants' actions.

(See Attached)

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:            08/02/2025

Signature of Plaintiff

Printed Name of Plaintiff      Stephanie Farler

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

                               _City_                _State_      _Zip Code_

Telephone Number

E-mail Address

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | | |
|---|---|---|
| **Stephanie Farler,** | : | |
| Plaintiff, | : | |
| | | |
| **v.** | : | **Case No:** _____ |
| **SNOHOMISH COUNTY WASHINGTON,** | : | **COMPLAINT FOR VIOLATIONS OF CIVIL** |
| a Municipal Entity; | : | **RIGHTS, DAMAGES, DECLARAROTY RELIEF,** |
| **SKAGIT COUNTY WASHINGTON,** | : | **DAMAGES, AND INJUNCTIVE RELIEF** |
| a Municipal Entity; | : | **JURY TRIAL DEMANDED** |
| | | |
| **MARLENE SPRAGUE, :** | : | |
| individually and as joint actor with state agents; | : | |
| | | |
| **DARLENE ROSENQUIST,** | : | |
| individually and as joint actor with state agents; | : | |
| | | |
| **JUSTICE CLARK,** | : | |
| individually and as joint actor with state agents; | : | |
| | | |
| **DOES 1-10** | : | |
| whose names and capacities are presently | | |
| unknown | | |
| Defendants. | : | |

(42 U.S.C. §§ 1983, 1985, 18 U.S.C § 1968 (RICO), Monell Liability, First, Fourth, AND Fourteenth Amendments. Supplementary State Law Abuse of Process, IIED, Malicious Prosecution)

## I. INTRODUCTION

Plaintiff, Stephanie Farler, brings this action pro se under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, and 42 U.S.C. §§ 1983 and 1985(3), for violations of her constitutional rights by an enterprise composed of private individuals and county officials acting under color of law.

The enterprise has engaged in a coordinated campaign of retaliation, harassment, and malicious prosecution, including unlawful detainment proceedings instigated by Marlene Sprague, refusal of police protection by County officials, and unconstitutional harassment involving county officials alongside Marlene Sprague, Darlene Rosenquist, and Justice Clark.

Surveillance facilitated by Justice Clark and Marlene Sprague, along with judicial retaliation perpetrated by county officials operating under the pretext of law, has been further exacerbated by collaboration with prosecutorial authorities to advance criminal charges as an expression of retribution.

This case arises from a pattern of conduct by municipal agents, law enforcement officers, and judicial actors who, operating in concert and under color of law, deprived Plaintiff of due process, intimidated witnesses, and obstructed access to justice through unlawful traffic stops, fabricated citations, eviction orders, and calculated interference in civil and criminal proceedings. Defendants sought to silence Plaintiff's legal advocacy and chill the exercise of her constitutional rights.

This is a civil rights and supplemental state law action seeking damages and equitable relief for ongoing violations of Plaintiff's constitutional rights, including retaliation for court access, deprivation of property, orchestrated harassment, fraud, and systemic bias—resulting in home loss, emotional and financial devastation, educational harm, and continuing irreparable injury to Plaintiff's family relationships.

The violations alleged herein stem from Snohomish County's systemic and sustained failure to protect Plaintiff from years of documented harassment, unlawful property deprivation, and retaliatory misuse of law enforcement and judicial authority.

As a lifelong resident and self-represented litigant, Plaintiff seeks redress for repeated and deliberate violations of her rights under the First, Fourth, and Fourteenth Amendments—namely: the right to petition the court for redress, retaliation for protected speech, due process, equal protection, meaningful access to the courts, illegal search and seizure, state-created danger, and the right to maintain and secure personal property.

Plaintiff further alleges that Snohomish County, through entrenched policies, practices, and customs, knowingly allowed private individuals to manipulate legal systems and law enforcement channels to inflict harm, intimidate, and deprive her of housing, livelihood, dignity, and access to justice.

Rather than responding with impartiality or concern, County officials acted with calculated indifference—discrediting valid evidence, ignoring credible threats, and shielding adversarial parties, thereby allowing constitutional violations to flourish.

This lawsuit does not challenge any specific judicial outcome. Instead, it exposes a pervasive and unconstitutional pattern of official neglect, bias, and retaliatory behavior by County agencies. These abuses culminated in the unlawful loss of property, baseless prosecutions, and the systemic denial of safety and dignity for both Plaintiff and a vulnerable adult with documented cognitive impairments—whom the County also failed to protect.

Plaintiff brings this action not only to vindicate her own rights, but also to hold Snohomish County, and individual Defendants accountable—to deter systemic harm against similarly situated individuals, especially those who are vulnerable, categorized as a "whistle blower" or known for speaking out about Official misconduct, and  unrepresented, or economically marginalized.

Defendants' failure to train judicial officers, court staff, and law enforcement personnel on the rights of pro se litigants, harassment victims,  and disabled persons demonstrates deliberate indifference. This indifference enabled predictable, repeated violations of civil rights in direct conflict with clearly established federal protections.

The persistent denial of due process, use of extraneous criminal charges to undermine requests for protection, and overt hostility toward Plaintiff as a pro se litigant are not isolated missteps—they reflect a County-wide culture of neglect, retaliation, and systemic abuse. As affirmed in City of Canton v. Harris, 489 U.S. 378 (1989), and Connick v. Thompson, 563 U.S. 51 (2011), such deliberate indifference establishes municipal liability under 42 U.S.C. § 1983.

Plaintiff alleges that Defendants, acting under color of law, engaged in an unlawful and well-coordinated pattern of harassment, intimidation, and deprivation of due process and other fundamental rights—violations actionable under § 1983, § 1985(3), RICO, and other relevant statutes.

Plaintiff alleges an association-in-fact enterprise under 18 U.S.C. § 1961(4), composed of private individuals and county officials who coordinated through informal and formal channels to engage in a pattern of racketeering activity, including mail fraud, obstruction of justice, and deprivation of constitutional rights.

Plaintiff seeks compensatory and punitive damages, injunctive relief to prevent ongoing harm, and attorney's fees under 42 U.S.C. § 1988 and 18 U.S.C. § 1964(c).

## II. PARTIES

### a. PLAINTIFF Stephanie Farler,

**Plaintiff Stephanie Farler**, a resident of Snohomish County, Washington, brings this action to redress repeated, unlawful interference with her constitutional rights, including denial of due process, retaliatory surveillance, and loss of property. At all relevant times, Plaintiff acted as a pro se litigant and a legal advocate for herself, while her mother served as caretaker of a vulnerable adult. This action seeks relief from both personal and systemic injury caused by Defendants, including violations of Washington privacy statutes arising from the retaliatory misuse of law enforcement and surveillance in spite of clear "No Trespass" notices.

Plaintiff asserts claims against the municipal entities of Skagit County and Snohomish County. By focusing on official-capacity claims, Plaintiff seeks to hold these counties liable for the acts and omissions of their agents acting under color of state law and pursuant to official policy, custom, or practice. These claims are not personal in nature and do not seek damages from the officials as individuals. Rather, they are functionally equivalent to claims against the counties themselves. See Kentucky v. Graham, 473 U.S. 159, 165–66 (1985) (official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent").

The Defendants, acting within the scope of their employment and authority, either participated in or failed to prevent the constitutional violations described herein, including malicious prosecution, suppression of exculpatory evidence, coordination with other counties for retaliatory purposes, and imposition of punitive license penalties without due process. These actions and omissions were taken pursuant to official County policy or custom, or were ratified by final policymakers, thereby rendering the County liable under Monell v. Department of Social Services, 436 U.S. 658 (1978).

Plaintiff does not seek to impose personal liability on any prosecutor, sheriff, or judicial officer. Rather, Plaintiff seeks declaratory, injunctive, and compensatory relief against the counties through these official-capacity claims, including orders to expunge the wrongful license suspension, prevent future retaliatory prosecutions, and implement proper training and oversight protocols. The evidence reflects a recurring pattern of procedural irregularities, denial of protection orders, improper suppression of evidence, and the misuse of law enforcement and court processes to retaliate against Plaintiff. This pattern supports the Monell claim by demonstrating that the unconstitutional conduct resulted from official County policies, customs, or the deliberate indifference of County officials.

**Defendant Snohomish County, Washington,** is a municipal entity and political subdivision of the State of Washington. At all relevant times, it oversaw the Snohomish County Sheriff's Office, Adult Protective Services (APS), and the administration of the Snohomish County Superior Court. Snohomish County is

sued under 42 U.S.C. § 1983 for the actions of its officials, employees, and agents, undertaken under color of state law and pursuant to County customs, policies, or deliberate failures to train and supervise. As established in Monell v. Department of Social Services, 436 U.S. 658 (1978), these unconstitutional actions were carried out pursuant to County customs and policies, resulting in the deprivation of Plaintiff's constitutional rights. This municipal liability is a core aspect of the Plaintiff's claim for injunctive and compensatory relief.

**Unconstitutional Policies, Practices, and Failures in Training and Supervision (Monell):** Snohomish County maintained unconstitutional policies, practices, and customs, including deliberate indifference to officer misconduct, tolerance of harassment of critics of the County, misuse of judicial processes, and failure to properly train or supervise personnel regarding constitutional rights. This deliberate indifference and systemic failure enabled the recurring pattern of harassment, property deprivation, and suppression of Plaintiff's rights. The County's failure to intervene or correct ongoing violations demonstrates a culture of misconduct and retaliation that must be addressed.

Specifically, Snohomish County failed to train its personnel on the **Fourth Amendment's warrant requirements**, the **Fourteenth Amendment's duty not to recklessly endanger or retaliate against individuals**, and the **obligation to respect the rights of pro se litigants and harassment victims.** This failure to train amounted to deliberate indifference to constitutional rights, giving rise to municipal liability under § 1983, as established in City of Canton v. Harris, 489 U.S. 378, 388–89 (1989).

**Pattern of Harassment and Unlawful Search (Fourth Amendment Violation)**
Snohomish County, through its Sheriff's Office, engaged in a pattern of harassment against the Plaintiff. This pattern included coordinating with private actors and culminated in the execution of an illegal search warrant on the Plaintiff's home in September 2022. County deputies raided the Plaintiff's residence, leaving her bedroom in one big pile in the middle of the room, and seized items—without a valid warrant then an hour later returned and drove her car off private property to be towed to the precinct pending a warrant.

The warrant that Snohomish County relied upon was facially invalid: it lacked the issuing judge's signature and did not include the requisite supporting documentation or email correspondence. As established by the fundamental principles of the Fourth Amendment, a warrant without a neutral magistrate's signature is no warrant at all. See Mapp v. Ohio, 367 U.S. 643 (1961). The deputies' actions in conducting the search and seizure without a signed warrant constituted an unreasonable search and seizure per se, lacking the fundamental safeguard of judicial oversight.

The invalidity of the September 2022 search warrant is confirmed by Snohomish County's own records. In discovery related to a pending second-degree felony charge against the Plaintiff, the warrant on file bears no judge's signature and lacks the required email authorization from the court. This glaring procedural defect further underscores the lack of judicial oversight and the County's indifference to constitutional safeguards, placing the Plaintiff's rights and protections in serious jeopardy.

**Prosecutorial Misconduct and Retaliatory Misuse of Process (Fourteenth Amendment Violations):**
Despite being notified of the warrant's invalidity, Snohomish County prosecutors pursued new charges against the Plaintiff, relying on evidence obtained during the unlawful search. This knowing reliance on an unsigned warrant and its fruits violated the Plaintiff's Fourteenth Amendment right to due process. See Goldberg v. Kelly, 397 U.S. 254 (1970), and Mathews v. Eldridge, 424 U.S. 319 (1976).

The County's prosecutors demonstrated deliberate and retaliatory misuse of the legal process, showing bad faith in pressing forward with charges despite the clear defect in the warrant. This conduct mirrors the improper and malicious prosecution condemned in Wayte v. United States, 470 U.S. 598 (1985).

The persistence in using obviously tainted evidence indicates that the prosecution was driven by an improper purpose—personal or political animus and retaliation—rather than legitimate law enforcement

objectives. This constitutes a substantive due process violation under the Fourteenth Amendment. See Hartman v. Moore, 547 U.S. 250 (2006).

**Failure to Train and Supervise on Warrant Requirements (Monell Liability):** The fact that Snohomish County officers proceeded with the home search absent a judge's signature—a glaring, basic requirement of the Fourth Amendment—demonstrates a failure in training and supervision so severe that it amounts to official policy. Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a municipality may be held liable when constitutional violations result from the County's own actions, omissions, or widespread customs.

In this case, the glaring omission of a judge's signature on the warrant was so obvious that proceeding with the search and subsequent prosecution strongly suggests that County policymakers approved or acquiesced in the misconduct. See Connick v. Thompson, 563 U.S. 51, 61–62 (2011). The absence of training on the basic requirement of a valid, signed warrant shows deliberate indifference to Plaintiff's Fourth Amendment rights. This failure in training and supervision was so severe that it amounted to a highly predictable consequence, demonstrating the County's liability for the resulting constitutional violations.

**Pattern of Dismissed Complaints and Indifference to Misconduct:** Snohomish County maintained a policy or custom of tolerating or ignoring officer misconduct and retaliatory behavior, particularly against individuals who criticized the County. County officials regularly dismissed or downplayed complaints about officer harassment or APS failures, creating a de facto policy of indifference to constitutional violations.

Moreover, the County failed to provide any training or guidelines to court staff on safeguarding pro se litigants' access to the courts, amounting to deliberate indifference to the risk of constitutional violations. See City of Canton v. Harris, 489 U.S. 378, 390 (1989). This entrenched pattern of ignoring complaints and failing to provide fundamental training contributed to the overall climate of deliberate indifference, reinforcing the County's Monell liability for constitutional violations.

**Ratification by Final Policymakers:** At all relevant times, final policymakers for Snohomish County—such as the County Sheriff and other department heads—knew of and implicitly approved the conduct described. Their knowledge and implicit ratification of these unconstitutional acts make it an official policy of the County. Under Monell, Snohomish County is liable for these constitutional violations because they flowed directly from the County's own policies, as County leadership's acceptance and endorsement of the misconduct effectively transformed it into an official County policy.

**Invalid Warrant and Joint Public-Private Misconduct (42 U.S.C. § 1985 Conspiracy):** Snohomish County's actions were not isolated. They involved coordination with private actors who instigated and directed the County's misuse of legal processes. Plaintiff alleges that Snohomish County, in concert with private individuals, orchestrated her removal from her home and the deprivation of her property through unlawful searches and retaliatory prosecutions. This pattern of collaboration between County officials and private actors substantiates a claim under 42 U.S.C. § 1985(3) for conspiracy to deprive equal protection. See Dennis v. Sparks, 449 U.S. 24 (1980). The County's actions—acting in concert with these private individuals—reflect a deliberate effort to punish Plaintiff outside the bounds of law, denying her the equal protection and fair treatment afforded to others.

Moreover, Snohomish County's refusal to halt prosecutions even after being notified of the warrant's invalidity illustrates a policy of "prosecute at any cost," regardless of the constitutional implications. Such persistence in using unlawfully obtained evidence and the coordination with private parties implicate the Plaintiff's Fourteenth Amendment right to due process and equal protection. See Village of Willowbrook v. Olech, 528 U.S. 562 (2000). This collaboration between County actors and private individuals, combined

with the County's persistence in pursuing charges despite known constitutional defects, supports the claim of a conspiracy to deprive Plaintiff of her constitutional protections.

**Prosecutorial Misconduct and Failure to Train on Exculpatory Evidence (Brady/Giglio Violations):** Snohomish County failed to train and supervise its prosecutors regarding their obligations under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), which extends Brady to impeachment evidence. The prosecution's continued reliance on unlawfully obtained evidence, even after the Plaintiff notified them of the warrant's defect, demonstrates a deliberate indifference to constitutional rights. In Connick v. Thompson, 563 U.S. 51 (2011), the Supreme Court held that failure to train prosecutors on Brady obligations can give rise to municipal liability if the need for training is so obvious that the lack of it demonstrates deliberate indifference. Here, the persistent use of tainted evidence and failure to disclose or address its invalidity constitute a failure to train that amounts to an official policy of deliberate indifference, creating grounds for municipal liability

By ignoring the Plaintiff's notification that the warrant was invalid and continuing the prosecution using unlawfully seized evidence, Snohomish County prosecutors effectively suppressed exculpatory information about the unlawful nature of the search. This suppression violated the Plaintiff's due process rights under the Fourteenth Amendment. Additionally, the County had a duty to ensure that prosecutors were properly trained on their Giglio obligations—namely, the requirement to disclose any material evidence that could impeach the credibility of government witnesses or the validity of the prosecution's case.

**Retaliatory Prosecution and Improper Purpose (First and Fourteenth Amendment Violations):** Snohomish County's decision to continue prosecuting the Plaintiff, even after it was clear that the evidence was obtained unlawfully, demonstrates that the prosecution was driven by an improper purpose. The County's actions suggest that the prosecution was not conducted in good faith, but rather as retaliation for the Plaintiff's protected speech and court petitions. This constitutes a violation of the Plaintiff's First Amendment right against retaliation for engaging in constitutionally protected activities, such as petitioning the government and criticizing public officials. See Hartman v. Moore, 547 U.S. 250 (2006).

Additionally, the use of criminal charges as a means to discredit the Plaintiff in unrelated civil matters demonstrates the County's improper motive. By coordinating with other counties and leveraging the mere existence of the Skagit County charges to undermine her credibility, Snohomish County demonstrated a clear custom of misusing the legal process to retaliate against and discredit critics. This pattern of retaliation against the Plaintiff's protected speech implicates both the First Amendment and the Fourteenth Amendment's due process clause, further reinforcing the County's constitutional violations.

**Policies or Customs of Retaliatory Legal Process Misuse and Collusion with Private Actors:** Snohomish County's liability also arises from its longstanding customs and practices of permitting private parties with connections to County officials to weaponize protection orders and criminal complaints. County officials—including in the Sheriff's Office and Prosecuting Attorney's Office—have a pattern of coordinating with private individuals, particularly those with influence or connections, to target and undermine disfavored individuals like the Plaintiff. The County's willingness to rely on unverified and biased reports from private actors hostile to the Plaintiff, and to pursue charges despite readily available exculpatory evidence, was not an isolated incident.

This pattern shows a custom of using the County's prosecutorial powers in bad faith, in coordination with private individuals to achieve ulterior motives. The County permitted private complainants to weaponize the legal system, and County officials failed to intervene to prevent this misuse. This collusion between public officials and private actors is actionable under § 1983 and § 1985, as it reflects a knowing agreement to deprive the Plaintiff of her constitutional rights under color of law.

See Dennis v. Sparks, 449 U.S. 24 (1980) (holding that private parties who conspire with state officials to violate constitutional rights can be liable under § 1983). The coordinated actions of Snohomish County officials and private complainants, resulting in malicious prosecution and improper charges, illustrate this entrenched custom.

**Failure to Intervene and Prevent Known Constitutional Violations (§ 1983 Failure to Intervene):**
Snohomish County officers and officials who were aware of the unconstitutional conduct, including the reliance on an unsigned warrant and the suppression of exculpatory evidence, had a duty to intervene. The failure of supervisors and other officials to halt the prosecution, despite known constitutional violations, supports liability under § 1983 for failure to intervene. Law enforcement officers and supervisors have an affirmative duty to prevent ongoing constitutional violations when they have knowledge of them.

See Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972) (establishing the duty of officers present to prevent constitutional violations). The deliberate indifference of County officials, who knew or should have known of the constitutional defects in the warrant and prosecution, reinforces the County's liability under Monell.

These actions reflect a deliberate pattern of indifference and retaliation in violation of clearly established laws. **Snohomish County is also liable under: Fourth Amendment** - Illegal search and SEIZURE – **(BECK V. OHIO)**, **(SOLDAL V. COOKCOUNTY)**, **Fourteenth Amendment** - Procedural and substantive due process violations -**(GOLDBERG V. KELLY)**, **(MATHEWS V. ELDRIDGE)**, **First Amendment** - Retaliation for court petitions and public grievances - **(HARTMAN V. MOORE)**, **State Law Malicious Prosecution** - Reliance on unlawful evidence and character-based prosecution **RCW 4.24.350**, **(AWABDY V. CITY OF ADELANTO)**, **Failure to train** - **(CITY OF CANTON V. HARRIS)**, 489 U.S. 378 (1989), **(CONNICK V. THOMPSON)**, 563 U.S. 51 (2011) – **Prosecutorial training liability, Suppression or Failure to disclose exculpatory or integrity**-compromising impacting evidence - **(GIGLIO V. U.S.)**, 405 U.S. 150 (1972)

In conclusion, Snohomish County is liable under 42 U.S.C. § 1983 for the constitutional violations committed by its officials, employees, and agents, which resulted from the County's unconstitutional policies, customs, and failures in training and supervision. The County's deliberate indifference to known risks, its policy of retaliatory misuse of the legal process, its failure to train on fundamental constitutional duties (such as obtaining a valid warrant and disclosing exculpatory evidence), and its collusion with private actors were all moving forces behind the constitutional deprivations the Plaintiff suffered.

**Accordingly, the Plaintiff seeks relief against Snohomish County, including:** Compensatory damages for the harm caused by the violations of her **First, Fourth, and Fourteenth Amendment rights,** including emotional distress, reputational harm, property loss, and legal expenses; Punitive damages where available, to deter future misconduct by the County and its policymakers; A declaration that Snohomish County's policies, customs, and practices violated the Plaintiff's constitutional rights; Injunctive relief to prevent future violations, including measures to ensure proper training on Fourth Amendment warrant requirements, disclosure of exculpatory evidence (Brady/Giglio), and the prevention of retaliatory prosecutions; Attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable statutes; Any additional relief the Court deems just and appropriate, including the clearing of the wrongful license suspension and restoration of the Plaintiff's rights; The return of all property taken during the September 2022 search warrant, as the warrant was invalid and the seizure of property was unlawful. The Plaintiff seeks the restoration of her belongings that were confiscated during the warrantless and unconstitutional raid, ensuring that her property is returned in full to mitigate the ongoing harm.

In addition, the Plaintiff respectfully requests that the Court issue immediate protective orders to prevent the Defendants, including Justice Clark, Marlene Sprague, Darlene Rosenquist, and any associated parties, from approaching or contacting the Plaintiff directly or indirectly. The Plaintiff seeks a no-contact order and any other relief necessary to ensure her physical safety and emotional well-being. Furthermore,

The Plaintiff seeks the Court's order to allow her to safely return to her residence without fear of further interference, harassment, or intimidation, enabling her to rebuild her life, regain stability, and recover from the severe disruption caused by the Defendants' actions. She also requests the Court to mandate a weapon surrender from both Marlene and Justice Clark to ensure her safety and that of her family. The Plaintiff genuinely fears potential retaliation as a result of this federal complaint. It is in the public's best interest that anyone who has used firearms to harass and open fire on property should not be permitted to possess such weapons. especially while there is still unresolved issues between the parties in court..

Through these remedies, the Plaintiff seeks to hold Snohomish County accountable for its misconduct and to prevent future constitutional violations through changes in County practices, policies, and training.

**Snohomish County** is a **municipal government entity** organized under the laws of the State of Washington. It is responsible for the policies, customs, and practices of its departments and agencies, including the **Snohomish County Sheriff's Office, judicial staff, Adult Protective Services (APS),** and other officials acting **under color of state law. The County is sued under Monell v. Department of Social Services, 436 U.S. 658 (1978), for unlawful actions** and omissions committed through its institutional mechanisms.

The **denial of due process, retaliatory misuse of pending criminal charges, and systemic hostility toward self-represented individuals** described herein are not isolated missteps. They reflect an entrenched countywide policy or custom of **systemic bias, neglect, and procedural obstruction.** Pursuant to **City of Canton v. Harris,** 489 U.S. 378 (1989), and **Connick v. Thompson,** 563 U.S. 51 (2011), **such indifference constitutes municipal liability under 42 U.S.C. § 1983.**

**Skagit County Washington**, is a **municipal entity** responsible for its law enforcement, prosecutorial decisions, and related policies. It is liable under (**MONELL V. DEPARTMENT OF SOCIAL SERVICES**), 436 U.S. 658 (1978), for maintaining practices or failing to train and supervise personnel in a manner that resulted in malicious prosecution, unlawful credibility attacks, and deprivation of Plaintiff's constitutional rights.

**Plaintiff alleges Skagit County, through its agents and employees:** Filed and pursued criminal charges using character-based evidence from an unconstitutional Snohomish County search warrant; Relied on these charges to undermine Plaintiff's credibility in other proceedings from the outset; Ignored exculpatory evidence, including a recorded statement from Plaintiff's uncle—acting as her grandmother's Power of Attorney—affirming no crime occurred and that it was a family matter; Failed to investigate Plaintiff's reports of harassment and duress surrounding the vehicle lease they were accusing her of felony crimes on; Acted in concert with Snohomish County and private defendants to perpetuate a retaliatory pattern, leveraging the pending criminal matter to obstruct Plaintiff's credibility and undermining her ability to seek redress and have a meaningful hearing in multiple court matters. Ignoring credible, recorded witness statements affirming Plaintiff's innocence. Failing to investigate exculpatory evidence before charging Plaintiff. Relied on unlawfully obtained evidence and character assumptions derived from Snohomish County Washington search warrant..

**Skagit County further bears liability under**: Failure to train - (**CITY OF CANTON V. HARRIS**), (489 U.S. 378 (1989); Prosecutorial training liability - (**CONNICK V. THOMPSON**), (563 U.S. 51 (2011); Suppression or failure to disclose exculpatory evidence - (**GIGLIO V. UNITED STATES**), 405 U.S. 150 (1972); Malicious prosecution where charges are filed with malice and without probable cause - (**AWABDY V. CITY OF ADELANTO**), 368 F.3D 1062 (**9TH CIR. 2004**).

Skagit County, through its prosecutorial office and in coordination with the Washington Department of Licensing, caused Plaintiff's driver's license to be "revoked" as part of criminal case resolution, despite Plaintiff never having possessed or been issued a Washington State driver's license.

Plaintiff was never advised by defense counsel or Skagit County prosecutors that the revocation would extend beyond the one-year period represented at plea, nor that reinstatement obligations would be imposed for a license she never held.

This constructive revocation constitutes a deprivation of liberty and a property interest without due process of law in violation of the Fourteenth Amendment, as it was imposed without verification of an existing license, without meaningful notice, and without an opportunity to contest the penalty.

Skagit County's actions further harmed Plaintiff by enabling Snohomish County courts to weaponize the existence of pending Skagit charges, and then used them to discredit Plaintiff's testimony and impair her credibility in unrelated civil proceedings.

These acts were committed under color of state law and were part of the same retaliatory pattern alleged herein, reflecting deliberate indifference to constitutional safeguards, actionable under **42 U.S.C. §§ 1983** and **1985**, and **MONELL LIABILITY** principles.

**Marlene Sprague,** acting as an individual and joint actor with official defendants under color of law, played a critical role in perpetuating the retaliatory pattern against Plaintiff. She used fraudulent legal documents, including fabricated declarations and false statements presented to judicial authorities, to dispossess and isolate Plaintiff. Sprague's actions included abuse of Power of Attorney, coercion of vulnerable parties to support improper filings, and calculated misuse of court procedures. Her involvement directly contributed to the retaliatory deprivation of Plaintiff's property and access to public resources.

Sprague's fraudulent legal activity, in concert with official defendants, further illustrates the coordinated pattern of racketeering activity. Her calculated misuse of legal processes and personal involvement in fabricating evidence align with the broader scheme of using the judicial system as a weapon against Plaintiff.

Plaintiff further alleges that Defendant Marlene Sprague operated as a participant in a racketeering enterprise within the meaning of 18 U.S.C. § 1962(c) (RICO), committing and collaborating with both private individuals and municipal officials to carry out the following predicate acts: Mail fraud—disseminating false declarations and legal notices through state-authorized channels; obstruction of justice—manipulating filings and obstructing witness narratives to influence proceedings; witness intimidation—coercing dependents and relatives to support illegitimate claims; and deprivation of housing and property rights—orchestrating dispossession without lawful justification.

These actions were not isolated incidents but formed part of a coordinated and continuous pattern of conduct with municipal officials and other private parties acting in concert, aimed at undermining Plaintiff's constitutional protections and chilling access to the courts, continuing for over three years.

Sprague's conduct constitutes joint action under Dennis v. Sparks, 449 U.S. 24 (1980), liability under Fogel v. Collins, 531 F.3d 824 (9th Cir. 2008) for private actors operating under state authority, civil conspiracy under 42 U.S.C. § 1985(3), and predicate liability under 18 U.S.C. §§ 1961, 1962(c), and 1964(c). This integration of private misconduct with official misconduct forms part of the overall racketeering enterprise, aimed at retaliating against Plaintiff and depriving her of her constitutional rights and property interests.

**Justice Clark,** is sued in his **individual capacity**. Clark acted as a private actor operating **under the color of law** through **joint participation with municipal agents**, including law enforcement officers and co-defendants Marlene Sprague and Darlene Rosenquist. Clark played a **central role** in a coordinated campaign of harassment, intimidation, and retaliation designed to dispossess Plaintiff, suppress court access, and deprive constitutional protections.

**Clark's conduct includes but is not limited to:** Joint action under (**DENNIS V. SPARKS**), 449 U.S. 24 (1980) Liability under (**FOGEL V. COLLINS**), 531 F.3D 824 (9TH CIR. 2008) -for private actors operating under that authority Civil conspiracy under **42 U.S.C. §1985(3) RICO** predicate liability under **18 U.S.C. §§ 1961. 1962(C), and 19649(c); Weaponization** of emergency services, including knowingly false and coercive 911 reports that led directly to the Plaintiff's unlawful arrest and incarceration; Use of **armed violence**, specifically **firing a rifle seven times into Plaintiff's vehicle** following Plaintiff's arrest—a **retaliatory act under color of law meant to terrorize**. Coordination with law enforcement to **Surveil and intimidate**; Enabling and coordinating acts of **surveillance and retaliation with local law enforcement and private parties;** Manipulation of legal filings and reports to provoke state action against Plaintiff and **chill Plaintiff's court access and housing stability; Sending these documents through the mail constitutes a predicate act of RICO liability under 18 U.S.C. §§ 1961. 1962(C) and 1964.**

Plaintiff further alleges that Defendant Clark operated as an **active participant in a racketeering enterprise within the meaning of 18 U.S.C. § 1962(C)**, in concert with official and unofficial actors and private co-defendants.

**The enterprise engaged in Mail Fraud** - Including false filings, deceptive communications, and use of the official mail system to support illicit court actions. **Obstruction of Justice & Witness intimidation** - including physical threats, retaliatory conduct, and tampering with witness access and statements. **Civil Rights Violations** - Including armed intimidation, coercive filings, and deprivation of housing and property without lawful justification.

**These actions:** Meet the criteria for joint action under (**DENNIS V. SPARKS**), 449 U.S. 24 (1980) and (**WEST V. ATKINS**), 487 U.S. 42 (1988). Support conspiracy liability under (**FOGEL V. COLLINS**, 531 F.3D 824 (**9TH CIR. 2008**) Constitute predicate acts under **RICO** statutes **18 U.S.C. §§ 1961(1), 1962(C), 1964(C)**. Violate Plaintiffs' **First, Fourth, and Fourteenth** Amendment rights under **42 U.S.C.** § 1985(3) (**GRIFFIN V. BRECKENRIDGE**, 403 U.S. 88 (1971).

**Darlene Rosenquist** acted as a **private individual and joint participant** with her sister Marlene Sprague, Justice Clark, and municipal agents. This coordinated campaign of harassment, dispossession, and retaliation works in **concert with municipal employees** and **law enforcement agents.** Her conduct includes: Participating in threats, intimidation, and verbal hostility directed at Plaintiff and vulnerable parties; Initiating property-related actions, including support for dispossession efforts and false tenancy claims; Abuse of court processes, including coordinated filings, retaliatory reports, and manipulated evidence; Enabling violence and surveillance, by signaling law enforcement involvement and contributing to an environment of harassment, collaborating with state actors under the color of law to isolate Plaintiff from housing, legal resources, and familial support

**Rosenquist's actions constitute:** Joint action under (**Dennis v. Sparks**), 449 U.S. 24 (1980), and (**West v. Atkins**), 487 U.S. (1988); **Conspiracy under 42 U.S.C.§ 1985(3)**, for depriving Plaintiff of equal protection and court access; **Mail fraud,** via false filings and communications supporting fraudulent legal action; Witness intimidation and **obstruction of justice**, including threats and retaliatory acts tied to Plaintiff's legal participation; **Threats to kill/violence** and civil process to dispossess and isolate Plaintiff, violating constitutional protections and federal criminal statutes; **RICO** liability under **18 U.S.C. § 1962(c)**, including participation in predicate acts such as mail fraud, obstruction of justice, and deprivation of constitutional rights

**Plaintiff further alleges that Does 1–10** are unknown agents whose conduct, when identified, will demonstrate conspiracy or joint action to deprive Plaintiff of federally protected rights. These individuals, acting in concert with named Defendants, participated in retaliatory actions, contributed to the pattern of harassment, and engaged in unlawful conduct under color of law. Plaintiff reserves the right to amend the complaint to name these individuals once their identities and specific actions are fully ascertained.

**JURISDICTION AND VENUE. JURISDICTION** This Court has subject matter jurisdiction pursuant to **28 U.S.C. § 1331**, as Plaintiff asserts claims arising under the Constitution of the United States and federal law, including **42 U.S.C. §§ 1983 and 1985**, and the **First, Fourth, Fifth, and Fourteenth Amendments.** Jurisdiction is further supported under **28 U.S.C. § 1343(a)(3)-(4)**, as this action arises under federal civil rights laws and **RICO** statutes.

Plaintiff also invokes supplemental jurisdiction under **28 U.S.C. § 1367** for related state law claims—including intentional infliction of emotional distress (IIED), abuse of process, and malicious prosecution—which arise from the same nucleus of operative facts.

Defendants Marlene Sprague, Justice Clark, and Darlene Rosenquist are individually liable under **§§ 1983, 1985(3), and 18 U.S.C. § 1962(c)** for acting in concert with state officials and agencies to deprive Plaintiff of constitutionally protected rights.

As held in *O'Handley v. Weber, 62 F.4th 1145 (9th Cir. 2023)*, joint action may be shown through conspiracy or willful participation with state actors. Defendants' use of official procedures, collaboration with law enforcement, and coordinated retaliation satisfy this standard.

All relevant events—including unlawful searches, retaliatory filings, deprivation of housing, and coordinated misuse of judicial and law enforcement procedures—occurred within the territorial jurisdiction of this Court. Plaintiff's claims are neither frivolous nor insubstantial, and arise under well-established federal law, including **18 U.S.C. § 1962(c) RICO, 42 U.S.C. §§ 1983 and 1985, and the First, Fourth, Fifth, and Fourteenth Amendments.**

The Court therefore has jurisdiction under the substantial federal question doctrine, as recognized in *Bell v. Hood*, **327 U.S. 678 (1946)**, and its progeny. Venue is proper under **28 U.S.C. § 1391(b)**, as all acts and omissions giving rise to this action occurred in Snohomish and Skagit Counties, Washington, both within the Western District of Washington.

Defendants Marlene Sprague, Justice Clark, and Darlene Rosenquist are individually liable under **§§ 1983 and 1985**, and **18 U.S.C. § 1962(c) RICO** for acting in concert with state officials and agencies to deprive Plaintiff of constitutionally protected rights.

**The Ninth Circuit holds that: [a]** plaintiff can show joint action either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents". **O'Handley v. Weber, 62 F.4th 1145, 1159 (9th Cir. 2023) (quoting Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1140 (9th Cir. 2012)).**

Defendants' use of official state procedures, collaboration with law enforcement, and coordinated efforts with state actors satisfy the joint action requirement under federal law.

**Statute of Limitations Compliance** Plaintiff's claims under **42 U.S.C. § 1983** and **§ 1985** are timely filed within the applicable statute of limitations under Washington law. Under *Wilson v. Garcia*, *471 U.S. 261 (1985)*, federal courts adopt the state's personal injury statute of limitations for **§ 1983 and § 1985 claims.** Washington State law (**RCW 4.16.080**) provides a three-year limitations period for personal injury actions. The federal "discovery rule" governs accrual: claims accrue when the plaintiff knew or should have known of the constitutional injury (*Wallace v. Kato*, *549 U.S. 384 (2007)*; *McDonough v. Smith*, *139 S. Ct. 2149 (2019)*).

Plaintiff's claims arise from a continuing pattern of retaliation, harassment, and coordinated misconduct spanning from September 2022 through at least July 2025, as documented in Exhibits 1 - ___.

Specific predicate acts—including threats, false filings, surveillance, and obstruction—occurred within the three-year window and are part of a coordinated enterprise under **§ 1985(3)** and a municipal custom or policy under *Monell v. Dept. of Social Services*, *436 U.S. 658 (1978)*.

Plaintiff reserves the right to assert equitable tolling or **the continuing violation doctrine** if necessary, based on ongoing retaliation and concealment of misconduct. Accordingly, all claims under **§§ 1983 and 1985** are timely filed and properly preserved for adjudication.

**VENUE** Venue is proper in the United States District Court for the Western District of Washington pursuant to **28 U.S.C. § 1391(b)**, as all events, injuries, and violations described herein occurred in Snohomish County, Washington, and all named Defendants reside or conduct regular business within this judicial district.

**FACTUAL ALLEGATION Pattern of Harassment and Joint Private-Government Misconduct** Plaintiff alleges that Marlene Sprague and Justice Clark instigated and directed the use of Snohomish County law enforcement and protection order processes, working in concert with public officials to orchestrate Plaintiff's removal from her home and the deprivation of her property. Justice Clark repeatedly engaged law enforcement in coordinated, pretextual calls to trigger police action, resulting in Plaintiff's arrest and property damage. These actions were not isolated, but formed part of a continuous, strategic collaboration between private parties and state actors

### Defective Search Warrant and Unlawful Entry/Property Seizure:

Deputy Mozeak (#1663) executed the search at 4232 142nd St, Lake Stevens, WA, using a search warrant that lacked a valid judicial signature. Under Washington State law and procedural standards—specifically CrR 2.3(c)—an emailed or electronically approved search warrant must include a judge's digitally certified signature. Additionally, all related email communications approving the warrant must be attached to every copy served or filed. The absence of these elements rendered the warrant procedurally invalid at the time of execution.

Plaintiff and homeowner Alan Sprague requested to see the warrant at the time of arrest but were denied access. The warrant was only taped to the door after the search was complete, and it still lacked the necessary judicial signature and supporting emails. This foundational defect rendered the subsequent entry, property seizure, and arrests unlawful under both federal and state law

Plaintiff and the homeowner requested to see the warrant at the time of arrest, but was denied access. Homeowner Alan Sprague came home shortly after it began and had to get out and walk from the street down our driveway to be able to see what was going on.

Alan demanded to see a warrant and called 911 on the officers when they failed to present a warrant and refused to leave the property. The warrant was only taped to the door after the search was completed and it lacked the required judicial signature and supporting emails. Despite the absence of the essential elements, law enforcement executed the search with extreme and unnecessarily force.

Approximately ten Sheriffs vehicles blocked the only road in and out of the plaintiff's dead-end neighborhood, arriving as sunset with emergency lights engaged, and using a **megaphone** requesting that 4232 come out with their hands up, creating an overwhelming and alarming display. The presence of multiple deputies standing in formation and illuminating the entire neighborhood created a false impression of a major crime event, damaging the plaintiff's reputation in her community.

The excessive show of force **traumatized the plaintiff**, **intimidated neighbors, and marked the beginning of an escalation of targeted harassment facilitated by the County and private Defendants, contributing to a cascading pattern of harassment, procedural obstruction, and legal destabilization that continues to this day**.

Despite the absence of a valid warrant, Law enforcement proceeded to **search the plaintiff's property, seized personal items, and arrested both the Plaintiff and her partner.** Officers also **seized personal property,** including a laptop, cell phone, and plaintiff's purse. The warrant and witness statments from

Alan and Tamera Farler are attached in **[EX Decl PACK]** as well as the warrant and inventory list and a few officers reports that assisted in the search is attached as **[EX 1 & 2].**

Her vehicle was not in plaintiffs name that her aunt had gifted her. This however was **not shown on the warrant inventory list**. The vehicle was not taken by officers until **an hour after** they left and they actually used plaintiffs keys to **start the car and move it on to the street out front of the home**. So it was not on private property and the tow truck driver would tow it to the precinct pending search warrant.

**Abuse of Process** - County tolerance of procedural invalid warrants and property seizures shows miss use of subpoenas, declarations, and emergency motions as tools of retaliation. **Fourth Amendment right to bee free from unlawful search, seizure, and deprivation of property** as protected by **Soldal v. Cook County, 506 U.S. 56 (1992), and Brewster v. Bd. Of Educ., 1449 F.3d 971 (9th Cir. 1998)**

**Legal Standards:** The Fourth Amendment protects the home as "first among equals" for warrant requirements (Florida v. Jardines, 569 U.S. 1, 6 (2013)). **Warrantless searches are per se unreasonable** unless a narrow exception applies. Here, no exception is applicable – the officers were ostensibly acting under a warrant, so the search stands or falls on that warrant's validity. **An unsigned warrant is no warrant at all**: it indicates that a neutral magistrate never made a probable cause determination or issued authorization. Washington law (CrR 2.3) and federal law alike demand that a warrant be issued by a judge; executing a search on an unsigned warrant violates the Fourth Amendment (Groh v. Ramirez, 540 U.S. 551, 557–58 (2004), holding a warrant invalid on its face cannot justify a search and officers cannot rely on it in good faith). In Plaintiff's case, because the "warrant" lacked a judge's signature, the search of her home was **unreasonable as a matter of law** – the complaint clearly alleges this facial defect and states that officers knew of it No exigent circumstance or consent excused the warrant requirement, and indeed officers did not even pretend an exception they simply ignored the defect and searched anyway.

Additionally, **seizure of Plaintiff's car** was an independent **Fourth Amendment violation**. Removing a vehicle from private property and impounding it constitutes a meaningful interference with possessory interests, i.e. a seizure (Soldal v. Cook County, 506 U.S. 56, 61 (1992) They invented a pretext of "abandonment" – an outright **falsehood**, as the complaint details – solely to circumvent the warrant requirement. This conduct violated Plaintiff's **clearly established rights**: no reasonable officer could believe it lawful to take a citizen's vehicle under a fictitious rationale without due process or probable cause (Taylor v. City of Saginaw, 922 F.3d 328, 332–33 (6th Cir. 2019) – using charade of chalking tires without proper authority).

**RICO (18 U.S.C. 1962 (c)):** Public spectacle created during the execution of this operation caused a domino effect of Harassment and being personally targeted by private parties. This ultimately grew into an association in fact enterprise with a coordinated network of public officials (Snohomish County & Skagit County actors) and private individuals (Marlene, Darlene, and Justice Clark).

This also ties in to the 1985 Conspiracy claims because the taking of the vehicle an hour after they had already left the home and after realizing they had the keys to the car that were in plaintiffs purse.

**Ongoing Malicious/Retaliation-based charges by Snohomish County.** Despite the warrant's **procedural invalidity**, Snohomish County continues to **pursue criminal charges against Plaintiff** based on items seized during the raid. Discovery confirmed the **absence of a judicial signature and required email correspondence.**

These charges were initiated only after retaliatory reports and allegations from **private Defendants**, forming part of a broader **enterprise aimed at silencing Plaintiff for asserting her constitutional rights while acting under color of law.** See **[EX UD PACK] -** this pack of documents involves both unlawful detainier cases filed on Plaintiff Stephanie Farler, including the April 11, 2025, Declaration from Marlene Sprague where she admits to having continued contact with prosecutors and her intentions to have Stephanie charged. Marlene has also made multiple statements to Plaintiff Stephanie Farlers mother while

visiting their home that she will make sure that Stephanie goes to jail for what she is doing. Statement of Tamera Farler is attached in **[EX Decl PACK]**.

**Targeted Harassment Emboldened Public Spectacle of Law Enforcement** Immediately following the **September 16, 2022**, search, Plaintiff began experiencing targeted harassment from neighbor Justice Clark, who appeared emboldened by the public spectacle created by law enforcement. Clark made repeated reports to police (See **[EX POLICE REPORT PACK])**, engaging in verbal harassment, and issued threats involving firearms towards the plaintiff. See **[EX 5,6,8, 17, 21b, and 22]**

Plaintiff has meticulously documented the majority of incidents described in this complaint through upgraded home surveillance systems, cell phone audio and video recordings, and comprehensive records of all court filings and proceedings. In addition to preserving physical evidence such as still shots, transcripts, and hundreds of pages of supporting documentation, Plaintiff has purchased official recordings of each court hearing directly from the court's website to ensure an unalterable record of the coordination and conduct of the named Defendants.

Each date referenced in this complaint is supported by corresponding exhibits, and Plaintiff has limited the attached evidence to what is necessary to substantiate the allegations pled. During discovery, Plaintiff intends to produce the full body of documentation, issue subpoenas to relevant witnesses and county officials, and introduce additional audio/video recordings, transcripts, and physical exhibits as permitted by law.

Plaintiff's residence is clearly posted with multiple **"No Trespass"** and **"You're being audio and video recorded"** signs, both at the property perimeter and at the entry point. These signs were in place prior to the recordings and are visible in photographs that will be submitted during discovery. Accordingly, **all recordings were made lawfully and are admissible under Washington law.**

Despite this extensive documentation, law enforcement—already predisposed against Plaintiff due to their own unlawful and highly publicized conduct—repeatedly acted on unverified and retaliatory reports initiated by Justice Clark and others. These actions furthered the campaign of harassment and intimidation, contributing to the **systemic destabilization of Plaintiff's life and violating her rights under the First, Fourth, and Fourteenth Amendments.**

**MAY 22, 2023 - Once-in-a-Lifetime Employment Opportunity Destroyed by State-Sanctioned** **[EX 3 Boeing Email]** - Alexandra carnes and Stephanie Farler. After the unconstitutional raid and arrest on September 16, 2022, Plaintiff was offered a rare and life-changing opportunity. Employment at Boeing, one of the largest aerospace companies in the world. Despite the trauma of the recent incident, Plaintiff successfully completed multiple interviews, a full background check, and a drug screening, ultimately receiving a formal employment offer.

At that time, Plaintiff had no felony record and had worked diligently to rebuild her life, secure stable housing, and pursue a meaningful career. However, the continuing harassment, false charges, and retaliatory policing—all of which were set in motion by the unlawful warrant execution—systematically destroyed every aspect of Plaintiff's stability.

In the fall of 2023, Plaintiff's car was inoperable and could not be repaired due to ongoing harassment and threats from Defendant Justice Clark and constant, intimidating police presence at Plaintiff's home. see **[EX INCIDENT REPORT PACK]**, including all reports I have received from records requests so far. Each time Plaintiff attempted vehicle repairs or arrangements, Defendant Clark would initiate contact or call law enforcement, resulting in further stress, confrontation, and fear for Plaintiff's safety. (See **[EX 10 Transcript/harass with Scotty]**)

The night before my start date to begin employment at Boeing. documenting harassment during detrimental vehicle repair. As a direct result of these ongoing threats and an urgent need to retain a rare

and potentially life-changing employment opportunity at Boeing, Plaintiff, under severe duress and emotional pressure, leased a car in Skagit County for zero down. Using her employment letter and her grandmother as co-signer. Exhausting all other resources before being forced to commit to the purchase and unwanted monthly payments that came with the purchase.

Plaintiff was given the keys and was suddenly called days later and asked to return the car because the bank decided not to honor the loan. After researching this plaintiff found that this is not that unusual and there are people all over the world that have experienced the same thing after believing that they were already signed in to a contract. Dealerships do this for multiple reasons.

The car was returned to the lot. They reported the vehicle as stolen because the plaintiff lived in a neighboring county and was not able to arrange a ride back home after she returned the car to them instantly upon there request.

There was a sheriff who contacted Plaintiff to inquire about the situation regarding the vehicle. They informed her that it had been reported as stolen by the lot, and if she were to drive it, there was a significant risk that she would be pulled over with firearms drawn and subsequently apprehended. Consequently, she arranged for the officer to retrieve the vehicle and transport it back to the lot alongside the sheriff. This is precisely how the vehicle was returned, and the zero down payment facilitated its return without incurring substantial losses or investments.

Skagit County formally accused the plaintiff of motor vehicle theft and first-degree identity theft in connection with the returned car lease, notwithstanding exculpatory evidence and the family's unwavering assertion of innocence.

Prosecutors disregarded the evidence presented by the Plaintiff and her uncle, resorting to intimidation through the imposition of excessive sentencing threats. Consequently, the Plaintiff was compelled to enter a plea due to the overwhelming burden of prolonged litigation, instability in her circumstances because the Snohomish County courts had repeatedly refused to place any type of protective measures on the harassers causing plaintiff suvere duress and emotional distress. The fear for her safety and well being was in serious question and the courts had refused it because of "Credibility". This unfortunate series of events culminated in her house arrest, the forfeiture of her employment, and the enduring stigma of a felony record. See **[EX Skagit pack]**

All acts alleged were executed intentionally, recklessly, or with deliberate indifference to the Plaintiff's constitutional and statutory rights. As a direct consequence of the Defendants' actions and omissions, the Plaintiff has endured and continues to endure profound losses, including the deprivation of housing, career opportunities, educational prospects, familial connections, emotional well-being, and equitable access to justice.

The vehicle lease constituted the sole viable means for the Plaintiff to consistently commute to work after exhausting all alternative options. The stress and duress that precipitated this transaction were directly instigated and exacerbated by the orchestrated campaign of harassment, intimidation, and legally sanctioned exclusion delineated above. (The Plaintiff intends to subpoena this recording as evidence during the discovery phase.)

The plaintiff was ultimately subjected to wrongful charges and prosecution, thereby jeopardizing her capacity to sustain employment at Boeing. Her employment was forfeited—not due to any misconduct on her part—but as a consequence of governmental malfeasance and orchestrated harassment by private entities, **emboldened by law enforcement.**

This lost opportunity signifies far more than mere financial compensation—it epitomizes the fracturing of the Plaintiff's existence, aspirations, and autonomy, brought by the unconstitutional abuse of authority. Boeing had chosen the Plaintiff based on her qualifications and merit, affirming her suitability for the

position. Yet, the stigma and criminalization engendered by the unlawful actions of the State and its accomplices obliterated her prospects for a fresh start.

**July 31, 2023 - Coordinated Trespass Incident and Retaliatory Notice to Vacate** On **July 31, 2023,** law enforcement in Snohomish County responded to a 911 call placed by Malene Sprague, reporting the presence of "*squatters on property in front yard*." This phrase is documented in the official Incident Report A-2, timestamped at 11:51 AM, and signifies the **inaugural recorded instance of collaboration between Justice Clark and Marlene Sprague.**

Plaintiff and other residents had graciously welcomed guests into their domicile, eliciting no objections from the homeowner, Alan Sprague, or the other inhabitants. However, Marlene Sprague and her family harbored a protracted personal animosity towards these guests that had persisted for over two decades.

Marlene arrived at the property shortly before noon, equipped with pre-printed "No Trespassing" signs, a roll of tape, and wooden stakes—an indication of her meticulous planning and deliberate intent. Notably, **she was devoid of her holstered firearm**, a detail that the Plaintiff found particularly peculiar, considering her customary behavior. This absence suggests that **she anticipated a police presence** and orchestrated the encounter with forethought.

Marlene refrained from entering the residence, opting instead to immediately affix signs and contact 911 to report alleged trespassers. The police arrived in substantial numbers, forcibly removing the guests despite the absence of prior complaints or disturbances. The Plaintiff remained indoors with her two young children, observing the incident unfold through home surveillance cameras in an effort to shield them from the escalating altercation.

The subsequent day, on **August 1, 2023,** Marlene returned and presented the Plaintiff with a **Notice to Vacate,** dated **July 31, 2023,** thereby **directly linking the eviction attempt to the previous day's orchestrated police action.** See **[EX 4 Notice to Vacate]**

Marlene invoked a "*family contract*" as the justification for the Plaintiff's expulsion, yet she conceded that she was permitting the Plaintiff's brother and niece to remain—**illuminating a pattern of selective enforcement and discriminatory intent.** The Plaintiff confronted Marlene regarding the timing, preparation, and collusion with Justice Clark, asserting that a neighbor had apprised her of the guests' presence and that Marlene's actions constituted a component of a mutual accord to extricate individuals from Alan's life in exchange for reciprocal concessions.

This incident heralds the inception of a **meticulously orchestrated campaign aimed at undermining the Plaintiff's residential stability, thereby substantiating allegations of conspiracy, retaliation, and abuse of process under both federal and state statutes. Refer to [EX 8 Police Report Pack] A-2 (July 31, 2023)**, which documents the police report detailing Marlene Sprague's call and her **use of the term "squatters."**

**Aug 1, 2023 - Evidence of Coordination Between Marlene Sprague and Justice Clark** Although Marlene Sprague was the individual who initiated the 911 call on **July 31, 2023,** it was Justice Clark who **apprised her of the presence of a vehicle** belonging to the targeted guests in the driveway—prompting her arrival and the ensuing trespass report. Marlene arrived with **premeditated** signage, adhesive tape, and stakes, and commenced affixing "No Trespassing" signs before anyone within the residence was cognizant of her presence. **This degree of preparation suggests a calculated intent and external collaboration.**

Subsequent to the departure of law enforcement, the **Plaintiff observed Marlene engaging in direct discourse with Justice Clark,** thereby affirming their complicity and mutual interest in expelling the guests. This interaction went unnoticed by others; however, the Plaintiff recognized it as a **pivotal moment elucidating the underlying conspiracy.**

During a conversation the following day (**August 1, 2023**), Marlene conceded to the Plaintiff that her actions were not exclusively motivated by her mother's coercion but were also **significantly swayed by the neighbor, Justice Clark.** This revelation was made as Marlene turned away, further substantiating the **collusive nature** of the campaign to displace the Plaintiff and her associates from the property.

These circumstances elucidate a **pattern of orchestrated conduct between Marlene Sprague and Justice Clark**, aimed at manipulating law enforcement and property rights to fulfill personal and **retaliatory objectives.**

**August 12, 2023 - Surveillance, Verbal Abuse, and Threats by Justice Clark** Plaintiff recorded this as it happened on her phone and home camera system. It happened on the shared property line during the day. **This is [EX 5 Transcript Aug 12 2023].**

On **August 12, 2023,** the Plaintiff was engaged in the act of cleaning her vehicle in the driveway of her residence during the evening hours when Justice Clark approached the property line and commenced a tirade of verbal harassment. This encounter was documented on video, marking the inception of the Plaintiff's awareness that Justice Clark was systematically surveilling her movements and daily routines. (*The Plaintiff intends to submit all video and audio recordings corresponding to each transcribed document during the discovery phase.*)

During the exchange, Justice Clark alluded to the Plaintiff's interactions with guests who had been trespassed on July 31, 2023, asserting: I observe you interacting with them consistently. He further remarked:

> "*I see you. I see you up until three in the... I see you.., and then you at like 7 or 8.*"

In response, the Plaintiff retorted:

> "*You're starting to stalk me now, it feels like.*" Justice Clark shot back with hostility: "*I'd be out of my mind to fucking stalk something like you. You gotta be kidding me!*"

The Plaintiff noted his intimate familiarity with her daily schedule, to which Clark responded with increased aggression and denial:

> "*When was I shooting my gun? Prove that I was shooting my gun! You cannot prove anything I had my gun. Prove in court.*"

When the Plaintiff inquired,

> "*Are you threatening me?*"

Clark escalated the confrontation further:

> "*Prove it in court. I can't even converse with you, you deranged woman. I intend to report you to the city regarding your residence there as well.*"

This incident underscores a troubling pattern of **stalking, intimidation, and retaliatory threats,** bolstering the Plaintiff's assertions of **emotional distress, retaliation, and the deliberate indifference** exhibited by county officials who **neglected to intervene or provide protection.**

### Aug 16, 2023 - Anti Harassment order Stephanie Farler Justice Clark No. 23-2-05904-31

Plaintiff initially filed a protection order in the Cascade District Court; however, it was promptly transferred to the Superior Court on the grounds that it pertained to property matters and fell outside their jurisdiction. I am omitting this Petition from this section of the complaint to avoid redundancy in

documentation, as I have included the complete petition in the supporting evidence of subsequent filings. Therefore, I will reference this petition accordingly.

## Aug 25, 2023 - Justice Clark's reply to Protection order No. 23-1-05904-31

### [EX 6 Aug 25 JC Reply]

**This exhibit is material to the following counts:**

- **First Amendment Retaliation (42 U.S.C. § 1983):** Clark's retaliatory request that the Court dismiss Plaintiff's petition and impose a restraining order demonstrates an effort to suppress protected petitioning activity

- **Civil Conspiracy (42 U.S.C. § 1985(3)):** The statements align with and support coordinated efforts by Defendants Sprague and Rosenquist to remove Plaintiff from her home and obstruct her legal remedies.

- **RICO (18 U.S.C. § 1962(c)):** Clark's admission of carrying a firearm in connection with disputes constitutes predicate intimidation and supports the pattern of racketeering activity.

- **Intentional Infliction of Emotional Distress (IIED):** The derogatory, malicious accusations and armed intimidation amount to extreme and outrageous conduct causing severe emotional harm.

- **Defamation / Reputation Harm:** The false claim that Plaintiff was "charged with identity theft" is defamatory per se, designed to damage Plaintiff's reputation and credibility.

- **Abuse of Process:** Clark's misuse of the protection order process to seek retaliatory court orders against Plaintiff demonstrates improper legal purpose.

- **Monell Liability:** County's tolerance of these actions, despite clear admissions of firearm intimidation and harassment, reflects deliberate indifference to constitutional violations.

### Purpose of Exhibit

This filing serves as direct evidence of retaliation, defamation, armed intimidation, and abuse of process by Justice Clark, and corroborates Plaintiff's claims of coordinated harassment and conspiracy involving both private actors and public officials.

**In Justice Clark's reply to this petition, he writes:**

> "That's also what my neighbor Spencer and his mom Melissa talked to me about. They live across the street, up on the hill, looking down."

> "**I have called the authorities quite a few times for disturbing the peace.**"

> "**I always carried my Pistol went outside at night**, was scared, you know? **Big note here. Stephanie has been charged with identity theft. We looked it up.**"

> "We're being **normal, noisy, disrespectful degenerates.** Had to get out of bed and **tell them to shut the F up and did say distasteful thing.**"

> "**I do not necessarily watch her,** just have to hear everything she does during quiet times."

> "Did not and have not yelled at anyone pulling into Alan's place."

> "Did not yell at Stephanie's brother and shouting insults at everyone I see on Alen's property. All not true."

> "Was not lighting fireworks and **nor have I ever shot a gun outside my place, Stephanie. Has no place of her own. The only property she has is a car.**"

"Don't recall lighting fireworks. **Stephanie is quite comfortable in her tiny home, all self-entitled, and she parks wherever convenience looks like.**"

**"Did say I'll get my dogs out next time her dog walk wakes me up."**

"Says she doesn't feel comfortable in her **8 x 8. She's had lavish amounts of time to upgrade. Not even legal to be staying in an 8 x 8 with children in a tool shed in city limits.**"

"Mom needs to retract something, and **Alan needs to follow through with a restraining order.** I am pleading for the court to dismiss this and put a restraining order on Stephanie and William's girlfriend."

"**It's time Stephanie gets her own place. She is a parasite nuisance, greatly taking advantage of a weak, feeble old man** who seems like a decent individual."

"**Stephanie. Prevocational, vexatious, gaslighting. Manipulative bully.**"

"**Stephanie doesn't have to protect herself. Absurd and stress, Stephanie lives for free and will defend that to no end. And her mom is like her 24/7 babysitter.**"

### Aug 27, 2023 - Justice Clark "Barking" aggressively - Harassment/Intimidation

**ᗪᗄᏃᏗᎷᎩ' Barking J C]**

In this recording, you hear Justice Clark screaming and barking like a dog aggressively at the property line. Plaintiff's two young children and her dog, and she were all watching a movie in her room while this began to take place. Plaintiff stayed with the door locked, and the kids helped her keep the dog calm. there was a surrounding neighborhood dog barking off in the distance.

"**Yeah, you fuckin' do like it, you fuckin' ass fuck.**"

"**Shut your fucking dog up.**"

"**Shut your fuckin' dog up", "shut the fuck up. Put your fuckin' dog in." "Don't leave your barking piece of shit out.**"

## Aug 29, 2023 Notice of Hearing No. 23-2-05904-31

**[EX ⊋ Notice of Hearing/ Events and Hearings printout].**

The Superior Court received this matter, and Jacklyn Brudvik scheduled a hearing for **September 11, 2023.** Furthermore, she marked the Domestic Violence checkbox instead of the Anti-Harassment order, thus altering the nature of the protective measure without formally requesting or even notifying the involved parties. This action supports the **Monell claims.**

## September 7, 2023 - Homophobic slurs, Verbal Harassment, Retaliation for filing a petition for protection on Justice Clark.

**[EX ⅀ Transcript w/scotty]**, and Incident Report from it.

This transcription captures a **hostile** and profanity-laced confrontation initiated by defendant Justice Clark. The exchange includes threats of violence, homophobic slurs, verbal harassment, and attempts to provoke physical altercations. Plaintiff and witnesses attempted to de-escalate while Clark continued to shout insults and intimidate. Alan Sprague intervenes to defend Plaintiff and threatens to call law enforcement.

This recording supports claims under:

- **42 USC 1983** Deprivation of peaceful enjoyment and safety under color of law;
- **42 USC 1985(3)** Conspiracy to intimidate and retaliate against protected activity.
- **RCW. 9A.36.080**. Felony harassment;
- **RCW 7.105. Point** 010-020 Civil protection order eligibility;
- **RCW 4-24-603**. Interference with property and privacy;
- **18 USC** section **1962(c)** Rico predicate acts, including intimidation and obstruction.

The original recording remains in possession of the plaintiff and will be included in discovery.

Some specific quotes from this transcription are:

- Justice Clark: "**Yeah, that helped her case, you moron.**"
- Stephanie Farler: "**Stop calling people names.**"
- Justice Clark: "**No. Uh, I'm going to sit out here. No, you're going to sit out here and fucking disrupt my sleep.**"
- Justice Clark: "**I'm. Going to sit out here and talk to you and irritate you.**"
- Justice Clark: "**I'll have a beer. You drink some poison.**"
- Justice Clark: "**Good Scotty, I, I just thought of something, I want to suck your dick, dude.**"
- Stephanie Farler "**What a weirdo.**"
- Justice Clark: "**Fuck Scotty, instead of fighting you. I want to suck your dick.**"
- Justice Clark: "**Oh, no, no, no, not me fighting you.**"
- Justice Clark: "**Uh huh. You were. Uh-huh. Yep. I'm going to sit out here and talk to ya**"
- Justice Clark: "**Hey, you shut the fuck up about my daughter, Scotty.**"
- Stephanie Farler: "**She's obviously not there tonight cause you're acting like a fucking maniac.**"
- Justice Clark: "**Scotty faggot.**"
- Stephanie Farler: "**Cause you don't act like a maniac when she's around.**"
- Justice Clark: "**What's that about my daughter, scotty faggot?**"
- Justice Clark: "**Fuck you want to talk about my daughter faggot?**"
- Stephanie Farler: "**he didn't say anything bad. He said nothing bad.**"
- Justice Clark: "**Is that mom's over there with the flashlight?**"
- Stephanie Farler: "**Probably. Who cares?**"
- Justice Clark: "**Sorry, Mom. Your daughter's acting like a freaking noisy delinquent.**"
- Stephanie Farler: "**You know what, Mother?**"
- Alan Sprague: "**She needs her car. For work, I don't see you. But I hear you out here. His bucket needles along alright. I'm tired, so tired against this. I've been sick for four days. I don't feel like coming out here. Listening to you, but you know, because she's trying to get her car fixed. Understand me? If you don't, I'm calling the cops and having you arrested.**"
- Justice Clark: "**Call the cops.**"

## Sept 11, 2023 - Obstruction by procedural irregularities and Judicial hostility No. 23-2-05904-31

**[EX 1ᗡ Court transcript No.23.2.05904-31]**

Plaintiff possesses the procured court record of this hearing, which will be submitted during the discovery phase. On **September 11, 20203**, Plaintiff appeared before Commissioner Harness to seek protection against Justice Clark, citing persistent threats, surveillance, and harassment. Notwithstanding Plaintiff's sworn testimony and the presentation of video evidence on a flash drive—previously partially reviewed by the Cascade District Court—Commissioner Harness declined to consider it, asserting, **"This court has a process regarding how, if you want me to consider videos...you must provide an explanation...why it could not be accomplished through transcription. I generally do not accept video evidence."**

Rather than granting temporary protection or acknowledging Plaintiff's declarations and supporting media, the commissioner imposed a burdensome and inequitable procedural demand, necessitating Plaintiff to demonstrate the transmission of the flash drive between courts, secure a third-party transcription, and justify any failure to do so. Harness further indicated that Plaintiff was **"put on notice"** that a failure to substantiate the flash drive's history would result in "assessing your credibility," despite prior judicial acknowledgment of the evidence.

The court did not impose analogous requirements on the opposing parties and referenced unrelated pending charges in Skagit County to undermine Plaintiff's credibility, which were irrelevant and inadmissible in this context. No protection order was issued, leaving Plaintiff vulnerable to ongoing retaliation as the court misapplied standards, dismissed testimonies, and delayed protective relief through excessive bureaucratic obstacles.

**These actions exemplify:**

- A denial of access to the court under the First Amendment.
- Discriminatory and retaliatory treatment in violation of the Fourteenth Amendment's Equal Protection Clause.
- An improper conspiracy between private and public actors under **42 U.S.C. § 1985(3).**
- Municipal liability under **Monell v. Dep't of Social Services,** 436 U.S. 658 (1978), due to systemic training deficiencies and a tolerance of biased adjudication.

The court also mandated that Justice Clark submit a financial loss statement, stating, **"In the off chance that we are all on a rabbit chase here, I would like you to provide a declaration of any fees you may have incurred for lost wages today."** This demonstrates an egregious and deliberate indifference to Plaintiff Stephanie Farler's safety and well-being in the face of severe retaliation and harassment involving intimidation with a weapon, all before any party had presented their case to the court. This further substantiates the constitutional rights that were usurped from Plaintiff by county officials.

**Sept 14, 2023 - Proof of flash drive**. Plaintiff submitted a certified updated docket from Cascade District Court will attach during discovery.

Plaintiff was able to submit the proof to the court in a timely manner. This was still not enough for the court. The plaintiff submitted transcriptions that she paid to have transcribed just as the court had recommended.

## Sept 18, 2024 - Procedural Impediments and Judicial Conduct  No. 23-2-05904-31

**[EX 12c Court Transcript pack]**

During this particular court hearing, I had recently missed a Skagit County Hearing . I was grappling with the overwhelming challenge of keeping track of all court dates that were being thrust upon me, particularly in light of the relentless filings initiated by Alan's sisters. The constant turmoil in my life, stemming from their retaliatory actions, left me feeling trapped with no means of escape. This unrest unfolded within the confines of my own home, a sanctuary where I sought solace, and witnessing my children bear the brunt of this chaos deeply affected me as well. I endeavored to maintain a façade of composure, masking the fact that I was on the verge of a mental health crisis, feeling utterly overwhelmed.

I found myself with nowhere to turn, devoid of options, as law enforcement had categorically refused to intervene.

I had already scheduled a hearing to address the warrant, yet it remained active during this session, as the date was set for later that week. This detail is crucial, particularly because during the **September 18, 2023** court hearing, the Commissioner, in a patronizing manner, inquired,

**"So, Miss Farler, is there any reason why you didn't appear in court in person today?"**

This query was posed in the presence of one of the principal individuals who had been actively attempting to tarnish my reputation and disrupt my life. This scenario exemplifies a profound case of **state-created danger and retaliation,** further **exacerbating the situation** and **enabling the court to become an instrument in an enterprise that was just beginning to unfold.**

In response, I stated,

**"My car is still not operational. I have been... that was the most recent incident I documented with the transcript, detailing my efforts to repair my vehicle. It remains inoperative."**

In the transcription, the plaintiff articulates the toll that these events have taken on her life, recounting instances of intimidation involving firearms and firecrackers throughout the night, leading to a pervasive sense of insecurity within her own home.

Justice Clark then interjected, offering no substantiated claims against the plaintiff that might justify his actions. He merely remarked that the friends who had visited before Marlene trespassed had confrontations with him, framing it in a manipulative manner as though it were the plaintiff's fault.

Ultimately, the court dismissed the request for a protection order, stating,

**"Well, the court, having reviewed the documents here, and frankly, I've examined your response, Mr. Clark. I have also considered what I assume is the plaintiff's strict reply, as the transcript indicates. However, it appears to the court that the transcript corroborates Mr. Clark's assertions, particularly given the time stamps. He seems to have made an effort to dissuade parties from continuing their activities after 10 PM."**

The plaintiff retorted,

**"I just came home."**

The Commissioner, in an aggressive tone, responded,

**"Ma'am, I am issuing my order now. Please do not interrupt. In this instance, the court finds Mr. Clark to be more credible in his statements, and even the transcripts provided seem to indicate that he was being threatened by individuals you had invited into your home. The language employed by those parties was undeniably outrageous and provocative."**

**Sept 25,2023 - Declaration of Robert Bates witness**


**[EX 4 Robert Bates decl]**

In his declaration, he states:

"She can't even walk out to grab something from her car after it gets dark out because she fears that it will set off her neighbor. It definitely seems to me that he is targeting Stephanie specifically for whatever reason, maybe because she has a black boyfriend."

"Stephanie has stayed at my house a few times instead of going home because she has such anxiety about the neighbor, she tells me to not talk until we get inside and closed the door. She has me wait to even close my door until we get out of her driveway and to the stop sign on her street."

These are just a few of the statements made by Robert Bates in his declaration.

### Dec 29, 2023 - Premeditated POA creation for unlawful reasons

#### [EX 15 First POA]

Pertinent assertions from 1985 and 1983 regarding the Rico predicate of Intentional Infliction of Emotional Distress (IIED) indicate that the documentation for the real property was not duly initialed. Nevertheless, it was established validly in accordance with the statutes of Washington State law. It was, however, presented unexpectedly and without prior notice by Marlene.

### Dec 31, 2023 - 911 call made by Darlene

#### [EX 16a Darlene Still Shots], [EX 16b Brandon Declaration]

Pertains to the 911 call made by Darlene on December 31, 2023. The pertinent claims involve **42 U.S.C. § 1983, 42 U.S.C. § 1985, and 18 U.S.C. § 1962(c)** under the Racketeer Influenced and Corrupt Organizations Act (**RICO**). This evidence illustrates a conspicuous conspiracy between Darlene Rosenquest and local authorities aimed at obstructing, intimidating, and retaliating against her. The documentation includes still shots as corroborative evidence.

## Feb 13, 2024 - Justice Clark Threats/Mocking/Taunting Plaintiff for attempted protection Orders

#### [EX 17 Transcript Mocking JC]

Relevant claims are: **1983, 1985, 1962, and RCW 9A 36.080.**

**Justice Clark** stated to Plaintiff:

"I'm not harassing you, you've already tried that".

**Plaintiff replies:** "Should I try again"

**Justice Clark replies:** "go ahead do you have to have like evidence there credible sufficient evidence".

**Justice Clark:** "I'll be seeing you in court so you'll have your time you'll have your time and you'll look like a fool again",

**Justice Clark:** "I'm not going to have to the court's will and then anything you say and do will be used against you and it's going to I mean holy s*** so you can go ahead and try and get another try to get an anti harassment order on me if you want an anti stocking order if you want to, get all your friends you know to write a bullshit statement for you".

## Feb 22, 2023 - Declaration of Tamera Farler

[EX 38 Tamera Declaration 2023]

## March 21, 2024 - attempt for protection by Plaintiff

### [EX 19 S F v. M S No. 24-2-02109-31], [EXH 20 S F v. J C No.24–2–02110–31]

Commissioner Susan Harness **March 21, 2024.** Full petitions included.

### In this petition, Plaintiff states:

*"his actions are becoming more and more aggressive and unpredictable he's acting strange and the whole possum thing makes me have believe he may be delusional".*

*"Justice Clark has used his gun and fireworks multiple times between the hours of 11 PM and 3:30 AM as an intimidation factor of fireworks to scare my dog, and gunshots to scare. With all due respect to you, I would like to start by informing you of the situation case No. 23-2-05904-31 it was denied due to "Credibility" and since then I have taken the time to learn more about the rules and regulations that apply here. I am resubmitting my petition for an anti Harassment and a stalking order."*

*"malicious harassment section 4 it states "if the provisions of this act or its application to any person or circumstances held in valid, the remainder of the act or application of the provisions to other persons or circumstances is not affected".*

*"The purpose for me stating this chapter 95 section 4 is only to prevent the possibility of similar situations or misunderstandings from happening again my "credibility" is put into question due to a case on my record I don't feel comfortable saying anymore details due to the severe harassment I already deal with at my home from my neighbor at the moment. In this type of situation, I believe that regardless what anyone's personal opinions are about an individual, that is not supposed to have any effect on the provisions of the ruling. People like me deserve to have the protection that every American would have if being harassed. Justice has used his gun and fireworks multiple times between the hours of 11 and 3:30 AM and as an intimidation factor, fireworks scare my dog and gun to scare me".*

*"One major incident was on September 7, 2024, and began at 10:05 PM. The police were called, by Alan Sprague the property owner I am attaching more than one Transcript to this petition from the specific incident it costs per word to have them transcribed professionally and it is a 13 minute video".*

*"There has never been a time when I have initiated a conversation with Justice Clark he goes out of his way to start problems with me and my transcriptions I have recorded most of the encounters between Justice and myself they include in the middle of the day he claims that he is mad he gets woken up, yet he comes to the property line because he noticed I was washing my car in my driveway and begins attacking me with his name calling and attempt to scare me. Stating all kinds of false allegations, he says he has recorded when the Scarecrow techniques don't work Justice begins calling me names and telling me that he's going to get me out of here and he's calling the city on me. This is attached as number 5".*

*"In the response to my first petition, he stated **I am not necessarily watching Stephanie** and that he **carries his gun on him outside on that night.** He calls me **miss credible now mocking me and the latest attempts to get protection** from his abuse and tells me I "don't have any evidence" and I would*

have to "prove that he is doing it" and I "already tried that" and he says in laughs I am including the Transcript from February 13th. He **mocks me repeatedly about the attempts to get protection** from his behavior and tells me that he is going to do all kinds of ridiculous things to cause trouble for me".

"I recently started a new job at UPS and was excited about it I was loading the truck and it reminds me to requires me to leave between 3 am - 4 am 6 days a week. It was freezing out and you have to start your car and exit before you can safely head to work. I tried just scraping the windows and starting it and leaving it I tried just starting the car and not getting out of it so I don't have to open the car doors again tried everything I could in attempt to make Justice not flip out on me each and every morning I decided it was not worth the stress and gave up the job I was filled with anxiety and dreading every morning his unpredictability and it was seriously affecting me recently I walked to my car to grab my cell phone and just yelled out to me "Hey if I find out you had something to do with this possum over here, if I find out you had something to do with this passing over here I'd probably make you eat it ha ha ha". I'm seriously in fear for my safety and my dogs please. I'm begging you to do the right thing, and actually give a look at the facts and the evidence that I have supporting my need for this order please refer to EXH 1, 2, 3, 4, and 5".

Plaintiff does not challenge the ruling made; instead, she includes this information to support her Monell and conspiracy claims against the county and highlight the deliberate indifference practiced by its employees. She aims to emphasize the policies and customs at play here and their role in causing the civil rights violation she has experienced.

## March 29, 2024 - Eviction Summons No. 24–2–01541–31. Complaint for Residential unlawful detainer

### [EX   UD pack]

**March 29, 2024.** Order to go to court No.24–2–01541–31 in this summons Marlene Sprague states:

"Stephanie farler has no lease and has never paid rent or utilities".

"Stephanie farler uses mobile home for all essential utilities she has no water no heat bathroom no kitchen requirements for fire alarms escape or carbon dioxide not there".

"The shed is not safe for children, moved all brother Alan's tools out of the shed change locks on the mobile home for her convenience. I could not get in told her to remove them and put the old ones back on."

"Has unwanted and unknown people on the property." "fights with the neighbor, fights with the relatives Darlene Rosenquist, sister".

"She has been told several times she cannot live anywhere on the property, she says don't need to leave. did not respond to unlawful detainer".

"has filed a protection order on me with no service". "has broken down car in driveway for months, attached photo".

"I am requesting that the court give me a Writ of restitution restoration and a no tresspass order".

Attached is the power of attorney that was no property rights given. A picture of the shed which was my bedroom before they even owned the property a picture after with the new $650 dollar door that I had installed on it a picture of my broken down car up on a Jack from Justice Clark stabbing the radiator with a stick in the middle of the night and the car was my ride to the auto store to buy the part. It also includes a print out of my background report from an online report.

## April 8, 2024 - Marlenes Declaration in support of Justice Clark No. 24-2-02110-31

[EX 21 Decl by MS No. 24-2-02110-31]
21 B
In this Marlene states"

> *"I am the neighbor, Marlene Property Owner. I have an unlawful detainer show cause court case against Stephanie. She has lived illegally on my property for almost 2 years. She lives in my 8x8 wooden shed, it has no utilities except electric. She has unwanted and unknown people on the property day and night. She has caused several verbal assaults on my neighbor Justice Clark. Sheriff's been called numerous times, we are now known as the nuisance house."*

> *"She does not have any legal right to file anything with the courts she does not legally live there".*

> *"Finally I would like the court to drop this case she has been no business at my home I want a peaceful place for my disabled brother to live. Justice has never caused any problem with me or my family. Only Stephanie farler. Thanks".*

### April, 18, 2024 - Court hearing for protection attempt from abuse

[EX 2t Court transcripts]

On April 18, 2024. The court hearing was held by Commissioner Kim Solomon. He heard both sides and dismissed the Petition. For lack of **"credibility".** "More so on the plaintiff than the defendant".

However, he did state before he made his ruling and afterwards that this should

> *"not constitute a victory"*

in Justice Clark's eyes. He stated that

> *"this has been very well documented"*

on the record now this being the second protection order filed with the same parties and that both of us need to just "disengage" or not talk to each other because it's not wanted. He then stated that

> *"credibility was a factor in this ruling"* and that *"no restraints will be put on by the court today".*

After this Plaintiff had a mental breakdown. Justice Clark was standing on the property line and continued to laugh and point as loud as he could at Plaintiff. Causing her to start drinking, which she doesn't normally do. Justice Clark called the cops and reported a disturbance. (this incident report is included in **[EX  Police report pack])**

I was crying and just panicking, basically lost hope in everything. Stuck in a corner and didn't know what to do, nobody would help. The cops came that day. They did nothing, they just looked at me like I was crazy because I was having a mental breakdown. Plaintiff told them to go away because they do nothing anyway.

## May 08, 2024 - Residential Unlawful Detainer action

[EX.   UD pack] dismissed **with prejudice**, No landlord-tenant relationship was ever established.

## May 16, 2024 - Robert Lane was arrested

[I    s Weaponize 911 calls from Justice Clark]

Sheriffs arrested him on private property. With no other reason but to arrest him for his warrant. They walked onto the property and looked at me, Asked for Justice Clark. I told them they had the wrong house and that was next door and I pointed. As soon as they made eye contact with Robert Lane they tackled him and took him into jail and I had to bail him out that evening.

## June 2024 - Skagit county house arrest began

## July 1, 2024 - Marlene Harassment: Taking Photos of Cars

### [EX 23 July 1, 2024 Marlene 12:30AM]

Marlene Sprague in our driveway snapping pictures of my vehicles, intimidation, retaliation, and conspiring.

Also ejectment summons was served on the Plaintiff. Marlene and Darlene had gotten an attorney Rob Trickler to represent them for a **Commercial Unlawful Detainier**. In the **same court** with the **same parties** and the **same Facts** from the Residential Unlawful Detainier action dismissed **With Prejudice.**

## July 5, 2024 - Revocation of POA by Alan

### [EX 24 Revocation of power of attorney]

**Relevant claims:** fraudulent misuse of legal authority, coercion and deceptive conduct, and Rico predicate conspiracy, Retaliation, Vehicle vandalism, evidence suppression, and coordinated retaliation under color of law.

## Date range July 2024 - Nov 2024 Attacks on Plaintiff's vehicle

### [EX 26 Vandalism pack]

Including a radiator sabotage BB gun attack, and Fire arm attack. Related claims **18 U.S.C. 1962** pattern of racketeering activity, vandalism, obstruction, retaliation against protective activity, enterprise structure, and coordinated conduct by public sector actors, Sheriff's office, defendant Clark, and private affiliates.

Marlene's ongoing retaliation and concealment tied to plaintiffs legal actions and civil rights claims

Injury to plaintiff physical loss of property, emotional distress and personal risk due to unsafe sleeping conditions deprivation of evidence need to pursue Justice.

These acts were not isolated; they formed a systemic campaign involving retaliatory targeting following federal filing and court appearances, law enforcement complicity in suppression of material evidence, shell casings, ongoing physical harm, deprivation of liberty, and risk to life and property. Theft of evidence sheriff's responded to a call after Plaintiffs car was shot 7 times with a rifle by Justice Clark. They took the bullet casings from the shooting and never open an investigation or fingerprinted them or did anything at all.

## July 24, 2024 - Transcription of Justice Clark harassment

[EX 28 Ill shoot it down]

"**I'll shoot it down**" transcription after shooting my car window out with a baby gun. Police came did nothing I called back they told me to stay inside.

## July 25, 2024 Commercial Unlawful Detainier filed & First Day House Arrest Skagit County No.24–2–05771–31.

[EX 13 UD Pack]

## July, 26, 2024 - Plaintiffs answer to Ejectment

### [EXH  ʈ UD Pack] M S v. S F No.24-2-05771-31

Filed on **July 26th 2024** case number **24-2-05771-31** Answer to complaint for Ejectment:

"comes now Stephanie the defendant in the above captions matter in response to the Marlene's complaint for ejectment. Denies all allegations contained in paragraph one of the plaintiff's complaint."

"Marlene is not the homeowner that resides in the home defendant denies the allegations contained in paragraph 2 of the plaintiffs complaint."

"Stephanie Farler is not a tenant of Marlene's. there is no John Doe defendant. Denies the allegations Definitely denies the allegations contained in paragraph for the complaint I received the document that was taped to my door and had nothing filled out at all"

Defendant "Denies the allegations contained in paragraph 5 of the complaint, plaintiff lacks standing to bring this action defendant denies wrongful occupying the property."

"Defendant has a legal right to occupy the property based on the agreement with the residential owner that was given the property as inheritance and resides on the property."

"Plan to fail to properly serve the at will termination notice on June 9th 29th 2004. plaintiff has engaged in severe harassment against the defendant."

"Intentional affliction of emotional stress filed 7 25 2024."

"Plaintiff both personally and through third parties has engaged in a prolonged pattern of retaliation against the defendant. harassment and surveillance and overbearing behaviors by the homeowner's sister Marlene in collaboration with neighbor towards the individual residing on the property amounts to harassment under Washington and law which is unacceptable and unlawful."

"The plaintiff was informed about the nature of this situation between Justice Clark the neighbor and a defendant before any conspiracy was initiated defendant is demanding for a jury trial in this case."

"The defendant will request that the judge permit the submission of video evidence in this case as it provides circumstantial evidence that connects all the relevant facts and is detrimental to filing understanding its nature."

"Under title 7 chapter 7.28 section 7.28.110 the defendant may substitute the landlord in their place if the landlord has an interest in the property therefore Alan's Sprague should be substituted as the defendant in the place of Stephanie Farler."

## August 1, 2024 -  Responce to IIED by Marlene and Darlene

[EX 29 IIED responce M S & D R]

## Intentional Disruption of Internet Access and Legal Sabotage

During a key period of litigation and house arrest, Plaintiff was denied access to internet services at her residence, which was essential for filing court documents, accessing legal resources, and responding to eviction proceedings.

The household internet account was managed under a family Comcast plan, and Defendant Marlene Sprague deliberately blocked Plaintiff's devices from connecting to the network. This occurred during three of the four months Plaintiff was confined to her home and unable to access the internet elsewhere.

Plaintiff attempted to circumvent the block by renaming her devices under her mother's name, but once this was discovered, Marlene shut off the internet entirely, knowing Plaintiff was still actively filing and researching her legal defense.

This disruption coincided with Justice Clark approaching Plaintiff's vehicle, despite multiple cameras being aimed at him. Marlene informed him that the cameras were not working due to the internet outage —suggesting coordination and foreknowledge of the surveillance gap.

The timing and intent behind the internet shutdown demonstrate a calculated effort to obstruct Plaintiff's access to justice, particularly as a pro se litigant reliant on electronic filing and online legal tools.

## August 9, 2024 - Orchestrated coercive and deceptive scheme.

### [EX2⁊a Coersed POA], [EX 30b Quick Deed]

On **August 8, 2024,** Defendant Marlene Sprague orchestrated a coercive and deceptive scheme to obtain legal control over Alan Sprague's property. Under the guise of discussing family matters, she isolated Alan from his caretaker and presented him with a blank document to sign, followed by a Power of Attorney and quick deed in a public setting.

Alan stated he did not understand the documents and was told to 'just sign them.' The POA included inconsistently dated witness signatures, which were later removed from court filings. These acts constitute **undue influence, fraudulent execution, and exploitation of a vulnerable adult,** supporting Plaintiff's claims **under 42 U.S.C. §1983, §1985(3), and 18 U.S.C. §1962.**

#### Relevance to Legal Claims:

- Due Process Violation (§ 1983, Fourteenth Amendment):
- Plaintiff's property and housing rights were denied based on a fraudulent/coerced POA after revoking the legitimate, original POA.

#### Monell Claim (Policy/Custom):

- County officials and courts failed to verify or challenge the defective, coerced POA, further exhibiting deliberate indifference or failure to train/supervise.

#### Joint Action/Conspiracy:

- The creation and use of the coerced POA formed an essential part of a coordinated campaign, involving Marlene, Darlene, and officials, to deprive Plaintiff of housing and due process.

#### Injunctive Relief:

- Plaintiff requests the invalidation of the coerced POA, an order barring its use in any property actions, and policy reforms ensuring proper POA verification.

## September 26, 2024 - Justice Clark Anti-Harassment Order in Retaliation

### [EX 31 Justice Anti-Harassment No. 24-2-07603-31]

In this petition, Justice Clark states:

"Stephanie defaulted on her ejectment. Marlene (property owner, friend at 4232) has been trying to remove her from the property for 2.5 years, and it is Stephanie who has been severely harassing me the entire time!"

The petition continues under firearms: "Stephanie has a lengthy criminal record with numerous DV incidents." Justice Clark checked the box to protect his daughter and her school, preventing Stephanie from approaching them.

"Stephanie has severely harassed me for 2.5 years now, and within one year, she has filed four petitions against me—two dismissals, one struck down, and now another—pursuing an exhaustive, vindictive, harassing vendetta against me and Marlene Sprague."

"Over the course of a year, Stephanie has attempted to accuse me of harassment, including in the summer of 2023, which was dismissed, and again in the spring of this year, also dismissed. She has repeatedly tried to e-serve me and has left paperwork on my gate."

"She has tried suing my good neighbor Marlene, as well as her sister and me, for $1.6 million for IIED, attempting to extort money from us. Marlene, her sister, and I are the ones being harassed, especially me, as I have to live next to this harassing drug-addict squatter who has been illegally staying on Marlene's property for three years."

"She is a career squatter with a strictly criminal background. To my knowledge, she has been charged with identity theft, possession of stolen property, and fraudulently attempting to use her own grandmother's name and credit to purchase a used Jetta. Both the dealership and her grandmother prosecuted her, resulting in four months of house arrest from each, totaling eight months. She has accused me of vandalizing her car, claiming she saw me do it, and emailed a declaration she intended to use but never did. Now, she is bringing it up again, accusing me of breaking her car window as well. This woman has tried to sic her..."

### Connection Between Civil Harassment and Downstream Criminal Charges

The ongoing harassment, intimidation, and property damage orchestrated by Defendants in Snohomish County, including repeated vandalism by Justice Clark, left Plaintiff in a state of extreme emotional distress and insecurity.

As a result of these events, Plaintiff was placed on house arrest in Skagit County in connection with unrelated charges that arose from her efforts to cope with the cascading harm from the events in Snohomish County.

On October 16, 2024, Plaintiff notified her Skagit County public defender, Daniel Blue, via email, describing the severe harassment, vandalism, and emotional toll she was experiencing See **[EX 11 Skagit Pack]** in this correspondence, Plaintiff specifically referenced:

- The destruction of her car radiator and window by her neighbor Justice Clark;
- Multiple police incidents and her ongoing civil suit for Intentional Infliction of Emotional Distress (IIED);

- Her inability to sleep, chronic hypervigilance, and difficulty coping as a result of ongoing harm;
- The link between this distress and the technical violations of her house arrest requirements.

Plaintiff asked her attorney if documentation of the civil case and other supporting proof should be provided to the Skagit court in mitigation of her circumstances. Plaintiff thus made Skagit County officials aware—prior to key criminal proceedings—that the Snohomish County Defendants' actions caused or contributed to the criminal events and her inability to comply fully with release terms.

## October 1, 2024 - Summary Judgment and Writ filed on Plaintiff Rob Tricklers office

[EX 13 UD Pack] [Summary Judg Writ/Ejectment No.24.2.05771.31]

## October 6, 2024 - Declaration of Alan Sprague

[EX 32 Decl Alan Sprague]

## October 16, 2024 - Plaintiffs reply to Ejectment No.24-2-05771-31, and Writ and Justice Clark No.24-2-07603-31

### [EX 33a Reply to Writ of Ejectment], [EX 33b Reply to J C Petition]

This includes a Declaration from Brandon Dal and Bless Pequette both stating there personally witnessed harassment, Photos of the major smoke clouds from Justice burning trash and a windmill to blow it right at my room and my car anytime I was outside.

This is documented in videos recorded during the harassment and will be included in discovery as permitted by law, photos of my gtis busted out back passenger side window,a frame by frame snapshot of our home cameras showing my mother outside in our back yard folding up the infladable slide and a huge firework lit off aimed directly above our home scaring the death out of my little niece and my mother.

Also included the same transcriptions as included in the earlier matters. The original written note book logs that I begn to write during the beginning stage of this harassment documenting my fear and how I was being targeted. All relevant incident reports that I have gotten back from records request at this time, all the petitions I had filed earlier with the court.

## End of Skagit county House arrest July 24, 2024-October 26, 2024

## October 28, 2025 - Attorney Rob Trickler supplemental reply to Summary Judgment Writ of Ejectment

### [EX 13 UD PACK]

On **October 28, 2024** Marlene and Darlenes Attorney rob Trickler, submitted a supplemental reply to the case **No. 24-2-05771-31**. This was in response to my reply to there Summary Judgment Writ of

Ejectment filed with the court and tricklers office on on **October 16, 2025.**

The court however does not list any response submitted to this matter in reply to the case on the 16th. I have included in the **[EX 13 UD PACK]** the stamped as received by Tricklers office document as evidence that it was in the courts hands and the lack of the it reflecting in the courts details of the case demonstrates a violation under Monell liability and violates Plaintiff Stephanie Farlers rights:

- **First Amendment**-Retaliation for protected Activity,
- **Fourteenth Amendment-**Discriminatory treatment
- **Fourteenth Amendment**-Due Process (42 U.S.C. § 1983)
- **Fourteenth Amendment**-Equal Protection
- **Retaliation** (42 U.S.C. § 1983)
- **Denial of Access to Courts** (42 U.S.C. § 1983)
- **Civil Conspiracy** (42 U.S.C. § 1985(3)
- **Monell** (failure to train/supervise)
- **Monell** (deliberate indiffrence)
- **RICO** (18 U.S.C. § 1962©

Furthermore, the Supplemental Reply was submitted on October 28th, with the scheduled hearing set for October 31st. When filing documents, there must be at least five business days between service and the court hearing. Additionally, Marlene called Alan and asked him to relay a message to Stephanie that the court was canceled on the 31st, and she didn't need to attend.

In this Supplemental Reply, Trickler stated that Marlene is now the sole owner, as Alan had quitclaimed the property to his sister Marlene on October 17th. This made any arguments regarding the creation of the POA or the coerced and fraudulent abuse of an elderly adult irrelevant to the case concerning the title to the home in an ejectment action.

The Plaintiff and Alan Sprague appeared at the court hearing this morning, only to be informed that the matter was already decided, and there was no reply. They were provided an email for Judge Steffener to send working copies directly. The Plaintiff sent an email to the judge that same morning as she was leaving the courthouse, detailing all the harassment and theft of the property and how Marlene used the court as a tool to unlawfully remove the Plaintiff from the home. This email is attached as **[EX 35 Email to Judge Steffener].**

Lastly, the court's online listing for this matter indicates that a decision was made on October 30th, granting the Summary Judgment and Writ of Ejectment. This means the case was decided the day before the hearing was scheduled. This raises concerns about Monell liability and a major predicate act under the color of state law.

## Nov 1, 2024 - Email to Snoco recording office about stolen property & Voicemail Transcript.

**[EX 3̶3̶ Recording@snoco.com], [EX 36b Voicemail Auditors Office]**

On **November 1, 2024**, a recording was made regarding an email to @snoco.ord. The plaintiff contacted Snohomish County after the property theft, seeking protection for Alan, a vulnerable adult. The attached email was sent in hopes that they could help with the property deed theft.

Additionally, a voicemail left on the plaintiff's answering machine has been transcribed and included, with the audio to be submitted during the discovery phase of the case.

Both Alan and the plaintiff repeatedly called the police to report the incident, but no officers responded, and the staff at the police stations refused to accept any reports. Efforts were made to visit all the police offices in the area without success.

## November 6, 2024 - Sheriff's involvement in Retaliation against the Plaintiff, resulting in arrest. Harassment under color of law.

### [EX 37 Release from jail #1]

On **November 6, 2024,** the plaintiff was arrested after Justice Clark reported the car they were driving and its direction to the sheriffs. The arrest was made since Skagit County charges that are described in detail elsewear in this complaint. a suspended license in Skagit County, and appeared to be a retaliatory act, raising concerns of double jeopardy.

## November 10, 2024 - Plaintiff arrested again by Sheriffs acting on false retalitory reports from Justice Clark.

### [EX 38 Jail again from 911 call]

**On Nov 10, 2024 just four days later,** the plaintiff was **arrested again just five blocks from home.** The officer claimed the car description was blue, although the plaintiff explained it had been spray-painted white. Despite this, the plaintiff was taken to jail for **a second-degree suspended license.**

Fortunately, a friend drove the car home and stayed overnight, as they were the **first to hear gunshots fired later that night.** Justice **Clark was seen fleeing with a rifle after firing seven shots through the plaintiff's vehicle. Clark knew the plaintiff was still in jail since his report is what informed sheriffs.** Justice Clark thought no one would be there to defend the property or **see him in the act.**

During this time, Marlene reportedly disconnected the home internet, believing it would disable the cameras and hindering court access for three out of the four months the plaintiff faced house arrest restrictions from skagit county.

**Targeted Arrests and Retaliatory Violence**

In the **same month** Plaintiff was **forcibly removed from her home** under a Writ of Ejectment, she was **arrested twice within four days** for driving with a suspended license—a suspension that stemmed from felony charges related to a pressured vehicle lease, which Plaintiff had entered **under duress** while trying to **secure transportation for her Boeing job.**

Justice Clark, **fully aware of Plaintiff's suspended license and legal vulnerability, repeatedly called 911 to report her movements, vehicle description, and direction of travel.** These calls were made with the intent to **provoke police action** and resulted in Plaintiff being taken to **jail twice in one week.** See **[EX 8 Police report pack]**

The second arrest led to Plaintiff being jailed **over the weekend**, during which time **Justice Clark shot Plaintiff's vehicle seven times with a rifle** while it was parked on her property. This **act of violence**

occurred while Plaintiff was incarcerated and unable to protect her property or herself.

the timing and coordination of these events—911 calls, arrests, and property destruction—**demonstrate a deliberate and malicious effort** to **destabilize Plaintiff, inflict emotional harm, and retaliate against her for asserting her rights.**

Law enforcement **failed to investigate the shooting or take meaningful action**, despite the **presence of video evidence, recovered shell casings, and a detailed police report filed by Plaintiff.**

### Connection Between Civil Harassment and Downstream Criminal Charges

The ongoing harassment, intimidation, and property damage orchestrated by Defendants in Snohomish County, including repeated vandalism by Justice Clark, left Plaintiff in a state of extreme emotional distress and insecurity.

As a result of these events, Plaintiff was placed on house arrest in Skagit County in connection with unrelated charges that arose from her efforts to cope with the cascading harm from the events in Snohomish County.

On October 16, 2024, Plaintiff notified her Skagit County public defender, Daniel Blue, via email, describing the severe harassment, vandalism, and emotional toll she was experiencing See **[EX 11 Skagit Pack]**. In this correspondence, Plaintiff specifically referenced:

- The destruction of her car radiator and window by her neighbor Justice Clark;
- Multiple police incidents and her ongoing civil suit for Intentional Infliction of Emotional Distress (IIED);
- Her inability to sleep, chronic hypervigilance, and difficulty coping as a result of ongoing harm;
- The link between this distress and the technical violations of her house arrest requirements.

Plaintiff asked her attorney if documentation of the civil case and other supporting proof should be provided to the Skagit court in mitigation of her circumstances.

Plaintiff thus made Skagit County officials aware—prior to key criminal proceedings—that the Snohomish County Defendants' actions caused or contributed to the criminal events and her inability to comply fully with release terms.

## Messages Between Plaintiff and Detective J. Ricksecker (#1651), Snohomish County Sheriff's Office (Nov.–Dec. 2024)

### [EX 40 Messages between Detective and Plaintiff]

### The Deputy was J. Ricksecker #1651 Snohomish County Sheriff.

**November 2024 - December 2024**, Plaintiff was in contact with a snohomish county detective reguarding the car shooting by her neighbor Justice Clark. These screen shots were included to this as **[EX 40]** and demonstrate the **Countys deliberate indifference and discriminatory treatment** of Plaintiff compaired to all others in her situation. In these text messages the plaintiff states:

**November 13, 2024 11:43 AM** - *"Please help me. I am seriously scared to death of what these people will do to me next. It has been 2 years now I have delt with this harassment and it just keeps getting worse. I fear that he will snap and hurt me or my dog of a family member next. I need help from this guy. I dont know what else...."*

*"I feel my safety is in Jeopardy and being alone at night in my room gives me major anxiety. I pray that this cry for help will be heard. Everything that I have said I was in fear of has happened already with this*

*harassment that I have been dealing with for over 2 years now. I would like to make a r....."*

The Detective replied to this just a few min after Plaintiff sent them, stating:

*"Ive received your messages and will reach out to you today to discuss. Sorry for the delay. Today is my first day back".*

**Plaintiff replies:** *"Its OK I understand"*

*"Did you get the police report I sent? I gave some documents to a police officer that said he would give them to you and I emailed the report and documents through email."*

**Detective replies:** *"Yes. Everything has been uploaded. Next week ill be contacting Justice for an interview."*

**Plaintiff replies:** *"I seriously need help. The 3 people that are behind Justice Clark shooting my car and harassing and bullying me have committed multiple felony charges in orer to ruin my life. I just fot served with papers saying I have to be out of my home in 6 days and I have 2 broken down cars because of the very people that caused the ejectment. Marlene and Justice have together worked this out to hurt me. The stolen property and the forged signiture are the only means that they could ise to make me leave".*

**Detective replies:** *"Is it a valid order"*

**Plaintiff replies:** *"Yes it is but only because of the forged document that marlene used to steal the property. We did not know about it until it was finilized and the documents were used in the ejectemnt and taped to my door", "that is how alan found out his sister had done this to him", "I went in to his room and showed him the documents".*

**Detective replies:** *"Im sorry but theres nothing I can do about that. You need to contact the court that the order is out of."*

**Plaintiff replies:** *"We went and tried to fight it everywhere we thought we could and nobody could do anything at all. And the judge ruled this  on Marlene being the sole owner."*

*"But she stole the property and she told the neighbor that our internet was off and thats why he was ok with walking up to my car and shooting it right in front of the many cameras we have." "He thought they were off line."*

*"Can we not pursue criminal charges on Marlene for the theft and forgery", "Not sure. I would have to sit doen with you and go over everything."*

*"Can we do that soon?. I have all the documents and there is a papertrail of it as it all happened through the courts."*

*"I can come to you and lay out all the documents that have been presented to the courts by marlene and justice and they clearly show what has happened".*

**Detective replies:** *"Im testifying in court today and have to stick around here until im done, not sure when that will be. Today is my last day this week. Your best bet is to call 911, to get a deputy out there today."*

**Plaintiff replies:** *"I have been fighting this harassment for 2 and a half years now and they have never actually had legal grounds to make me leave until they committed feloney and stole the property."*

*"I have tried", "We called 911 2 times and they have not showed up."*

*"The neighbor has called and reported so many false things that they dont even come to our house for anything anymore."*

**Detective replies:** *"Today".*

**Plaintiff replies:** *"No not today we called 2 days after we found out what had happened".*

*"Ok. Not sure why they wouldnt have shown up but call now and request a deputy contact you in perso. Theres a lot going on right now with the stom and such but a deputy should be out there."*

*"Justice Clark has agressivly harassed me on our property line again. I ran to the gas atation and came back and when I got out of the car he instantly began to mock and tell me i a worthless bumb whos tresspassing on marlenes property and then he bgan to tell me that I am taking advantage of an..."*

**Detective replies:** *"Call 911", "Im off for the rest of the week."*

On **November 24, 2024** Plaintiff texted:

*"Can we make a time to sit down and go over the papers and evidence on the stolen property this week sometime?", "I have it all ready".*

There was no reply to this question. The next messages were sent on **December 9, 2024:**

*"Hello Im wondering about the status of the criminal investigation with my neighbor Justice Clark that shot up my car"*

No reply until the next day **December 10, 2024**:

*"Ive submitted the report which gets forwarded to detectives. Not sure what the status is".*

This was the last information I received about the shooting from any law enforcement. I went to the prosecuting attorney's office at the Snohomish County Courthouse and spoke with them. They informed me that they had not received any such report.

When they entered my name into the computer, they found a record indicating that I was listed as the defendant in the matter, not the victim. They mentioned it involved a shooting but confirmed I was not listed as the victim. They refused to provide me with any documents or evidence, stating they were not allowed to do so.

### Failure to Investigate Shooting and Forgery

**On or about early November 2024, Plaintiff's vehicle was shot multiple times by her neighbor, Justice Clark.** Plaintiff immediately reported this incident to the Snohomish County Sheriff's Office. Deputies responded to the scene and recovered spent shell casings as evidence of the shooting. Plaintiff also informed deputies of a related legal dispute involving a **forged quitclaim deed** executed by Marlene Sprague (Plaintiff's sister-in-law) that had unlawfully stripped Plaintiff's partner, Alan Sprague, of his property ownership.

**In the days following the shooting, Plaintiff engaged in multiple communications with Detective J. Ricksecker (#1651) of the Snohomish County Sheriff's Office** (see EX 40, text message log). In these communications, Plaintiff pleaded for help and detailed her situation:

- She expressed that she was "*scared to death*" and feared the harassment would escalate to physical harm against her, her dog, or family members.
- She recounted that the harassment had been ongoing for over two years, **escalating to the point of a firearm being used** against her property.
- Plaintiff also emphasized the **forgery and theft of the property** by Marlene Sprague, explaining that this fraudulent deed was being used to evict her from her home. At one point, she wrote, "*The only reason I have to leave is because [Marlene] committed a felony and stole the property*."

Detective Ricksecker acknowledged Plaintiff's messages on November 13, 2024, responding, "*I've received your messages and will reach out to you today to discuss. Sorry for the delay. Today is my first day back.*" When they spoke or messaged later, the detective indicated that **he had received the evidence Plaintiff sent** (including the police report and documents regarding the forged deed) and that "everything has been uploaded." He informed Plaintiff that he would be contacting Justice Clark the following week for an interview regarding the shooting **[EX 40]**

Despite Plaintiff's urgent pleas and the clear evidence of criminal activity, Detective Ricksecker **repeatedly deflected responsibility** back onto Plaintiff. In subsequent messages, when Plaintiff asked if they could meet so she could present all the documents proving the forgery and theft, the detective advised her to "*call 911*" if she felt unsafe or if new incidents were occurring. He declined to set a prompt meeting, citing his busy schedule, and did not directly address the evidence of the forged deed. On one occasion, he told Plaintiff, "*Your best bet is to call 911, to get a deputy out there today,*" instead of indicating any immediate action on the ongoing investigation **(EX 40).**

As the date of eviction drew near, Plaintiff's messages grew increasingly desperate. She informed Detective Ricksecker that **the perpetrators' actions (the forged deed by Marlene and harassment by Justice Clark)** had directly led to a court order giving her only a few days to vacate her home. She explained that the eviction (writ of ejectment) was set to occur because Marlene's fraudulent documents convinced a judge that Marlene was the sole owner of the property. Plaintiff also reported continued harassment by Justice Clark during this time—such as Clark standing at the property line shouting insults and false accusations that Plaintiff was trespassing—further contributing to her fear.

On **December 9, 2024,** after weeks of limited feedback, Plaintiff messaged Detective Ricksecker again, asking for an update: "*Hello, I'm wondering about the status of the criminal investigation with my neighbor Justice Clark that shot up my car.*" The next day, **December 10, 2024,** Detective Ricksecker replied: "*I've submitted the report which gets forwarded to detectives. Not sure what the status is.*" This was the final communication Plaintiff received from the Sheriff's Office regarding the shooting incident **(EX 40).**

Unsatisfied and seeking justice, Plaintiff went in person to the Snohomish County Prosecuting Attorney's Office to inquire about the case. **There, she learned shocking information**: the prosecutors had **no record of any investigative report** about the shooting **naming her as the victim**. Instead, when staff looked up her name, they found a record misclassifying **Plaintiff as a "defendant" in a shooting incident**. The Prosecutor's Office personnel confirmed that they had not received any report seeking charges against Justice Clark for the car shooting, and thus no action was being taken against him. They refused to provide Plaintiff with further documentation, stating they were not permitted to release records, but the implication was clear — **Plaintiff's complaint had not been processed in the normal manner of a crime victim report.**

In early 2025, Plaintiff experienced the consequences of this investigative failure firsthand. She had a recorded verbal altercation with Justice Clark **[EX 42 Transcript "Shell casings"]** in which **Clark openly mocked the Sheriff's Office's inaction**. Referring to the evidence from the shooting, Clark yelled: "*Yeah, where's that fucking officer that's supposed to come over, huh? TO GET THOSE FINGERPRINTS OFF THOSE CASINGS MOTHER FER\*\*! YEAH, I DON'T THINK SO!*" **[EX 41]**.

This outburst indicated Clark's awareness that **no forensic analysis (such as fingerprinting the shell casings) would be conducted** by law enforcement, and it emboldened him to continue his menacing behavior. During the same confrontation, Clark hurled misogynistic slurs at Plaintiff and even taunted her with veiled threats, suggesting she follow him into the woods alone (implying harm), before he himself called 911 to falsely report Plaintiff as the aggressor **[EX 42]**. No arrest or protective action resulted in Plaintiff's favor from that incident.

**The foregoing facts demonstrate Snohomish County's deliberate indifference to Plaintiff's rights and safety.** Despite tangible evidence and ongoing threats, the Sheriff's Office failed to actively investigate or make any arrests in the shooting and forgery incidents. Critical evidence (the shell casings) was never processed, and the case never reached prosecutors through proper channels.

By misclassifying the victim as a perpetrator and ignoring her pleas, County officials not only denied Plaintiff equal protection and due process, but effectively punished her for seeking help. This inaction and misclassification **deviated starkly from standard law enforcement practices**, suggesting that Plaintiff was treated differently from other crime victims without a valid basis – a discriminatory outcome.

The lack of response to a serious violent incident, combined with the dismissal of the documented property fraud, **reflects a policy, practice, or custom of apathy (or even hostility) toward Plaintiff's complaints**, supporting a Monell claim against Snohomish County. Furthermore, the chilling effect of these events—where complaining to the authorities resulted in no help and instead led to Plaintiff being portrayed as an offender—amounts to a retaliation against Plaintiff for exercising her First Amendment right to petition the government for redress of grievances.

### RICO Predicate Acts (Association-in-Fact Enterprise)

**Plaintiff alleges that Defendants Justice Clark, Marlene Sprague, Darlene Rosenquist, and others known and unknown formed an association-in-fact enterprise** with the common purpose of unlawfully seizing the Sprague family property and silencing Plaintiff (and Alan Sprague) through harassment and intimidation. This enterprise operated in Snohomish County, Washington, and its activities directly affected interstate commerce by depriving Plaintiff of property and rights under color of state law.

**As set forth in Exhibits 40–44, Defendants engaged in a pattern of racketeering activity** within the meaning of 18 U.S.C. § 1961(1). The predicate acts committed by members of this enterprise included, but are not limited to, crimes such as **witness intimidation, obstruction of justice, extortion/coercion, and fraud**. The following table summarizes the key predicate acts, the individuals involved, the applicable statutes violated, and a brief description of each act:

**Each of these predicate acts was related and part of the enterprise's overall scheme.** The intimidation, obstruction, extortion, and fraud were not isolated incidents, but rather mutually reinforcing steps toward the goal of wresting control of the property and punishing those who stood in the way. The enterprise functioned as an ongoing organization with each member playing a role see **[EX 46]** *Marlene Sprague* provided a veneer of legal legitimacy to the property theft through fraud, *Justice Clark* engaged in open harassment and threats to enforce the enterprise's will on the ground, and *Darlene Rosenquist* (another sister of Alan Sprague) lent support to Marlene's actions and participated in the conspiracy's planning or cover-up. These individuals, along with any other unknown associates, associated together for this illegal purpose over an extended period.

**The racketeering pattern had continuity and extended over at least two years,** beginning with harassment that started around 2022 and escalating through late 2024 and early 2025. During this time, Defendants repeatedly acted in ways that violated criminal laws and targeted the same victims (Plaintiff and Alan Sprague) in pursuit of the same objective (acquisition of the property and silencing of opposition). This continuity of conduct demonstrates the "pattern" element required for a RICO claim.

For example, Justice Clark's menacing conduct and statements in early 2025 (EX 41) demonstrate how the enterprise protected its fraudulent gains through intimidation. **Clark explicitly referenced the lack of police action** ("...those casings... I don't think so!") to underscore that Plaintiff was at the mercy of the enterprise, with law enforcement effectively neutralized. This indicates that the enterprise not only

committed initial crimes (the shooting, the forgery) but also took active steps to prevent detection and accountability (threatening the victim, mocking the idea of justice).

Additionally, the use of fraudulent legal documents to obtain the Writ of Ejectment (see EX 44) shows the enterprise's willingness to corrupt the judicial process as part of its scheme. By submitting a forged deed and false statements to the Snohomish County Superior Court, Marlene Sprague and her associates invoked the authority of the courts to carry out the final act of dispossession. **This abuse of process is directly linked to the predicate acts of mail and wire fraud** – legal filings and notices were transmitted in furtherance of the scheme to defraud Alan and Plaintiff of their property – and extortion, insofar as the threat of the Sheriff's enforcement was used to compel Plaintiff to vacate.

**In sum, Defendants' coordinated actions satisfy the elements of a RICO enterprise and pattern of racketeering activity.** Their conduct demonstrates an ongoing criminal enterprise that **unlawfully combined private harassment, fraud, and manipulation of public institutions** (law enforcement and courts) to achieve its ends. The harm to Plaintiff – loss of her home, fear for her life, and deprivation of her rights – was directly caused by this pattern of racketeering activity. Plaintiff therefore includes in her complaint a civil RICO claim under 18 U.S.C. § 1964(c), predicated on the acts outlined above

Specifically:

1. **Witness Intimidation and Threats (18 U.S.C. § 1512; RCW 9A.72.110):**
   - Clark threatened Plaintiff's life during the 2025 recorded altercation, attempting to deter her from pursuing legal remedies.

2. **Obstruction of Justice (18 U.S.C. § 1503; RCW 9A.76.020):**
   - Clark admitted that law enforcement never tested the **shell casings** recovered by deputies, mocking the lack of investigation.
   - This shows collusion between enterprise members and Snohomish County officials to obstruct accountability.

3. **Extortion and Coercion (18 U.S.C. § 1951 – Hobbs Act; RCW 9A.56.110):**
   - Plaintiff was forced from her home through a forged quitclaim deed, combined with ongoing harassment and violent threats, depriving her of property under duress.

4. **Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343; RCW 9A.60.020):**
   - Marlene Sprague used forged declarations and fraudulent filings in Snohomish County Superior Court, while Clark backed these efforts with intimidation and harassment.

Together, these acts demonstrate a **pattern of racketeering activity** that furthers the enterprise's objectives:

- Fraudulent seizure of property;
- Violent harassment and intimidation of Plaintiff;
- Obstruction of official investigations (suppressed evidence, untested shell casings); and
- Abuse of the court process through fraudulent filings.

Snohomish County's deliberate indifference to the violent threats and refusal to test physical evidence (shell casings) further enabled the enterprise by shielding its members from consequences and allowing the pattern to continue.

## November 21, 2024 - Plaintiff motioned the court to vacate the ruling.

### [EX 13 UD Pack - FILED STAMPED TRICKLERS OFFICE No.24-2-05771-31]

First, the execution of the Writ of Ejectment on November 24, 2024, directly supports Plaintiff's claims of property deprivation without due process under 42 U.S.C. § 1983. The fact that her opposition filing was never considered by the court strengthens her argument that her right to a fair hearing was denied—key evidence of a Fourteenth Amendment due process violation.

Second, the chain of events—starting from fraudulent property transfers to the court's granting of the Writ—aligns with her claims under 42 U.S.C. § 1985(3) for conspiracy to interfere with civil rights. There is documented evidence of coordinated efforts by Marlene Sprague, Darlene Rosenquist, Justice Clark, and Rob Trickler. These parties allegedly acted in concert to ensure Plaintiff's opposition would be ignored. This supports the conspiracy element of the claim, showing a pattern of coordination to deprive her of property and equal protection.

Third, the involvement of law enforcement in the eviction, despite the procedural irregularities, lends weight to her Monell liability claim against Snohomish County. The consistent failures of the court and sheriff's office to recognize or rectify these procedural problems could point to deliberate indifference by the county, which is central to her Monell claim under 42 U.S.C. § 1983.

Finally, the procedural irregularities, including the missing opposition filing and the unopposed granting of the Writ, are part of her larger RICO claim under 18 U.S.C. § 1962(c)-(d). The pattern of predicate acts—fraudulent deeds, obstruction of justice by ignoring filings, and coordinated harassment—demonstrates a scheme to deprive her of property and retaliate against her.

In summary, the events surrounding the Writ of Ejectment tie directly into Plaintiff's claims: they illustrate the deprivation of due process, the coordinated conspiracy between private parties and public actors, and the abuse of judicial process that underlies her civil rights, conspiracy, and RICO claims.

## November 22, 2024 - Family conflict at the core of the motivation behind the campaign to retaliate

### [EX 43 - Family Transcript]

#### conversation involving Marlene, Alan, Stephanie, and Tamera:

There's a major dispute over property ownership and control. Alan is adamantly claiming that Marlene and others have taken control of property that he believes is his. There are accusations of stolen property, misuse of power of attorney, and fraudulent property transfers.

Alan feels that Marlene, along with others, is isolating him and taking advantage of his situation. He mentions losing support, like Stephanie (Plaintiff) helping him, and even losing a pet, Bear (Plaintiffs dog).

Marlene and Alan's argument escalates to personal insults. Alan accuses Marlene of not taking care of him as their father allegedly wanted. Marlene counters that Alan is a grown man and that she owes him nothing.

Stephanie supports Alan's claims, repeatedly confronting Marlene about why she wanted power of attorney if she didn't intend to care for Alan. Stephanie also accuses Marlene of stealing property from her brother.

Tamera is caught in the middle, trying to diffuse the situation, suggesting that their father wouldn't want this conflict. She acknowledges the tension but doesn't take a firm side.

Alan mentions feeling bullied and even expresses suicidal thoughts due to the ongoing conflict, highlighting the emotional toll.

There's a clear pattern of longstanding family disputes, with references to their father's death, past grievances, and accusations of betrayal.

In summary, this conversation is part of a deeper, ongoing dispute involving claims of property theft, misuse of legal authority, and emotional and familial manipulation. Alan is resisting Marlene's alleged attempts to control his property, while Stephanie supports him and confronts Marlene. Tamera tries to mediate but is also drawn into the conflict.

First, the core dispute over property control matches the larger documented campaign against Alan, Stephanie, and Tamera. The transcript shows Alan accusing Marlene of taking the property without his consent. This lines up with the documented misuse of power of attorney and fraudulent property transfers. Alan's frustration about losing control of his home and property is a direct manifestation of what's documented as a campaign of dispossession.

Second, Marlene's dismissive attitude—her refusal to acknowledge Alan's claims, saying she doesn't need to take care of him and her insistence that he's a grown man—connects to the broader pattern of isolation and coercion identified in the case. Alan's statements about Marlene wanting power of attorney but not actually supporting him reflect the documented misuse of legal instruments to deprive him of autonomy.

Third, Stephanie's confrontations with Marlene—specifically about the felony accusations and property theft—tie into the broader legal narrative of fraudulent property transfers and manipulation. She's voicing the same core accusations that appear in the case documentation: that Marlene and others improperly took property from Alan and his family without consent.

Fourth, Alan's mention of feeling bullied to the point of suicidal thoughts is consistent with the emotional distress and vulnerability noted in the case documents. The record describes Alan as a vulnerable adult being coerced and isolated by Marlene. His statements in the transcript reflect the emotional toll of that coercion.

Fifth, Tamera's attempts to mediate and her role as a caretaker are noted in the case findings. She is described as having witnessed many incidents and being drawn into the conflict. In the transcript, she tries to calm the situation, reflecting her position as someone caught between the warring parties.

Finally, the general tone of hostility, accusations, and escalating confrontation fits the pattern of coordinated harassment, legal manipulation, and emotional distress outlined in the case. The conversation itself is a direct example of the family conflict, intimidation, and pressure described throughout the investigation.

Altogether, the transcript is a real-time snapshot of the long-term patterns of property conflict, emotional manipulation, and legal battles that are central to the case.

## November 22, 2024 - Family recording of Alan, Marlene, Tamera and Plaintiff Stephanie Farler.

### [EX 40A Family recording]

**On November 22, 2024, a crucial face-to-face conversation took place at the Sprague family property, shedding light on the fraudulent property transfer and the internal family conflict.** Present were Plaintiff Stephanie Farler, her partner Alan Sprague, Alan's sister Marlene Sprague, and Plaintiff's relative

Tamera Farler. The conversation was audio-recorded by the participants. A true and correct transcript of this recording is attached as EX 42, and the audio itself is identified as EX 43.

**During this conversation, Alan Sprague directly confronted Marlene Sprague about her misuse of a power of attorney and the fraudulent quitclaim deed.** Alan had recently discovered that Marlene, acting under a power of attorney granted by their late father, had secretly executed a quitclaim deed to put the entire property solely in her name, effectively cutting off Alan's ownership rights. This action was done without Alan's knowledge or consent. On the recording, Alan is heard angrily demanding that Marlene undo this wrongdoing, declaring: *"I want this house put back in my name, [and] the property taxes put back in my name!"* (EX 42). Alan's statement reflects his rightful position as a co-owner of the property and his insistence on being restored to that status.

**Marlene Sprague's response to Alan's demands was not a denial of the deed forgery, but a threat to involve law enforcement against Alan and Plaintiff.** Specifically, Marlene threatened to call the police and report Alan and Plaintiff for trespassing if they did not leave the property immediately (EX 42). This was an alarming threat because Alan lived on the property and had a legal interest in it that Marlene herself had curtailed only through the dubious quitclaim deed. Marlene's threat exemplifies an abuse of process: she was willing to misuse law enforcement (by falsely portraying lawful occupants as trespassers) to solidify the gains of her fraudulent scheme. In effect, she attempted to intimidate Alan and Plaintiff into submission by brandishing the threat of a wrongful arrest or removal.

**The recording also captured the profound emotional distress that Defendants' actions had inflicted on Alan Sprague.** At one point, overwhelmed by frustration and betrayal, Alan stated: *"To the point to where I want to kill myself – that's what I want to do."* (EX 42). This stark admission reveals the extreme psychological pressure Alan was under. It underscores how the combination of familial betrayal (by Marlene and perhaps other siblings) and relentless external harassment (by Justice Clark) had pushed him to a breaking point. Plaintiff can be heard trying to support Alan during this exchange, highlighting the personal toll their fight for their home was taking on them.

**Plaintiff Stephanie Farler is heard on the recording accusing Marlene Sprague of committing a felony theft of the property.** Plaintiff states to Marlene: *"The only reason I have to leave is because you committed a felony and stole the property from your brother."* (EX 42). Marlene does not issue any retraction or denial in response to this direct accusation. Instead, her reaction (as evidenced in EX 42) was to justify her actions by claiming she was following their deceased father's wishes. Such a justification implicitly acknowledges that she did indeed take actions to transfer the property; it is effectively an admission that the property was taken from Alan (and that she felt entitled to do so, rightly or wrongly).

**Sheriff and Marlene conversation [EX 40B].** This is a critical piece of evidence, as it provides unfiltered insight into the scheme and the participants' state of mind. It corroborates several elements of Plaintiff's claims:

- *Fraud and Forgery:* Alan's confrontation confirms that a secret property transfer occurred via abuse of power of attorney and a forged deed.
- *Extortion and Intimidation:* Marlene's threat to call the police on rightful occupants mirrors the extortionate tactic of using fear (of arrest or force) to maintain control of the property.
- *Knowledge and Intent:* The fact that Marlene resorted to threats rather than denying the fraud indicates **consciousness of guilt** and intent to maintain the upper hand by any means necessary.
- *Harm:* Alan's expression of suicidal ideation evidences the severe emotional harm caused by Defendants' conduct, supporting claims of emotional distress and the outrageous nature of the

Defendants' actions (relevant to punitive damages and the egregiousness of the civil rights violations).

On November 22, 2024, Marlene Sprague and a Snohomish County Sheriff engaged in a conversation inside the plaintiff's home following a call from Alan Sprague reporting Marlene's harassment and refusal to leave.

Marlene informed the sheriff that an ejectment had been served on the plaintiff and claimed to own the home, referencing a quitclaim deed. She explained that she visited to verify if the plaintiff had moved out. Marlene also admitted she did not currently live at the property but planned to move in. She described the living arrangements involving Alan's caretaker, Tamera, and Tamera's children.

A significant moment occurred when the sheriff acknowledged prior familiarity with the plaintiff, revealing he had previously served a warrant on the house related to an identity theft investigation involving Stephanie. This disclosure was highly unprofessional and gave Marlene insight into the sheriff's office's prior negative dealings with the plaintiff. This comment is crucial: it connected the ongoing confrontation to a broader pattern of misconduct by the same sheriff's office, which had been repeatedly involved in questionable searches, traffic stops, and legal actions against the plaintiff. This reinforces the plaintiff's claim of a coordinated conspiracy involving the misuse of authority.

Furthermore, Marlene explicitly stated that she was carrying a firearm and that she always carried it around the plaintiff. This detail is critical: it shows a pattern of intentional intimidation, reinforcing the plaintiff's allegations of extortion-like tactics—an overt act in the furtherance of the RICO conspiracy. The presence of the firearm was not incidental—it was part of Marlene's ongoing intimidation and harassment, aiming to pressure the plaintiff into submission.

The sheriff's neutral handling of Marlene's admission that she was armed further highlights the double standard at play. Marlene's armed presence and the sheriff's apparent alignment with her narrative, demonstrated through the disclosure of prior interactions with the plaintiff, establish a consistent pattern. This pattern links Marlene's conduct to the broader enterprise, involving private parties and the sheriff's office working together to deprive the plaintiff of her rights.

In summary, this transcription reveals not only the immediate details of the November 22 interaction but also its broader implications. The sheriff's mention of prior enforcement actions against the plaintiff, combined with Marlene's armed intimidation, demonstrates a continuous pattern of acts designed to intimidate, retaliate, and deprive the plaintiff of her property and rights. This supports the plaintiff's RICO claims, as it illustrates a coordinated enterprise, involving both private individuals and public officials, engaged in a pattern of racketeering activity—abuse of process, extortion, intimidation, and retaliation.

Marlene's repeated armed presence around the plaintiff was not an isolated incident but part of a series of overt acts designed to maintain control and ultimately force the plaintiff out of her home. When viewed alongside the sheriff's office's repeated involvement—from the disappearance of the plaintiff's court filings to prior illegal searches and traffic stops—this pattern forms the basis of the plaintiff's civil RICO claim. The sheriff's office's apparent indifference or tacit support of Marlene's actions—evidenced by the sheriff's acknowledgment of prior dealings with the plaintiff and the lack of intervention in Marlene's armed intimidation—serves as further proof of a coordinated enterprise.

The November 22, 2024, conversation illustrates how private actors (Marlene Sprague) and public officials (the Snohomish County Sheriff's Office) worked in concert to further the scheme. The sheriff's failure to intervene—coupled with the sheriff's divulgence of information unfavorable to the plaintiff—reinforces the plaintiff's assertion that the legal process was weaponized against her.

This event is a critical piece of evidence supporting the plaintiff's RICO claim. It demonstrates a final overt act in furtherance of the conspiracy: the intimidation, the armed threats, the sheriff's disclosures, and the

resulting actions all culminated in the plaintiff's eventual eviction. This overt act, along with the prior pattern of fraudulent transfers, fraudulent court processes, and harassment, completes the racketeering pattern and solidifies the conspiracy to deprive the plaintiff of her constitutional rights.

Ultimately, this interaction underscores the convergence of private wrongdoing and public authority misuse, reinforcing the plaintiff's claims for relief under 42 U.S..C. § 1983, 42 U.S.C. § 1985(3), and 18 U.S..C. § 1962(c)-(d). Each element of this exchange—the intimidation, the sheriff's disclosure, and the lack of action against Marlene—contributes to the broader narrative of a conspiracy designed to silence, displace, and punish the plaintiff for her refusal to give up her rights without a fight.

**The events of this family meeting tie directly into the broader pattern of racketeering and retaliation.** Immediately after this confrontation, the recording shows that **when challenged, the Defendants doubled down on threats and coercion**, rather than reconsidering their unlawful actions. This further demonstrates that the subsequent steps—such as obtaining the Writ of Ejectment—were taken willfully and in concert, as part of the same conspiratorial enterprise, rather than as independent or unrelated events.

## November 24, 2024 - Last day at home  Sheriffs serve the Writ of Ejectment

.

### [EX UD PACK Writ of Ejectment Nov 24, 2024]

**November 24, 2024 was the last day Plaintiff was allowed to remain in her home** Alan Spragues property. On that day, Snohomish County Sheriff's deputies arrived to execute a Writ of Ejectment against Plaintiff, forcibly removing them from the property (EX 44). This eviction was the culmination of the coordinated actions by Defendants, coming after the fraudulent transfer of title and the campaign of harassment.

The **Writ of Ejectment had been issued by a Snohomish County Superior Court judge** after Marlene Sprague, through her attorney Rob Trickler, filed a motion for summary judgment in an eviction (ejectment) proceeding. Marlene's motion was premised on her claim to be the sole owner of the property (by virtue of the quitclaim deed she obtained). According to the court's docket and order, **the motion for summary judgment was granted unopposed** – the record reflected that Plaintiff (the defendant in the ejectment case) did not file any response or opposition.

**In reality, Plaintiff did prepare and submit a timely written response opposing the summary judgment motion** in the ejectment case. On October 16 2024 Plaintiff personally delivered her **written reply brief** to the Snohomish County Superior Court Clerk's office. Mere minutes after filing it with the court, Plaintiff brought a courtesy copy to the office of opposing counsel, Rob Trickler. At Mr. Trickler's office, an employee stamped Plaintiff's copy as "RECEIVED" with the date and time, acknowledging receipt of the document (Plaintiff's file-stamped reply is included in **[EX UD PACK]**). **Thus, Plaintiff has physical evidence that her opposition to the eviction was submitted and received by the attorney for Marlene Sprague**.

Plaintiff Stephanie Farler has the stamped documents from Tricklers office and she also has recor of an email that was sent to judge steffener directly to his working copies email address that is included in the **[EX UD PACK]** from October 31, 2024 right after Alan Sprague and Plaintiff Stephanie Farler left the court house after being told there matter was already decided and there was no reply by the clerk in the court room that morning.

When looking online at the courts records of this matter, the case file shows that the Summary Judgment was granted on the 30th of October. That is one day before the scheduled court date. There was also a

phone call to Alan on the 30th in the morning from Marlene asking Alan to "relay a message to Stephanie because court was canceled tomorrow and we didn't need to show up".

Despite this, when the court considered Marlene's summary judgment motion, **Plaintiff's opposition was apparently never presented to or considered by the judge.** The official case docket contains no record of Plaintiff's filing. The court's order granting the Writ of Ejectment indicates that it was treated as an unopposed motion. This outcome is deeply troubling given that opposing counsel had actual knowledge of the existence of Plaintiff's opposition (via the stamped copy in his possession). **If a filing submitted by a pro se litigant fails to appear in the record, the opposing attorney's ethical duty of candor should compel them to inform the court.** In this case, no such disclosure was made by Mr. Trickler's office. The result was that the court, unaware of Plaintiff's arguments and evidence of fraud, granted the eviction solely on Marlene's submissions.

**The circumstances surrounding the granting of the Writ of Ejectment suggest collusion or at least a serious procedural irregularity involving the court system and the private parties.** Plaintiff alleges that the disappearance or omission of her opposition filing was not an accident. Given the stakes and the clear evidence of fraud Plaintiff presented in that document (including proof of the forged deed and the history of harassment), the only way Marlene's motion could prevail was if Plaintiff's side of the story was never heard. The coordination between Marlene Sprague, Darlene Rosenquist, Justice Clark, and attorney Rob Trickler – effectively an alliance to dispossess Plaintiff – extended into the judicial arena. **By ensuring Plaintiff's opposition was ignored, the enterprise secured a crucial victory in its scheme: a court order removing Plaintiff under color of lawful process.**

This reflects an abuse of the legal system as part of the conspiracy and is an overt act in furtherance of the 42 U.S.C. § 1985(3) conspiracy to deprive Plaintiff of her rights (equal protection and property rights). As well as reflects the claims for First Amandment Retaliation because the core reason for this behaviour was to win and force Plaintiff to be homeless for her refusing to allow anyone to violate her constitutional rights without speaking out and standing her ground. as well as decomstrates a Rico predicate act of abuse of process and retaliation as well as 1983 claims for monell liability for the courts deliberate indiffrence to plaintiffs well being and safety and due process violations and equal protection.

**As a direct consequence of the Writ of Ejectment's execution, Plaintiff was forced out of her home without a fair opportunity to be heard**, and Alan Sprague was similarly dispossessed of his rightful property interest. Plaintiff lost not only her residence but also the sense of security and community that came with her home of many years. The eviction was carried out in the presence of law enforcement, giving it the aura of legitimacy, even though it was obtained through fraudulent and unethical means. This event marks a significant **Fourth Amendment violation** as well, in that it constituted an unreasonable seizure of Plaintiff's home and effects, accomplished through deception and without due process of law (a violation of the Fourteenth Amendment's Due Process Clause).

**The November 24, 2024 eviction underscores the retaliation and conspiratorial misconduct at the heart of Plaintiff's complaint.** It occurred in the wake of Plaintiff's persistent efforts to seek help from law enforcement and to resist the fraudulent eviction through legal channels. Instead of being protected for speaking out and asserting her rights, Plaintiff was met with a devastating outcome orchestrated by the very individuals she had been complaining about. The timing and manner of the eviction thereby serve as the climax of Defendants' First Amendment retaliation against Plaintiff for her outspoken opposition and her attempts to expose their unlawful behavior. It is also the final predicate act (abuse of judicial process via fraud) in the pattern of racketeering, bringing the enterprise's scheme to fruition.

In summary, the period from **November 13, 2024 through November 24, 2024** encapsulates a convergence of private wrongdoing and public authority misuse: Plaintiff's pleas for help were ignored, evidence was suppressed or lost, a fraudulent deed was given effect by the court, and an innocent person was ousted from her home. These factual allegations will support Plaintiff's claims for relief,

including violations of her civil rights under 42 U.S.C. § 1983 (by Snohomish County's deputies and policy makers), conspiracy to interfere with civil rights under 42 U.S.C. § 1985(3), retaliation for exercising First Amendment rights, Monell liability against Snohomish County for deliberate indifference, and a civil RICO claim under 18 U.S.C. § 1962(c)-(d) based on the pattern of predicate acts by the association-in-fact enterprise.

## December 2, 2024 - Alan Sprague corrected the property Deed back to his name

### [EX 4| Alans corrected Property Deed]

Plaintiff asserts the following facts regarding the correction of Alan Sprague's property deed and the actions undertaken:

On or about December 2, 2024, Alan Sprague, the rightful owner of the property, corrected the property deed to restore it to his name. Alan was the original owner; it was part of his inheritance from his parents.

Alan Sprague contacted the plaintiff and requested that she accompany him to the auditor's office to correct the fraudulent deed, which had previously been transferred out of his name by Marlene Sprague through misuse of Power of Attorney and coercion See [EX UD Pack].

At Alan's request, plaintiff agreed to have her name added to the deed to help protect Alan from further unauthorized transfers and to ensure that his sisters could not remove his name without his consent or knowledge.

The correction of the deed was done in good faith, in the presence of the auditor, with Alan fully understanding the process. No part of the process was illegal or improper, as Alan, the rightful property owner, requested and signed the deed adjustment.

This action was taken to protect Alan from further fraudulent or coercive actions by Marlene Sprague, who had previously engaged in fraudulent transfers of Alan's property without his consent, as documented through multiple declarations and evidence.

The plaintiff's involvement in the process was solely to ensure Alans protection from further exploitation.

The evidence shows that Alan was deprived of his property through prior fraudulent actions by Marlene Sprague, and his decision to correct the deed and his request to add the plaintiff was a legitimate correction to regain control of his home and protect himself from further harm.

This section frames the correction of the property deed as a good-faith action, supported by Alan's ownership rights and his desire to prevent further fraudulent interference. It highlights the prior fraudulent transfers by Marlene and underscores that the plaintiff's involvement was neither criminal nor improper.

## December 5, 2024 - Vulnerable adult protection order granted by court despite no supporting evidence or the vulnerable adult's consent

### [EX 42- VAPO (Retaliation) Granted]

The vulnerable adult protection order (VAPO) was granted despite no supporting evidence or the vulnerable adult's consent.

Marlene Sprague initiated this as part of a pattern of retaliatory legal actions against the plaintiff, following the correction of Alan Sprague's property deed.

The initial VAPO prohibited the plaintiff from contacting Alan for about two weeks, pending a hearing.

At the hearing, Alan testified that he supported the plaintiff and was opposed to her removal, and that the plaintiff was added to the deed at his request.

Based on Alan's testimony, the court ultimately denied the protection order.

After the hearing, Marlene escalated by contacting prosecutors and raising criminal allegations against the plaintiff, linked snohomish county charges filed against plaintiff in retaliation from the invalid search warrant done by snohomish county sheriffs  County.

Marlene's actions are part of a documented pattern of coordinated harassment, abuse of court processes, and manipulation of APS and law enforcement to isolate and discredit the plaintiff. These actions also represent a continued effort to harass and retaliate against protected speech, falling under the RICO predicate acts.

Relevant exhibits mentioned:

- EX 42: VAPO (Retaliation) Granted
- EX UD Pack (Marlene Spragues Declarations)
- EX 40A: Family Transcript
- EX 23: Marlene in driveway at 12:30 AM
- EX 24: Revoked POA for misuse
- EX IIED PACK (Response to IIED)

## Dec 10, 2024 - Protection Order filed after November's shooting caught Justice Clark on camera

### Protection order S F v. J C No. 24-2-50260-31

### [EX 52, 51, 50b, 47, 45, 47, 43, 40a, 40b, 37, 35a, 35b, 28]

In addition to the November 22, 2024 confrontation, another critical event occurred on December 10, 2024. On that date, the plaintiff, Stephanie Farler, filed a petition for a protection order against Justice Clark, connected to a shooting incident caught on camera. Clark had been documented repeatedly harassing the plaintiff, including calling 911 over her vehicle movements. This harassment escalated to the point where Justice Clark was seen on security footage firing seven rounds into the plaintiff's vehicle, and still images and photos of the damage were submitted as evidence (EX 52, 51, 50b, 47, 45, 43, 40a, 40b, 37, 35a, 35b, 28).

The plaintiff's petition for a protection order included not only this evidence but also the transcription of the November 22, 2024, family conversation, showing the coordination among the involved parties. Despite the gravity of the evidence, the court failed to grant a weapon surrender order and repeatedly postponed hearings, ultimately delaying any resolution until late February 2025. Frustrated by the court's lack of assistance, the plaintiff withdrew her petition, further cementing the pattern of judicial indifference and obstruction of justice.

This December 10 event ties directly into the broader claims of harassment, civil rights violations, and conspiracy. It supports the plaintiff's claims under 42 U.S.C. § 1983 for constitutional violations, under § 1985(3) for conspiracy to interfere with civil rights, and under RICO statutes for coordinated actions involving fraud, extortion, and intimidation. The repeated postponements and the court's refusal to issue a weapon surrender order underscore a pattern of delayed or inadequate judicial response. This deliberate

indifference supports Monell liability claims against the municipality for failing to act in the face of clear threats to the plaintiff's safety and well-being. The court's failure to address the protection order in a timely and thorough manner further illustrates the broader narrative of official neglect and misconduct that frames the plaintiff's entire case.

## December 17, 2024 – The Sheriff's return of service for the plaintiff's petition was marked as NOT SERVED by the Sheriff.

### [EX 52, 51, 50b, 47, 45, 47, 43, 40a, 40b, 37, 35a, 35b, 28]

On December 17, 2024, the plaintiff's petition for the protection order was returned by the Sheriff's Office marked as "NOT SERVED." This failure to serve the protection order constitutes evidence of official neglect, bias, and a failure to protect the plaintiff's safety. Meanwhile, a vulnerable adult protection order filed by Marlene Sprague on behalf of Alan Sprague—without actual supporting evidence or Alan's consent—was successfully served on the plaintiff. This order restricted the plaintiff from contacting Alan Sprague, effectively preventing her from seeing her family during a time of homelessness and emotional hardship.

This stark disparity in how the Sheriff's Office handled the two protection orders—failing to serve the plaintiff's petition while swiftly enforcing Marlene's—adds further evidence of official bias, neglect, and a failure in training or supervision by Snohomish County. The plaintiff was barred from family contact during an already vulnerable period, deepening the emotional harm inflicted by the defendants' coordinated actions.

This sequence of events—Justice Clark's shooting, the court's delays, the failure to serve the plaintiff's protection order, and the successful enforcement of Marlene's order—further strengthens the plaintiff's claims under 42 U.S.C. § 1983 for constitutional violations, § 1985(3) for conspiracy to interfere with civil rights, and under RICO for coordinated fraud, extortion, and intimidation. It also bolsters the Monell liability claims against Snohomish County for deliberate indifference and failure to properly train or supervise its personnel.

The plaintiff's petition for a protection order was not served by the Sheriff's Office, and the document was returned without service. This return constitutes evidence of a failure in training, official bias, and neglect toward the safety of victims.

Meanwhile, a vulnerable adult protection order filed by Marlene Sprague on behalf of Alan Sprague— lacking actual supporting evidence and Alan's consent—was successfully served on the plaintiff. This order restricted the plaintiff from contacting Alan Sprague, preventing her from seeing her family during a time of homelessness and emotional hardship.

This pattern of official conduct supports multiple legal claims, including:

1. Violations of constitutional rights under 42 U.S.C. § 1983.

2. Conspiracy to interfere with civil rights under 42 U.S.C. § 1985(3).

3. Obstruction of justice and abuse of legal process.

4. Deliberate indifference and Monell liability against Snohomish County for failure to train or supervise personnel.

5. Claims under RICO (18 U.S.C. § 1962) supported by coordinated acts of fraud, extortion, and intimidation.

This factual allegation ties into the broader legal narrative of constitutional violations, abuse of process, and civil rights infringements.

## December 20, 2024 - Motion for preassignment of Plaintiffs IIED claims against the defendants was denied

### [EX ___Denied pre assignment IIED]

On December 20, 2024, the Plaintiff's motion for preassignment of the Intentional Infliction of Emotional Distress (IIED) claims was denied. The plaintiff cited the complexity of the case and the multiple court hearings that had been stricken due to improper filing dates or documents as the main reasons for her motion. The plaintiff emphasized minimizing costs for all parties involved. Yet this was denied. The Plaintiff wishes to clarify that this complaint does not challenge the final rulings in these matters, but rather serves to outline the impact of those prior procedural issues on the Plaintiff's claims.

The court's denial of preassignment is part of the broader context of the ongoing harassment and procedural obstacles faced by the Plaintiff. The denial reflected the ongoing pattern of procedural irregularities and delays that contributed to the Plaintiff's emotional distress. This event further documents the Plaintiff's claim of IIED against the defendants, underscoring the emotional toll of repeated legal setbacks and procedural barriers.

## January 7, 2025 APS report letter and emails - Retaliation

### [EX 46 & 46B]

## January 10, 2025 Marlene's coordination with the sheriff's letterhead

### [EX 48]

In this document there is no police officers signiture but the sheriffs letter head is up top. this was something that was meant to scare plaintiff from visiting her mother and family at the home. proof that mthe defendants have intentionally isolated plaintiff from family and suppor in her time of need. IIED Rico predicate act of intimidation and conspiracy. I am out of time to complete this so I am submitting what I have. the rest of the evidence will be attached in discovery.

## January 26, 2025 Justice Clark Supplemental reply to protection order

### [EX 50]

## January 28, 2025 Transcription of court hearing

### [EX 51]

Factual Allegations from February 11, 2025 Court Transcription

1. Proof of Service and Prior Admissions:
   - Stephanie Farler stated that she had filed proof of service with the clerk's office, confirming that Justice Clark had been served. She highlighted a prior hearing with Commissioner Kirkley, in which Clark admitted he had received the documents. Despite this admission, Clark later contradicted himself by claiming he had not been served.
   - Susan Harness reviewed the prior order from December 18, which indicated that the matter was continued to allow additional time for service. There was no official record of the newly filed proof of service, leading to confusion regarding the status of the service in the case.

2. Commissioner Kirkley's Instructions:

- ○ Stephanie mentioned that during the hearing with Commissioner Kirkley, Justice Clark had agreed to be served by the Sheriff's Office, and specific arrangements had been made. She noted that Clark had been given the option to select a location for service, and he had chosen the Sheriff's Office. Despite this, Clark later denied having been served and questioned the validity of the service process.

3. Justice Clark's Position:

- ○ Justice Clark acknowledged that he had served Stephanie Farler via email, stating that he had used the email address because he did not know where else to serve her due to her having been previously removed from the neighboring property. He admitted that his service was late and apologized to the court, but maintained that proper service from Farler was not in order because he never received traditional personal service.

4. Court's Clarification on Service:

- ○ Susan Harness emphasized that Farler had the right to request law enforcement service. She clarified that it was not mandatory for Farler to hire a process server or rely on personal acquaintances. The court noted that the Sheriff's Office had made one attempt to serve Clark, and if two attempts were unsuccessful, the court could consider alternate methods of service.

5. Safety Concerns and Firearm Allegations:

- ○ Stephanie Farler raised concerns about her safety, stating that Clark had used a firearm in a threatening manner, and there was video and photographic evidence. She questioned why temporary protection, including firearm surrender, had not been granted. Susan Harness responded that the court was not changing any underlying orders and that Clark had a right to a full hearing before any action on the firearm allegations.

6. Future Steps and Hearing Reset:

- ○ The court concluded by resetting both matters for a future date, emphasizing that the Sheriff's Office would need to attempt service again. Clark indicated that he would cooperate with any future attempts at personal service.

## Feburary 11, 2025 transcription of court hearing

### [EX 52]

Section: Factual Allegations from February 11, 2025 Court Transcription

1. Service of Court Documents Dispute:

- ○ Susan Harness, presiding, asked Justice Clark if he had been served. Clark stated he had not been served by law enforcement.

- ○ Stephanie Farler argued that Clark admitted to having received the documents and even responded to specific points in her petition. She noted that Clark's response addressed details from her filings, raising contradictions about his claim of non-service.

- ○ The court reaffirmed that no official proof of service was in the file, leading to confusion over whether law enforcement had followed through with the court-ordered service.

2. Dispute Over Electronic Service:

- ○ Stephanie Farler expressed frustration that Clark served her through email, while she was not allowed to serve him the same way. Susan Harness explained that electronic service had been previously authorized by a court order, but the inconsistency in enforcement led to confusion. Stephanie denied agreeing to electronic service and reiterated that she had never consented to it.

3. Discussion on Delays and Continuances:

   ○ The court noted that the case had been ongoing since October and that multiple continuances had occurred due to unresolved service issues. Stephanie objected to further continuances, saying that the delays were unjustified, especially since Clark had acknowledged receiving the documents informally.

4. Withdrawal of Petition:

   ○ Toward the end of the hearing, Stephanie Farler requested to withdraw her petition entirely, expressing frustration with the process and the court's handling of the matter. She indicated her intent to refile a new petition with additional evidence, but she did not want the cases combined.

5. Court's Response and Next Hearing Date:

   ○ The court acknowledged the withdrawal of the petition and confirmed it on the record. Susan Harness indicated that a new hearing date was set for February 25, 2025, to address the remaining issues. Both parties confirmed availability for that date.

## February 20, 2025 Snohomish County filed charges for the search warrant in retaliation. [EX 70]

1. Background of Initial Incident – September 16, 2022:

   ○ Snohomish County Sheriff's deputies executed a search warrant at 4232 142nd Ave NE, Lake Stevens, WA.

   ○ The warrant lacked a judicial officer's signature and was described as "email approved," raising serious questions about the validity of the search.

   ○ During the search, Farler's vehicle was removed from private property and impounded even though it was not listed on the warrant inventory. The warrant was taped to the door after the search, and the lack of a valid signature violated the proper legal procedures.

   ○ Farler was arrested on identity theft charges, and her vehicle was towed about an hour after the search, contributing to reputational harm and emotional trauma.

2. Retaliatory Actions and Coordinated Harassment:

   ○ Following the initial incident, Farler and Alan Sprague alleged a multi-year pattern of coordinated harassment by Marlene Sprague, Justice Clark, and Darlene Rosenquist. This included false police reports, malicious reporting to APS/CPS, surveillance, and repeated property damage.

   ○ Justice Clark admitted in declarations to carrying a pistol at night and surveilling Farler, and there were documented incidents of vehicle vandalism—including radiator sabotage and firearm attacks on Farler's car. Deputies collected shell casings from a vehicle shooting but failed to process or preserve them.

   ○ The retaliatory pattern included repeated legal filings, including eviction and ejectment actions, protection order petitions, and quiet title lawsuits. Most protection order requests were denied or dismissed for lack of evidence or procedural issues, but Marlene Sprague successfully obtained a writ of ejectment against Farler.

3. February 20, 2025 – Identity Theft Charges:

   ○ After a long period of inactivity on the original identity theft charges, Snohomish County filed new 2nd-degree identity theft charges against Farler. This coincided with renewed contact from Marlene and Darlene Sprague and was viewed as a form of retaliation.

- ◦ The prosecutor's office presented the unsigned search warrant from the 2022 search as evidence in the new charges, despite full awareness that it lacked a signature. Farler alleged that this misuse of evidence and the timing of the new charges demonstrated malicious intent and retaliation for her previous legal advocacy.

4. Law Enforcement and Prosecutorial Inaction:

- ◦ Despite repeated reports of violence, threats, and fraud by Marlene Spr

5. Law Enforcement and Prosecutorial Inaction (continued):

- ◦ Law enforcement repeatedly declined to fully investigate the allegations raised by Farler and Alan Sprague, including the failure to process shell casings from the vehicle shooting and the refusal to classify Farler as a victim in various incidents.

- ◦ The prosecutor's office similarly failed to pursue or investigate reports of fraudulent property transfers, intimidation, and the misuse of emergency services. This inaction allowed the retaliatory pattern to continue unchecked.

- ◦ There were repeated instances of procedural irregularities in court, including the denial of Farler's protection order petitions despite supporting evidence of threats and violence.

6. Impact of Retaliatory Actions:

- ◦ As a result of the ongoing harassment, threats, and misuse of court and law enforcement processes, Farler experienced severe emotional distress, loss of employment (including her jobs at Boeing and UPS), and housing instability, culminating in homelessness.

- ◦ The cumulative effect of these actions, from the execution of the invalid search warrant to the filing of new criminal charges in 2025, demonstrates a pattern of retaliation in response to Farler's attempts to seek court access and protect her rights.

## May 9, 2025 Hearing in Support of Conspiracy and RICO Claims

The events and statements made during the court hearing on May 9, 2025, provide direct evidence of the coordinated and conspiratorial actions of the defendants—Marlene Sprague, Darlene Rosenquist, and Justice Clark—**in furtherance of the pattern of racketeering activity and civil conspiracy alleged in this complaint.**

### Fraudulent Property Transfer and Forgery:

During the hearing, the defense explicitly alleged that I, the plaintiff, participated in a fraudulent property transfer. The defense counsel stated:

"REIN: So, as you may have figured out earlier, Ms. Farler had to be ejected from my client's house. ... Somebody forged a deed to Ms. Farler ... the deed is not affected but it was reported, and I suspect the title." This allegation of forgery fits directly into the larger pattern of fraudulent activity that the defendants have repeatedly engaged in.

Furthermore, my testimony highlighted that Marlene Sprague unilaterally altered the quitclaim deed to remove her brother Alan:

"FARLER: She went and she removed her brother, Alan, from it. And she took a power of attorney that was not created in a valid way." This demonstrates the ongoing conspiracy to manipulate and control ownership of the property—an act that aligns with the broader pattern of extortion and property fraud.

### Retaliatory Use of Criminal Charges:

The hearing further revealed that the defendants introduced evidence of pending criminal charges as a tactic to undermine my credibility. When I objected to the relevance of those charges, Judge Okrent questioned my response:

*"OKRENT, RICHARD: Are you telling me they don't have a due process right to respond to you?"*
*"FARLER: They absolutely do, but the things that they say ..."*

This exchange highlights that the introduction of pending charges was not a neutral act. Instead, it served as part of a conspiratorial effort to discredit me and obstruct justice, fitting into the broader RICO scheme of using legal processes as tools of manipulation.

### As I testified:

"FARLER: The charge that he was saying about two months ago was a pending charge. So no way is that admissible ... it's innocent until proven guilty in the court of law." This underscores the retaliatory nature of introducing unproven allegations as part of the coordinated attacks against me.

### Coercion of Alan Sprague and Power of Attorney Abuse

My testimony demonstrated that Alan Sprague was coerced into altering the property ownership to prevent his sisters from taking control. I stated:

*"FARLER: All he did was ask me to be on the deed to protect him. And so I went to the auditor's office ... He was scared they were going to do that to him."*

**This testimony underscores the element of coercion:** that Alan was placed in a vulnerable position, manipulated by Marlene Sprague, and that the power of attorney was abused as part of the scheme. The coordination between Marlene Sprague and Darlene Rosenquist is evident in the joint legal actions and the manipulation of Alan's ownership.

### Judge Okrent's own words further emphasize the significance of this coercion:

*"OKRENT, RICHARD: Some of the statements that you just made could be used against you in a criminal case."*

This statement reflects the gravity of the situation and the potentially criminal nature of the coordinated property transfer efforts, supporting the RICO claim's allegation of fraud and extortion in the context of property manipulation.

### Coordinated Legal Actions as Part of the Conspiracy:

The May 9 hearing also demonstrated the coordinated nature of the defendants' legal strategy. Defense counsel Mr. Rein's argument that all alleged conduct did not meet the standard for "*extreme and outrageous*" shows a unified defense strategy aimed at dismissing the IIED claim. The judge's consistent refusal to entertain new evidence or challenges also reflected procedural barriers that aligned with the defendants' coordinated legal maneuvers.

This coordination is further exemplified in the defense's attempt to leverage credibility issues. Judge Okrent stated: *"OKRENT, RICHARD: Because your credibility is relevant every time a case comes forward now. Why? Because that's the law."*

This quote underscores that the defendants' coordinated focus on discrediting me and using every procedural avenue to challenge my credibility was part of the broader conspiracy to obstruct justice and maintain control over the narrative.

### V. Conclusion:

The May 9, 2025 hearing is a critical piece of evidence that exposes the defendants' coordinated actions and further supports the conspiracy and RICO claims. The fraudulent property transfer, the retaliatory use of pending criminal charges, the coercion of Alan Sprague, and the unified legal maneuvers all show a clear pattern of coordinated conduct. This hearing transcript is an integral part of the evidence in this complaint and provides direct support for the allegations of conspiracy, fraud, and racketeering.

### Stephanie Farler's Position

- Asserted that Alan Sprague, the original property owner, asked her to be added to the deed to protect his rights from his sisters.
- Explained that she accompanied Alan to the auditor's office, where he added her to the deed voluntarily.
- Argued that her inclusion was lawful and protective, not fraudulent.
- Challenged the relevance of her deed involvement to the IIED claim, emphasizing that Alan was the property owner and had legal authority.

### Judge Okrent's Response

- Repeatedly pressed Stephanie to confirm whether her name was on the deed.
- Asserted that her **credibility is legally relevant** in all future proceedings.
- Refused to consider new documents during the hearing.
- Warned that her statements about the deed could be used against her in a **criminal investigation**.
- Emphasized that **pro se litigants are held to the same standard as attorneys** in Washington State.

### Courtroom Tension

- Alan Sprague protested that his mother gave him the house.
- Judge Okrent called for security and reiterated that the property legally belonged to Sprague and Rosenquist.
- The judge noted that the ejection order was signed by Judge Steffener and denied upon appeal.

### V. CAUSE OF ACTION

## COUNT I – CONSTITUTIONAL VIOLATIONS (Fourth and Fourteenth Amendments – 42 U.S.C. § 1983 – Against Snohomish County, Skagit County, and Does 1–10)
## Demand for Relief: $8,000,000

Statutes Violated:
This Count arises under 42 U.S.C. § 1983 for Defendants' violations of Plaintiff's rights under the Fourth Amendment (protection against unreasonable searches and seizures) and the Fourteenth Amendment (due process and equal protection of the laws).

Allegations:

Incorporation of Allegations:
Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

### Unlawful Search and Seizure (Fourth Amendment):
Defendants Snohomish County and Skagit County, acting under color of state law and in coordination with private parties, deprived Plaintiff of her property and security through an unlawful search and seizure. In September 2022, Snohomish County officers searched Plaintiff's home pursuant to a defective warrant that lacked a judge's signature and required correspondence. This unsigned warrant conferred no

lawful authority, yet officers proceeded to raid Plaintiff's home, rifling through personal papers and electronic data, and seizing items without probable cause or proper judicial approval. Additionally, private defendants, working in close coordination with county officials and participating in an association-in-fact enterprise, used a fraudulent writ of ejectment based on falsified documents (see **[EX UD PACK]**). This coordinated action, involving both public officials and these private defendants acting under color of law, resulted in Plaintiff's forcible removal from her home, constituting an unreasonable seizure in violation of the Fourth Amendment (Soldal v. Cook County, 506 U.S. 56 (1992)). Plaintiff was entitled to be secure in her home and property; Defendants' coordinated, baseless intrusion and dispossession violated that right.

### Selective Treatment and Equal Protection (Fourteenth Amendment):

Defendants also treated Plaintiff disparately from similarly situated individuals, without any rational basis, in violation of the Equal Protection Clause of the Fourteenth Amendment. While Defendants—who were parties to the same disputes—received swift and favorable law enforcement responses, Plaintiff's own legitimate requests for protection and relief were summarily denied or ignored. Judicial staff and law enforcement officers exhibited open hostility toward Plaintiff, influenced by her background and her status as a pro se litigant, rather than evaluating her claims on their merits. This intentional, differential treatment of Plaintiff as a "class of one" had no lawful justification. Instead, it was motivated by animus, depriving Plaintiff of equal protection of the laws (Village of Willowbrook v. Olech, 528 U.S. 562 (2000); Armstrong v. Davis, 275 F.3d 849 (9th Cir. 2001)). Such disparate handling of Plaintiff's cases—denying her relief where others in like circumstances would receive it—was carried out pursuant to County customs and a common plan among Defendants and private co-conspirators to undermine Plaintiff.

### Retaliation and Denial of Access to Courts (First and Fourteenth Amendments):

When Plaintiff sought to petition the courts and seek official help, Defendants retaliated and obstructed her access to judicial remedies. Through the coordinated actions of county officials and private defendants, key evidence offered by Plaintiff—including affidavits corroborating her claims—was excluded or struck from the record. Plaintiff's petitions were dismissed without fair hearings, and Defendants repeatedly prejudiced the proceedings by bringing up unrelated criminal charges—which were themselves the product of Defendants' unlawful actions—to discredit Plaintiff. During her court-ordered home detention, Marlene Sprague and Darlene Rosenquist deliberately cut off her internet access, knowing she relied on electronic communication for her legal defense. This act impeded Plaintiff's ability to prepare filings and communicate with advisors, effectively hampering her right to meaningful access to the courts. These acts violated Plaintiff's First Amendment right to petition the government for redress of grievances and her Fourteenth Amendment due process right to a fair and full opportunity to present her claims (Bounds v. Smith, 430 U.S. 817 (1977); Christopher v. Harbury, 536 U.S. 403 (2002)). As a result of Defendants' obstruction, Plaintiff was denied a full and fair opportunity to be heard, and the outcomes of crucial matters were decided not on the merits, but due to Defendants' misconduct.

### Denial of Due Process – Lack of Fair Hearing (Fourteenth Amendment):

Defendants' concerted actions deprived Plaintiff of procedural due process. Plaintiff was entitled to fair, impartial adjudication of her rights and to be heard in a meaningful manner at meaningful times. Instead, as described, court officials—including clerks and staff acting beyond their authority—effectively pre-judged Plaintiff's applications and prevented her from fully presenting evidence and arguments. Key decisions—such as the eviction from her home—were executed without proper notice or opportunity to be heard, relying on defective court orders obtained through fraud. Law enforcement officials likewise refused to enforce court orders that were beneficial to Plaintiff or to investigate clear wrongs against her, denying her the ordinary protections of the law. This egregious lack of due process shocks the conscience and violates the Fourteenth Amendment. Plaintiff was entitled to neutrality and fair procedure (Goldberg v. Kelly, 397 U.S. 254 (1970); Mathews v. Eldridge, 424 U.S. 319 (1976)); instead, Defendants' actions ensured a tainted process where outcomes were driven by malice and collusion rather than facts.

**Official Policy, Custom, and Conspiracy:**
The above-described constitutional violations were not random acts of rogue individuals. They were the direct result of official policies, customs, or practices of Snohomish County and Skagit County, and the product of a conspiracy between state actors and private individuals. County policymakers knew or should have known about the defective warrant and improper home removal, yet failed to train, supervise, or discipline their officers, effectively ratifying those actions (Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); Connick v. Thompson, 563 U.S. 51 (2011)). The widespread hostility toward Plaintiff—from sheriff's deputies to court personnel—reflects an unofficial custom within both Counties to treat Plaintiff as an adversary rather than a citizen deserving protection.

**Furthermore, sabotaging Plaintiff's rights required coordination:** private individuals (Alan Spragues sisters) initiated false claims, and County officials lent the power of the state to those unlawful ends. This meeting of the minds is actionable as a civil conspiracy under § 1983 and § 1985(3). Defendants Snohomish and Skagit Counties, through their employees, agreed among themselves and with private co-conspirators to achieve the unlawful objectives described—e.g., to unlawfully evict Plaintiff from her home, to prosecute her on trumped-up charges, and to suppress her legal challenges. This joint engagement of state and private actors makes all participants liable under § 1983 (Dennis v. Sparks, 449 U.S. 24 (1980); Fogel v. Collins, 531 F.3d 824 (9th Cir. 2008)), and the invidiously discriminatory intent (targeting Plaintiff as a lone, vocal opponent) triggers §

# COUNT II – FIRST AMENDMENT RETALIATION
## *(42 U.S.C. § 1983 – Against Snohomish County, Justice Clark, Marlene Sprague, and affiliated actors)*
## Demand for Relief: $2,000,000

**Statutes Violated:**

- **42 U.S.C. § 1983** – Civil action for deprivation of rights
- **First Amendment** – Right to petition the government; freedom of speech and association

**Elements of the Claim:**
To establish a First Amendment retaliation claim under § 1983, Plaintiff must show:

**(1)** she engaged in constitutionally protected activity;

**(2)** Defendants took adverse action against her that would chill a person of ordinary firmness from continuing to engage in that activity; and

**(3)** Plaintiff's protected activity was a substantial or motivating factor behind Defendants' conduct (*Pinard v. Clatskanie Sch. Dist., 467 F.3d 755, 770 (9th Cir. 2006); CarePartners LLC v. Lashway, 428 F. Supp. 3d 1213, 1227 (W.D. Wash. 2019))*.

Municipal liability attaches if this retaliation flowed from a County policy or custom or from a failure to train and supervise amounting to deliberate indifference *(Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); Lytle v. Carl, 382 F.3d 978, 983 (9th Cir. 2004))*.

**Allegations:**

**Incorporation of Prior Allegations:** Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

**Plaintiff's Protected Activity – Petitions and Complaints:** Plaintiff engaged in constitutionally protected petitioning and expressive activity. She **filed multiple petitions for protection orders**, **submitted formal**

**judicial complaints** against court personnel, and **documented unlawful property transfers** in official records – all of which are core First Amendment activities (petitioning the government for redress and speaking out on matters of public concern).

**Plaintiff's Protected Advocacy – Reporting Misconduct:** Plaintiff further exercised her First Amendment rights by **reporting and opposing governmental misconduct**. She exposed the **misuse of a power of attorney** by private individuals (involving her elderly relative) and **challenged fraudulent court filings** that were being used to divest her of property. She also **raised concerns about systemic judicial bias** affecting her cases. These actions – whistleblowing and criticizing judicial operations – are protected speech and advocacy under the First Amendment.

**Adverse Actions in Response to Plaintiff's Speech:** In direct response to Plaintiff's protected petitions and speech, Defendants undertook a series of **adverse actions designed to deter and punish Plaintiff's First Amendment activity**. Defendants' officials and collaborators set out to **silence Plaintiff's criticism** and **disfavor her petitions**, as detailed below.

**Retaliatory Denial of Court Relief:** Defendants repeatedly **denied Plaintiff's requests for protective orders** and other court relief, even when Plaintiff presented credible threats to her safety supported by substantial evidence. By contrast, the same officials **granted similar relief to Plaintiff's adversaries on far less evidence**. This stark disparity in treatment – favoring Plaintiff's opponents while denying Plaintiff's well-founded petitions – had no legitimate basis and was motivated by animus towards Plaintiff's advocacy (*Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000) (equal protection violated by irrational, disparate treatment)).

**Judicial Officers Undermining Plaintiff:** Judicial officers, abused their positions to **publicly undermine Plaintiff's credibility and petitions** in open court. For instance, court staff summarily **dismissed Plaintiff's filings without proper hearings**, made disparaging comments about Plaintiff's litigation efforts, and generally **obstructed Plaintiff's access to judicial relief** specifically because Plaintiff had filed complaints against them. Such actions by a judge to target a litigant for her protected complaints are adverse and unlawful, as they **infringe Plaintiff's right of access to the courts** (*Bounds v. Smith*, 430 U.S. 817 (1977); *Christopher v. Harbury*, 536 U.S. 403 (2002) (recognizing right of court access free from obstruction by officials)). see **[EX 10, 11, 12, 21C, 32, 42, 43, 61]**

**Private Co-Conspirators' Retaliatory Acts:** Private Defendants – including **Marlene Sprague** and **Darlene Rosenquist** – **acted in concert with state officials** to further this retaliatory campaign. These individuals filed **false petitions and defamatory reports** with the court (which officials accepted at face value) **[EX UD PACK]** to paint Plaintiff as culpable, and they **interfered with Plaintiff's housing and property rights** by leveraging judicial processes (such as evictions and lien actions) based on fraudulent pretenses. Sprague, Rosenquist, and others coordinated their efforts with Snohomish County actors so closely that they became **joint participants under color of law** (*Dennis v. Sparks*, 449 U.S. 24 (1980); *Fogel v. Collins*, 531 F.3d 824, 832–33 (9th Cir. 2008) (private persons who conspire with judges or other state officials are acting under color of state law)). Their private actions, taken together with public officials, contributed to the adverse measures inflicted on Plaintiff.

**Sustained and Coordinated Campaign:** The adverse actions against Plaintiff were not isolated or sporadic; they formed a **sustained and coordinated campaign** aimed at silencing Plaintiff over a period of more than three years. Nearly every time Plaintiff engaged in protected speech or filed a complaint, Defendants swiftly reacted with a punitive measure – demonstrating a pattern of **cause and effect**. This continuous barrage of retaliation is objectively severe and pervasive, such that **an ordinary person would be deterred from continuing to speak or petition under these conditions** (*Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (sustained retaliatory campaign would chill a person of

ordinary firmness)). Plaintiff herself experienced fear and hesitation to file further petitions due to this relentless retaliation.

Plaintiff's protected activity was a substantial or motivating factor behind Defendants' adverse actions. Notably, during the Intentional Infliction of Emotional Distress (IIED) hearing, the judge explicitly characterized Plaintiff as a frivolous litigant and dismissed her claims with prejudice. This judicial characterization and the dismissal underscore the pattern of retaliatory actions taken after Plaintiff engaged in protected activity. This direct reference by the judge provides further evidence of the causal link between Plaintiff's actions and the adverse outcomes.

**County Liability (Monell):** Defendant **Snohomish County** is liable for the retaliation because these actions were taken **pursuant to County customs and with County policymakers' approval**. The pattern of denying Plaintiff's petitions and pressing unfounded charges reflects an unofficial County policy of hostility toward Plaintiff's complaints. County supervisors and decision-makers knew of and **ratified the retaliatory conduct** – for instance, the Sheriff's Department and Prosecutor's Office, at the highest levels, approved moving forward with the baseless identity theft charge against Plaintiff despite its evident connection to her complaints about local officials. Additionally, Snohomish County **failed to adequately train or supervise its employees** (court staff, deputies, and others) to ensure that citizens' First Amendment rights were respected. This failure to train and intervene was **deliberately indifferent** to Plaintiff's rights and was a moving force behind the violations (*Monell*, 436 U.S. 658; *Lytle*, 382 F.3d at 983). In short, Snohomish County, through its customs and lack of training, **tolerated and even encouraged the retaliation** by its officials, making the County itself culpable under § 1983.

**Injuries to Plaintiff:** As a direct and proximate result of Defendants' retaliatory actions, Plaintiff has suffered substantial damages. Defendants' coordinated retaliation caused Plaintiff to **lose her home and real property** (through unjust eviction and liens), to suffer **irreparable reputational harm** (by being falsely portrayed as a criminal and a vexatious litigant), and to endure **severe emotional distress** (including anxiety, depression, and loss of faith in the justice system). Plaintiff also effectively **lost meaningful access to the courts**: due to Defendants' actions, her legitimate claims were never heard fairly, and she was deterred from pursuing further relief. These injuries are precisely the type of harm § 1983 is designed to remedy. Plaintiff therefore seeks compensatory damages for all pecuniary and non-pecuniary losses, as well as any appropriate punitive damages against the individual actors to penalize and deter this egregious violation of her First Amendment rights.

## COUNT III – MUNICIPAL LIABILITY (MONELL DOCTRINE)
### *(42 U.S.C. § 1983 – Against Snohomish County and Skagit County)*
### Demand for Relief: $5,000,000

**Statutes Violated:**

- **42 U.S.C. § 1983** – Civil action for deprivation of rights
- *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (municipal liability under § 1983)

**Relevant RCW's:**

- RCW 36.28 – Duties of sheriffs and peace officers
- RCW 4.96 – Actions against political subdivisions
- RCW 7.105 – Civil Protection Orders

- RCW 42.56 – Public Records Act

**Allegations:**

**Incorporation of Prior Allegations:** Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

**Municipal Entities Subject to Suit:** Defendants **Snohomish County** and **Skagit County** are municipal entities subject to suit under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Each County is liable for constitutional violations **caused by its official policies, customs, or persistent failures in training and supervision** of its agents.

**Unconstitutional Policies or Customs:** Snohomish County, in particular, **maintained and tolerated unconstitutional practices** that were the moving force behind Plaintiff's injuries, including but not limited to:

- ○ *Enforcement of Retaliatory 911 Reports:* Repeatedly **enforcing false and retaliatory police reports** initiated by private defendants against Plaintiff, while ignoring or dismissing Plaintiff's own legitimate emergency calls. This violates **RCW 36.28**, which outlines duties of law enforcement officers to act without bias and protect all citizens equally.
- ○ *Judicial Deception and Fraudulent Filings:* County deputies and court clerks **facilitated judicial deception** by accepting and processing **blank or false declarations and coerced signatures** prepared by Plaintiff's adversaries, instead of rejecting such fraudulent filings, in violation of their duties under RCW 36.28 and RCW 4.96, contributing to the denial of due process.
- ○ *Failure to Discipline Collusive Officers:* A **failure to investigate or discipline officers** who acted in concert with known harassers of Plaintiff. For example, despite credible reports (see Exhibits 27, 30, 40) that certain deputies were colluding with private individuals to intimidate Plaintiff, the County took no corrective action.
- ○ *Refusal to File Plaintiff's Motions:* A **refusal by court clerks to process Plaintiff's own filings** – such as petitions for protection orders and supporting declarations – while simultaneously **fast-tracking filings by those harassing her**, contrary to RCW 7.105, which governs procedural fairness in civil protection order proceedings. (See Exhibits 8, 10, 20, 25, documenting instances where Plaintiff's submissions were "lost" or returned for trivial reasons, whereas her adversaries' submissions were readily accepted.)

These longstanding failures reflect a custom of **deliberate indifference** to Plaintiff's constitutional rights, including: (a) her **First Amendment** right to seek redress of grievances without retaliation; (b) her **Fourth Amendment** right to be free from unreasonable searches, seizures, and arrests without probable cause; and (c) her **Fourteenth Amendment** rights to equal protection of the laws and to due process.

**Causal Link to Constitutional Injuries:** The above policies and omissions enabled and **encouraged a coordinated campaign of retaliation and abuse** against Plaintiff. As a result:

- ○ Plaintiff was coerced into an unfavorable **plea agreement under duress**, caused by overlapping enforcement actions and legal pressure orchestrated by the Counties in concert with private actors.
- ○ Plaintiff's driver's license was **fraudulently revoked and suspended**, leading to repeated unjust jailings on "driving with suspended license" charges – even though the suspension was procured through a defective process and should never have existed.
- ○ Plaintiff was **denied access to the courts and impartial adjudication** – her petitions for protection were systematically denied without fair hearing, and she was effectively barred from a neutral forum. Key decisions were made ex parte or without considering her evidence, rendering the

process fundamentally unfair, violating RCW 7.105. Key decisions were made ex parte or without considering her evidence, violating her due process rights under both the Fourteenth Amendment and state law governing impartial proceedings.

In short, the Counties' unlawful customs were the **moving force** behind the First, Fourth, and Fourteenth Amendment violations that Plaintiff suffered. But for these policies of retaliation and indifference, Plaintiff would not have been deprived of her liberty, property, and rights as she was.

**Failure to Train and Supervise (Deliberate Indifference):** Defendants Snohomish County and Skagit County **failed to adequately train or supervise** their deputies, clerks, and judicial officers. No effective training was provided on avoiding abuse of process, RCW 42.56-related duties on record preservation, or the duty to fairly process all filings. These failures were pervasive and reflected deliberate indifference to the foreseeable risk of constitutional injury (City of Canton v. Harris, 489 U.S. 378 (1989)). regarding the constitutional safeguards owed to citizens, evincing deliberate indifference. For example:

- The Counties provided **no effective training on avoiding "patterned abuse of process."** This failure allowed officials to become tools of private harassment – repeatedly enforcing baseless filings across multiple jurisdictions (a predictable consequence that proper training could have averted).

- The Counties failed to train law enforcement on the **duty to preserve exculpatory evidence and refrain from obstructing justice.** As a result, officers suppressed evidence favorable to Plaintiff and supported the obstruction of Plaintiff's cases (e.g., not forwarding Plaintiff's evidence to the prosecutor, or refusing to take statements from her witnesses).

- The Counties did not supervise or correct **court personnel who were hostile to vulnerable parties.** This enabled a procedural environment where Plaintiff – a self-represented litigant and caregiver to a vulnerable adult – faced open hostility and lack of protection, instead of the assistance and neutrality she was entitled to.

These training and supervision failures were so pervasive and obvious that they reflect a **municipal policy of deliberate indifference** (City of Canton v. Harris, 489 U.S. 378 (1989)). The risk that citizens like Plaintiff would suffer constitutional injury was plainly foreseeable, yet the Counties took no meaningful steps to prevent it.

**Ratification by Policymakers:** The unconstitutional actions described were **ratified by officials with final policymaking authority** in each County. Despite Plaintiff's numerous complaints to County leadership – including detailed reports of violence, harassment, and property fraud (see Exhibits 27, 30, 40) – **County policymakers failed to investigate or intervene.** Instead, they either tacitly approved the misconduct or actively defended it (for example, County attorneys continued to pursue a retaliatory prosecution of Plaintiff despite clear evidence of malice and lack of probable cause). This ratification by the Counties' decision-makers represents an official adoption of the unconstitutional behavior, satisfying Monell's policy requirement. The widespread and repeated nature of these violations was not an isolated error; it was **systemic.**

**State-Created Danger:** Defendants' policies and omissions also **placed Plaintiff in a position of known danger,** constituting a substantive due process violation under the state-created danger doctrine. Ninth Circuit law (e.g., Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989); Kennedy v. City of Ridgefield, 439 F.3d 1055 (9th Cir. 2006)) recognizes that when officials affirmatively act to increase an individual's vulnerability, they violate due process. Here, County officials **increased Plaintiff's risk of harm:** despite repeated reports that Plaintiff was being violently harassed and defrauded, officials not only failed to protect her, but emboldened the harassers by consistently siding with them. For instance, by enforcing a fraudulent eviction at her adversaries' behest and jailing her on a bogus license suspension, the Counties signaled that Plaintiff was without law enforcement protection.

This **foreseeably placed Plaintiff in greater danger**, leading to physical endangerment (her car was vandalized and even shot at while she was jailed, with no genuine investigation by authorities). Plaintiff thus suffered physical, emotional, and dignitary harms as a direct result of this state-created danger.

**Joint Action with Private Co-Conspirators:** Additionally, private individuals such as **Marlene Sprague, Justice Clark, and Darlene Rosenquist** acted **in joint participation and conspiracy with County officials** to violate Plaintiff's rights. Under the Ninth Circuit's standard, "a private party who is a willful participant in joint action with the State or its agents" acts under color of law (*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012); *O'Handley v. Weber*, 62 F.4th 1145, 1159 (9th Cir. 2023)).

Here, these Defendants leveraged state processes and collaborated with law enforcement (for example, by concocting affidavits that deputies then enforced, and by alignment with a judge's bias) to deprive Plaintiff of her rights. Accordingly, to the extent these private parties implemented the Counties' unlawful policies or induced state actors to retaliate against Plaintiff, they are **liable under § 1983 and § 1985(3)** alongside the municipal Defendants. This joint action underscores that the constitutional injuries were not the result of rogue private conduct, but of a **concerted policy or custom involving state authority at every step.**

**Conclusion – Municipal Liability:** In sum, **Snohomish County and Skagit County are liable under Monell.** They established and perpetuated the above unconstitutional customs (e.g., bias against self-represented litigants, refusal to protect vulnerable persons in their jurisdiction, failure to discipline collusive officials), and these policies directly caused Plaintiff's constitutional injuries. The Counties' deliberate indifference to Plaintiff's rights – evidenced by their pattern of ignoring her pleas and ratifying misconduct – renders them answerable for the deprivations of Plaintiff's First, Fourth, and Fourteenth Amendment rights. Plaintiff therefore is entitled to recover damages, as well as declaratory and injunctive relief, from the Defendant Counties under 42 U.S.C. § 1983. Plaintiff also reserves the right to amend this claim as new evidence of additional policies or practices comes to light during discovery.

**Legal Authority:** *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978); *City of Canton v. Harris*, 489 U.S. 378 (1989); *Connick v. Thompson*, 563 U.S. 51 (2011); *Gibson v. County of Washoe*, 290 F.3d 1175 (9th Cir. 2002); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989); *Alexander v. City & County of San Francisco*, 29 F.3d 1355 (9th Cir. 1994); *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023).

## COUNT IV – MALICIOUS PROSECUTION AND ABUSE OF PROCESS
## *(42 U.S.C. § 1983 and Washington Common Law – Against Skagit County, Snohomish County, Justice Clark, and Marlene Sprague)*
## Demand for Relief: $2,500,000

**Statutes Violated:**

- **42 U.S.C. § 1983** – Civil action for deprivation of rights
- **Washington common law** – Malicious prosecution; Abuse of process

**Relevant RCW's:**

- RCW 4.24.350 addresses liability for false reports resulting in wrongful prosecution.
- RCW 9A.80.010 covers official misconduct by public officials.
- RCW 4.84.185 allows for awarding costs in cases of frivolous litigation

**Elements of the Claim:**
Under § 1983 and Washington law, a claim for **malicious prosecution** requires showing:

**(1)** Defendants initiated or caused a prosecution to be initiated against Plaintiff;

**(2)** the prosecution lacked probable cause;

**(3)** Defendants acted with malice (i.e. a primary purpose other than bringing an offender to justice);

**(4)** the criminal proceedings terminated in Plaintiff's favor; and

**(5)** Plaintiff suffered damages as a result. *(Awabdy v. City of Adelanto, 368 F.3d 1062 (9th Cir. 2004); Clark v. Baines, 150 Wash.2d 905, 912 (2004)).*

An **abuse of process** claim under Washington law requires showing:

**(1)** Defendants committed an act using legal process not proper in the regular course of proceedings, and

**(2)** they did so for an ulterior purpose (to accomplish an objective not legitimate in the process's use). *(Batten v. Abrams, 28 Wash. App. 737, 745 (1981)).* Plaintiff alleges that Defendants' conduct satisfies each of these elements, as set forth below.

### Allegations:

**Incorporation by Reference:** Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

**Initiation of Proceedings Without Probable Cause:** Defendants **caused criminal proceedings to be initiated and maintained against Plaintiff without probable cause.** Specifically, Skagit County officials (acting in concert with others) filed a felony identity theft charge against Plaintiff arising from a vehicle financing incident, even though Plaintiff had lawfully returned the vehicle and committed no crime. Similarly, Snohomish County officials pursued charges and arrests against Plaintiff based on retaliatory and false allegations from private actors. At no point did Defendants have reasonable grounds to believe Plaintiff had violated the law; instead, the proceedings were based on **misleading or fabricated information** supplied by private co-conspirators and accepted uncritically by County officials.

**Proceedings Conducted with Malice and Ulterior Purpose:** Defendants instituted and prosecuted the above proceedings **with malice and for an ulterior purpose.** The timing and circumstances demonstrate that Defendants' primary purpose was not to enforce the law impartially, but to **silence and punish Plaintiff for her protected speech and court petitions.** For example, the Skagit County prosecution was initiated shortly after Plaintiff publicly criticized local officials, indicating a retaliatory motive. The prosecutions and arrests were used as tools to discredit Plaintiff and give leverage to her adversaries, rather than to adjudicate any legitimate wrongdoing (thus meeting the malice element). This misuse of government power to chill Plaintiff's First Amendment activity and deny her equal protection was intentional and driven by malice (*Awabdy, 368 F.3d at 1067-68*).

**Misuse of Civil Process to Coerce and Harass:** Beyond the criminal cases, Defendants **abused civil legal processes** to injure Plaintiff. They weaponized eviction proceedings, property liens, and restraining orders to coerce Plaintiff out of her home and to tarnish her credibility in ongoing litigation. For example, Defendant Marlene Sprague—acting in concert with Justice Clark and County agents—filed an **unlawful detainer (eviction) action** and recorded a **fraudulent quitclaim deed** on Plaintiff's residence with no lawful basis. These processes were pursued not to resolve genuine legal disputes over property, but to harass Plaintiff and force her displacement. Likewise, Defendants sought and obtained a meritless protection order against Plaintiff (at Sprague's request) simply to brand Plaintiff as a wrongdoer, even as Plaintiff's own petitions for protection were denied. Such acts, taken under color of official procedure but for purely private retaliation, constitute a classic **abuse of process:** legal tools were used in a manner not proper for their intended purpose, in order to achieve Defendants' illegitimate ends *(Batten, 28 Wash. App. at 745)*.

**Improper Use of Legal Tools (Subpoenas, Declarations, Motions):** In furtherance of their scheme, Defendants **misused specific legal tools and proceedings**. They issued subpoenas not to gather truth, but to intimidate witnesses sympathetic to Plaintiff (threatening contempt to those who supported Plaintiff, thereby deterring exculpatory testimony). They submitted **false declarations and emergency motions** in court—ablaze with perjury and factual distortions—to obtain orders against Plaintiff that they could not have obtained honestly. For instance, Justice Clark signed an ex parte order cutting off Plaintiff's access to certain evidence or filings, based on one-sided representations from Sprague and others that he knew (or should have known) were dubious. Each such act—using a court process (like a subpoena or motion) for a malicious, ulterior reason—was an overt misuse of process in violation of Plaintiff's rights.

**Law Enforcement's Knowing Participation:** Defendants' misuse of process was **enabled by law enforcement officers' knowing cooperation**. County deputies and police officers **knowingly relied on false statements** from the private Defendants to justify Plaintiff's arrests and the search of her home. Officers disregarded Plaintiff's exculpatory evidence and instead swore out affidavits echoing the private Defendants' lies (for example, omitting that Plaintiff had lawful authority or evidence of her innocence). By lending the authority of the state to falsehoods, law enforcement officers became willful participants in Defendants' malicious prosecution and abuse of process. Their actions were taken in **bad faith and with reckless disregard for the truth**, further showing the proceedings were without probable cause and driven by malice.

**Favorable Termination of Proceedings:** Although the malicious proceedings were not initially terminated outright in Plaintiff's favor, the ultimate outcomes reflect favorable resolutions. The Skagit County felony charge resulted in the dismissal of the most serious accusations, and no conviction of wrongdoing was obtained.

Regarding the plea, the charges themselves remained serious. The prosecution did not reduce the core charges apart from removing the "color of aid" wording after Plaintiff explained her duress. The plea deal involved four months of house arrest and one year of DOC supervision, significantly less than the mandatory minimum time. Plaintiff successfully completed DOC oversight in three months, with early release due to compliance and clean UAs.

**Injuries Suffered by Plaintiff:** As a direct and proximate result of Defendants' malicious prosecution and abuse of process, **Plaintiff suffered significant damages**. She was wrongfully deprived of liberty—spending approximately **four months in jail** and then placed on restrictive house arrest—due to Defendants' actions. She endured **loss of housing and real property** (being forcibly removed from her home and unable to return due to Defendants' fraudulent filings). Plaintiff's professional and personal **reputation has been severely damaged**: she is now unjustly stigmatized with an arrest record and has been portrayed (in public filings and the media) as culpable for crimes and wrongs she did not commit. Plaintiff incurred substantial **financial losses**, including legal expenses in defending herself against the baseless actions, lost income and employment opportunities during incarceration and house arrest, and the expense of securing alternate housing and restoring her property rights. She has also suffered **extreme emotional distress**, including anxiety, systemic isolation, depression, and humiliation, as a foreseeable consequence of being maliciously prosecuted and publicly branded a criminal. These injuries were directly caused by Defendants' misuse of legal process and would not have occurred absent their unlawful acts.

**Legal Authority:** *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066–67 (9th Cir. 2004) (recognizing § 1983 claim for malicious prosecution where defendants prosecuted plaintiff without probable cause and for the purpose of denying constitutional rights; favorable termination establishes the presumption of no probable cause); ***Clark v. Baines, 150 Wash.2d 905, 912–13 (2004)*** (listing elements of malicious prosecution under Washington law: institution of proceedings by defendants, lack of probable cause,

malice, favorable termination, and injury, and affirming that malice can be inferred from lack of probable cause); *Batten v. Abrams, 28 Wash. App. 737, 743–45 (1981)* (defining abuse of process as the perversion of legal procedure for an objective not intended by law, requiring an act after issuance of process to accomplish an improper purpose).

Defendants' conduct, as alleged above, meets these standards: they initiated proceedings without cause and with malice, and they committed overt acts (filing false pleadings, executing unlawful warrants) to achieve goals outside the normal litigation process, rendering them liable for malicious prosecution and abuse of process under § 1983 and Washington common law.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)
### *(Washington Common Law – Against Justice Clark, Marlene Sprague, and Darlene Rosenquist)*
### Demand for Relief: $3,000,000

**Incorporation of Allegations:** Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

**Extreme and Outrageous Conduct:** Defendants Justice Clark, Marlene Sprague, and Darlene Rosenquist engaged in a concerted campaign of **extreme and outrageous conduct** toward Plaintiff. Their tactics included surreptitiously **surveilling Plaintiff's home at night**, brandishing **firearms to threaten and intimidate** Plaintiff, repeatedly making **false 911 calls** to summon law enforcement on baseless pretenses, **vandalizing Plaintiff's vehicle**, and spreading **defamatory accusations** about Plaintiff in her community. This pattern of behavior **goes beyond all possible bounds of decency** and is utterly intolerable in a civilized society, satisfying Washington's standard for the tort of outrage (IIED)

**Coordinated Harassment via Legal Filings:** In furtherance of this malicious campaign, Defendants coordinated multiple **frivolous lawsuits and court filings** against Plaintiff solely to harass and intimidate her. They **orchestrated sham legal actions** (including baseless complaints and motions in various courts) not to resolve genuine disputes, but to bombard Plaintiff with litigation and cause her emotional distress. Using the courts as a harassment tool in this manner is **extreme and outrageous**, and it compounded Plaintiff's emotional trauma by entangling her in constant, bad-faith legal battles.

**Mockery and Taunting in Court Proceedings:** Even in official court proceedings, Defendant **Justice Clark** stepped outside the bounds of propriety by **mocking and taunting Plaintiff on the record**. During hearings, Justice Clark made derogatory remarks and ridiculed Plaintiff's filings in open court, conduct far removed from any legitimate judicial function. Defendants continued to **target and harass Plaintiff** with personal attacks and procedural abuse **even after certain claims by Plaintiff were judicially vindicated or Defendants' actions were sanctioned by other courts**. Defendants' persistence in their egregious behavior – **even after judicial rebuke or dismissal of their positions** – underscores their intent to inflict emotional harm on Plaintiff without regard to the law. Such conduct by a judicial officer and co-conspirators is unequivocally extreme and outrageous, as it **violates the fundamental norms of respectful, impartial treatment expected in the justice system**.

**Intent or Reckless Disregard:** Defendants' actions were taken **intentionally and with reckless disregard** of the near certainty that Plaintiff would suffer severe emotional distress. The ongoing, malicious nature of their conduct – including late-night threats and public humiliation – evidences a deliberate purpose to emotionally devastate Plaintiff, or at minimum a **reckless indifference** to the emotional havoc they were wreaking. Defendants knew or should have known that their behavior, carried out over many months in a relentless manner, would cause Plaintiff extreme psychological harm.

**Severe Emotional Distress Suffered:** As a direct result of Defendants' extreme and outrageous conduct, **Plaintiff suffered severe emotional distress**. Plaintiff's distress is evidenced by debilitating **anxiety, trauma manifesting in sleeplessness and hypervigilance**, deep **humiliation** and loss of dignity, and a profound **disruption of her family life and personal relationships**. Plaintiff has been under medical care for stress-related conditions and has experienced ongoing psychological anguish. This emotional harm is severe and enduring, far beyond the ordinary annoyances or inconveniences of life. It meets the requirement for IIED that the distress be **"so severe that no reasonable person could be expected to endure it"**

**Foreseeability and Causation:** Plaintiff's severe emotional injuries were the **foreseeable result** of Defendants' conduct. Given Defendants' repeated, malicious misconduct, it was plainly foreseeable that Plaintiff would suffer extreme emotional distress. Indeed, any reasonable person subjected to the onslaught of threats, defamation, and legal harassment that Plaintiff endured would experience significant emotional trauma. Defendants **intended this distress**, or at least acted with wanton disregard of its likelihood. Accordingly, Defendants' outrageous actions were the proximate cause of Plaintiff's emotional harm: but for Defendants' campaign of intimidation and ridicule, Plaintiff would not have sustained such severe psychological injury.

**Legal Authority:**

* *Reid v. Pierce County*, 136 Wash.2d 195 (1998) (outlining the tort of outrage and requiring conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" in order to be actionable

* *Kloepfel v. Bokor*, 149 Wash.2d 192 (2003) (affirming that **intentional and persistent harassment** causing severe emotional distress is actionable as IIED, and that plaintiffs need not prove physical injury to recover for severe emotional distress under Washington law).

## COUNT VI – CIVIL RICO (RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS)

### *(18 U.S.C. §§ 1962(c) and 1964(c) – Against Justice Clark, Marlene Sprague, Darlene Rosenquist, and affiliated public actors)*

### Demand for Relief: $3,000,000 (to be trebled to $9,000,000 under 18 U.S.C. § 1964(c)), plus injunctive relief

**Statutory Framework:** This Count is brought under **18 U.S.C. § 1962(c)**, which makes it unlawful for any person employed by or associated with an enterprise engaged in interstate commerce to conduct or participate in the enterprise's affairs through a pattern of racketeering activity.

Plaintiff also seeks relief under **18 U.S.C. § 1964(c)**, which provides that a person injured in their business or property by a RICO violation may recover treble damages, costs, and attorney's fees.

**Elements of the Claim:** To establish a civil RICO claim under § 1962(c), Plaintiff alleges:

**(1)** the existence of an **enterprise** affecting interstate commerce;

**(2)** Defendants' **association** with and participation in the enterprise's affairs;

**(3)** a **pattern of racketeering activity** – i.e., at least two related predicate acts within ten years – conducted through the enterprise; and

**(4)** resulting **injury to Plaintiff's business or property** by reason of those racketeering acts. (See *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir.

2007) (en banc)). Plaintiff's allegations satisfy each of these elements, as set forth below.

**Incorporation by Reference:** Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

**Existence of an Enterprise:** Defendants and their confederates formed an **association-in-fact enterprise** – an ongoing collaboration of private individuals and public actors – that engaged in activities affecting interstate commerce. This enterprise consisted of, **Justice Clark** , **Marlene Sprague** and **Darlene Rosenquist** (private parties and sisters of Alan Sprague), and public actors, affecting interstate commerce through property transactions, legal processes, and intimidation. This enterprise aimed to retain control over property and retaliate against Plaintiff. The enterprise, though informal, had an organized structure, continuity, and a common purpose: to unlawfully maintain control over Alan Sprague property and assets, to **retaliate against Plaintiff for her advocacy**, and to **obstruct Plaintiff's legal efforts** to protect her rights.

This association-in-fact constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), and it engaged in or its activities affected interstate commerce (for example, by misuse of the United States mail and electronic transmissions in furtherance of the scheme, and by impacting Plaintiff's employment opportunities).

**Defendants' Participation:** Each Defendant **was employed by or associated with the enterprise** and **conducted or participated** in its affairs. Justice Clark, Marlene Sprague and Darlene Rosenquist all leveraged legal system to legitimize and further the enterprise's objectives (acting in an unofficial capacity to file or facilitate retaliatory actions, and lending the enterprise the appearance of judicial authority). Marlene Sprague and Darlene Rosenquist actively directed and coordinated the enterprise's illegal activities – they executed fraudulent property documents, initiated baseless lawsuits, and recruited public officials to their cause. The public actor Defendants (including certain sheriff's deputies and court clerks) knowingly **provided assistance and cover** for the enterprise's scheme (e.g., processing false filings, carrying out predatory court orders, and selectively enforcing laws against Plaintiff). All Defendants thus **willfully participated** in the conduct of the enterprise's affairs.

**Pattern of Racketeering Activity:** Over a period of approximately Three years (2022 through 2025), Defendants conducted the enterprise's affairs through a **pattern of racketeering activity**, as defined in 18 U.S.C. § 1961(1) and (5). This pattern consisted of multiple, continuous predicate acts that were related by their common purpose and participants. The predicate acts include, without limitation:

**a. Mail Fraud (18 U.S.C. § 1341):** Defendants devised and executed a scheme to defraud Plaintiff of property and honest services by transmitting false and fraudulent documents through the United States Postal Service and interstate carriers.

They **mailed forged quitclaim deeds, falsified court pleadings, and perjured declarations** to courts and parties to induce reliance on lies. For example, Defendants **mailed a fraudulently notarized quitclaim deed** purporting to transfer Alan Sprague's home (where Plaintiff resided) to Marlene Sprague, knowing this deed was signed under false pretenses and without Alan's true consent.

They also mailed **false witness statements and forged signatures** (including a fabricated "declaration" by Alan Sprague, actually drafted by Defendants) to the Snohomish County Superior Court to support a baseless anti-harassment petition against Plaintiff. Each such mailing was in furtherance of Defendants' fraudulent scheme and constitutes an act of mail fraud. (*See Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 361–62 (9th Cir. 2005) (repeated use of mails to submit false evidence and obstruct justice can qualify as racketeering predicates)).

**b. Wire Fraud (18 U.S.C. § 1343):** Defendants similarly used interstate electronic communications to advance their scheme. They transmitted emails and electronically filed court documents containing false

representations – for instance, Justice Clark (using his personal email) **electronically coordinated with Marlene Sprague** to file an emergency motion containing fabricated allegations of "harassment" purportedly by Plaintiff.

Additionally, Defendants engaged in **honest services fraud** by depriving Plaintiff of the honest services of public officials through bribes or kickbacks (or alternately through a pattern of non-disclosed conflicts of interest and official misconduct). Specifically, Defendants provided personal inducements and exerted undue influence on certain deputy sheriffs and clerks (who were friends or acquaintances) to ensure those officials acted not impartially, but in furtherance of the scheme – conduct tantamount to a denial of honest services (18 U.S.C. §§ 1343 & 1346). (*See McNally v. United States*, 483 U.S. 350, 356 (1987) (addressing schemes to defraud citizens of intangible rights such as honest services of public officials)). Electronic communications in furtherance of these activities constitute acts of wire fraud.

**c. Obstruction of Justice (18 U.S.C. § 1503) and Tampering with Witnesses (18 U.S.C. § 1512):**
Defendants corruptly influenced and obstructed state court proceedings to prevent Plaintiff from obtaining a fair adjudication. They **interfered with protective order hearings and property proceedings** by manipulating court schedules (Justice Clark quietly arranged for Plaintiff's petitions to be heard by a biased judge out of rotation) and by **destroying or withholding exculpatory evidence**

**d. Retaliatory Prosecution (predicate act of extortion and honest services fraud):** Defendants, acting in concert with corrupt public actors, **caused unfounded criminal charges to be brought against Plaintiff** as a means of extorting her compliance and punishing her advocacy. They procured a **defective search warrant** (unsigned by a judge) and had Plaintiff arrested on false pretenses, then **pressured Plaintiff with excessive charges (including First Degree Identity Theft)** to coerce a plea bargain. This abuse of the prosecutorial process—essentially threatening imprisonment to force Plaintiff to abandon her property and claims—constitutes extortion under color of official right (18 U.S.C. § 1951) and is part of the pattern of racketeering.

Plaintiff was in fact **coerced into a plea** (for a lesser offense) due to the cumulative pressure of these unjust charges and the realization that the system was rigged against her by Defendants' enterprise. The malicious prosecution of Plaintiff, orchestrated by Defendants for personal gain, thus serves as a predicate act as well.

**e. Extortion and Theft of Property (18 U.S.C. § 1951, § 659):** Through the above actions, Defendants effectively **extorted Plaintiff's property and rights**. By enforcing the fraudulent quitclaim deed and engineering Plaintiff's eviction under false legal pretenses, Defendants obtained Plaintiff's **residential property (and its rental value and equity)** that they had no legitimate claim to.

They also forced Plaintiff out of her Boeing employment (through reputation damage and forcing her into house arrest so she could not work), thereby taking from Plaintiff the money and benefits she would have earned. These takings were effectuated via wrongful use of fear (of jail, of financial ruin, of armed harm), constituting extortion. Additionally, the coordinated entry into Plaintiff's home under the sham deed and removal of her personal belongings can be analogized to criminal theft. Together, these acts were part of the pattern of racketeering, designed to permanently strip Plaintiff of her business and property assets.

These predicate acts occurred over multiple years with regularity and continuous threat of repetition, satisfying RICO's requirement of a "pattern" of racketeering (at least two acts within ten years that are related and continuous). The acts shared common participants (Defendants and their agents), common victims (Plaintiff and those aligned with her), and common purpose (retaliation and unlawful enrichment) They were not isolated incidents but rather interrelated components of Defendants' ongoing scheme.

**Injury to Business or Property:** Plaintiff has been **injured in her business and property** by reason of Defendants' RICO violations. Specifically, Plaintiff suffered:

**(a) Loss of Employment and Income** – Plaintiff lost her position at Boeing, along with a promising career trajectory, as a direct result of the felony charges and reputational harms inflicted by Defendants' enterprise (once she was branded a felon and incarcerated, Boeing rescinded her employment offer, causing significant lost earnings);

**(b) Loss of Real Property and Home Equity** – Plaintiff was wrongfully ousted from the family home in Snohomish County, losing her residence and any equity or property interest she had or would have obtained (through living in, maintaining, and owning the home), an injury quantifiable in the home's rental value and appreciated equity;

**(c) Legal Expenses and Financial Depletion** – court costs, and related expenses to defend against Defendants' fraudulent lawsuits and criminal charges, and to attempt to regain her property – these out-of-pocket losses are recoverable RICO injuries; and

**(d) Deprivation of Intangible Property Rights** – Plaintiff was deprived of her intangible right to the honest services of public officials (an "injury" recognized under RICO when it results in concrete economic harm, such as here where the corruption of officials led to Plaintiff's financial losses) and of her right to pursue legal claims without improper interference (resulting in the loss of value of those claims).

In sum, Plaintiff's **business and property were directly damaged** by the enterprise's actions – her income, assets, and legal rights were taken or destroyed by Defendants' racketeering. These injuries were proximately caused by Defendants' predicate acts: for example, the mail/wire fraud and extortion in recording the fake deed and evicting Plaintiff caused her property loss, and the mail fraud and witness tampering leading to the bogus criminal case caused her job and income loss. But for Defendants' racketeering, Plaintiff would have retained her job and home.

**Causation and Relief Sought:** Plaintiff's injuries were **by reason of** Defendants' violations of § 1962(c), as the scheme of racketeering acts was devised to and did injure Plaintiff's property interests. Plaintiff therefore has a cause of action under 18 U.S.C. § 1964(c) and is entitled to recover **treble damages** in an amount according to proof (estimated here at no less than $3,000,000 in actual damages, to be trebled to $9,000,000), plus **costs and attorney's fees**.

Furthermore, pursuant to 18 U.S.C. § 1964(a) and this Court's equitable powers, Plaintiff seeks appropriate **injunctive relief** to dismantle the racketeering enterprise and prevent ongoing irreparable harm. Such injunctive relief includes but is not limited to: an order **enjoining Defendants and their agents (including local law enforcement) from any further harassment or surveillance of Plaintiff, vacating and expunging any fraudulent liens, deeds, or court orders procured through the racketeering scheme, returning to her the property taken during the invalid search warrant** (Laptop, Cell phone, Purse) and **restoring Plaintiff to her home and property** (or barring Defendants from continuing to exclude her from it).

Given the continuous threat Defendants' enterprise poses – as evidenced by Sheriff's deputies still shadowing Plaintiff's movements and the lingering cloud on her property title – this injunctive relief is necessary to stop the racketeering activity from causing further irreparable injury.

**Supporting Case Law:** *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985) (civil RICO is to be construed broadly for victims of fraud and extortion, and a prior criminal conviction is not required for a § 1962(c) claim; establishing injury and causation standards); *Odom v. Microsoft Corp.,* 486 F.3d 541 (9th Cir. 2007) (an informal association of individuals can constitute a RICO enterprise; no separate structure is required beyond that inherent in the pattern of racketeering acts); *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.,* 431 F.3d 353 (9th Cir. 2005) (sustaining RICO claims where defendants engaged in a pattern of fraud and obstruction of justice that deprived plaintiffs of property in civil litigation); *McNally v. United States,*

483 U.S. 350 (1987) (discussing schemes to defraud via mail; Congress later clarified that honest services fraud counts as mail/wire fraud, which Plaintiff alleges here under 18 U.S.C. § 1346).

Plaintiff's allegations fit squarely within civil RICO's intended scope: Defendants turned government processes into instruments of fraud and extortion, causing Plaintiff concrete financial harm. Accordingly, Defendants are jointly and severally liable to Plaintiff for treble damages and equitable relief to undo the damage of their racketeering enterprise.

## COUNT VII – PUNITIVE DAMAGES (42 U.S.C. § 1983 and Washington Common Law – Against Justice Clark, Marlene Sprague, Darlene Rosenquist, and Does 1–10, Individually)

**Demand for Relief: $5,000,000**

Allegations:

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

Defendants acted with malice, oppression, and reckless disregard for Plaintiff's federally protected rights. Defendants' conduct, including but not limited to coordinated harassment, retaliatory prosecution, and fraudulent property transfers, was intentional and extreme.

Defendants were motivated by personal animus toward Plaintiff. Justice Clark, Marlene Sprague, and Darlene Rosenquist each participated in a calculated campaign to destroy Plaintiff's reputation, livelihood, and property interests. The coordinated retaliatory prosecution, the fraudulent quitclaim deed, and the misuse of public authority all reflect intentional acts depriving Plaintiff of her constitutional rights.

Under 42 U.S.C. § 1983, punitive damages are appropriate against the individual Defendants in their personal capacities where their conduct was shown to be motivated by evil motive or intent, or involved reckless or callous indifference to the federally protected rights of Plaintiff. The Supreme Court in Smith v. Wade, 461 U.S. 30 (1983), established that punitive damages may be awarded in § 1983 actions when the defendant's conduct involves reckless or callous indifference to the rights of others.

Similarly, under Washington common law, punitive damages are available when a defendant's actions are willful and wanton, demonstrating a conscious disregard of the rights of others. In Dang v. Cross, 422 F.3d 800 (9th Cir. 2005), the Ninth Circuit affirmed that punitive damages serve both punitive and deterrent purposes in civil rights cases. Additionally, in Dailey v. North Coast Life Insurance Co., 129 Wash. 2d 572, the Washington Supreme Court recognized that punitive damages can apply where malice, oppression, or wanton misconduct is present.

Defendants' sustained pattern of behavior—including leveraging false accusations to trigger criminal charges, coordinating with government officials to deprive Plaintiff of due process, and fraudulently transferring Plaintiff's property—demonstrates a blatant disregard for Plaintiff's protected rights. This conduct was not isolated or accidental—it was a deliberate and malicious endeavor.

Defendants' fraudulently notarized quitclaim deed, which purported to transfer Alan Sprague's property without true consent, was a key part of the malicious scheme. Justice Clark, Marlene Sprague, and Darlene Rosenquist knew that the deed misrepresented Alan's intentions and relied on Alan's vulnerability. The fraudulent transfer was executed to deprive Plaintiff of the home in which she resided and had a legitimate interest.

In addition to the property fraud, Defendants instigated false criminal charges against Plaintiff, resulting in Plaintiff's arrest, incarceration, and coerced plea. The retaliatory prosecution was carried out with the cooperation of certain Snohomish and Skagit County officials who were complicit in the scheme.

Defendants acted in reckless indifference to the truth, knowing that probable cause was lacking and that exculpatory evidence, such as the Power of Attorney statement, was deliberately withheld.

Defendants' coordinated misuse of the legal process—including the seizure of Plaintiff's vehicle under false pretenses, the towing of her property, and the continued surveillance of Plaintiff—constitutes oppressive conduct aimed at intimidating and punishing Plaintiff. This pattern of behavior demonstrates a conscious disregard of Plaintiff's constitutional rights.

Plaintiff suffered severe emotional distress, financial loss, and reputational harm as a direct result of Defendants' actions. The oppressive and malicious nature of the Defendants' conduct warrants the imposition of punitive damages.

Plaintiff seeks punitive damages in the amount of $5,000,000 against Justice Clark, Marlene Sprague, Darlene Rosenquist, and Does 1–10, individually, to punish their egregious acts and to deter similar misconduct in the future.

Legal Authority:
Smith v. Wade, 461 U.S. 30 (1983) (holding that punitive damages are available in § 1983 actions when a defendant's conduct is shown to be motivated by evil intent or reckless indifference to federal rights).
Dang v. Cross, 422 F.3d 800 (9th Cir. 2005) (affirming that punitive damages in civil rights cases serve to punish and deter egregious conduct).
Dailey v. North Coast Life Insurance Co., 129 Wash. 2d 572 (recognizing that punitive damages may be awarded under Washington law for willful and wanton conduct that demonstrates a conscious disregard for the rights of others).

Accordingly, punitive damages in the amount of $5,000,000 are necessary to punish Defendants for their malicious and oppressive conduct and to deter future violations of Plaintiff's rights.Injunctive Relief: In addition to monetary punitive damages, Plaintiff seeks injunctive relief to prevent Defendants from continuing their oppressive actions. Plaintiff requests an order enjoining Defendants and their agents, including any law enforcement collaborators, from engaging in further harassment, surveillance, or intimidation of Plaintiff. Such injunctive relief is necessary to prevent ongoing irreparable harm. This includes an order vacating fraudulent property transfers, reversing any unlawful court orders obtained through racketeering, and protecting Plaintiff's property rights moving forward.

Deterrence: Punitive damages are also sought to deter Defendants and others from engaging in similar misconduct in the future. The deliberate and repeated violations of Plaintiff's rights demonstrate a pattern of behavior requiring strong deterrence. Without substantial punitive damages, Defendants may continue or repeat similar conduct.

Plaintiff also requests that the Court order the return of any personal property seized during the unlawful actions, including Plaintiff's vehicle, electronic devices, and any personal belongings taken under false legal pretenses.

Demand for Relief: Based on the foregoing allegations and legal authority, Plaintiff seeks punitive damages in the amount of $5,000,000, along with injunctive relief necessary to restore Plaintiff's rights and prevent ongoing harm. Plaintiff also seeks costs and attorney's fees pursuant to 42 U.S.C. § 1988 and any other relief the Court deems appropriate under the law.

## COUNT VIII – CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

(**42 U.S.C. § 1985(3)** – Against Justice Clark, Marlene Sprague, Darlene Rosenquist, and Public Officials Acting in Concert)
**Demand for Relief: $2,000,000**

**Statutory Framework**

- **42 U.S.C. § 1985(3)** – Provides a cause of action against two or more persons who conspire to deprive another of equal protection of the laws or equal privileges and immunities under the laws.
- Conspiracy liability attaches when defendants, motivated by discriminatory animus or retaliatory intent, act in concert to deprive a plaintiff of constitutional rights.

**Allegations**

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein;

Defendants Justice Clark, Marlene Sprague, Darlene Rosenquist, and affiliated public actors conspired together to obstruct justice, retaliate against Plaintiff's protected activity, and deprive her of equal protection of the laws.

The conspiracy began no later than September 2022, with coordinated efforts to surveil Plaintiff, initiate false police reports, and prepare fraudulent legal instruments for use in court.

Private Defendants acted in concert with law enforcement officers and judicial officials, thereby cloaking their conduct under color of state law.

The object of the conspiracy was to drive Plaintiff from her residence, undermine her employment opportunities, and silence her access to courts through intimidation and retaliation.

Acts taken in furtherance of the conspiracy included:

a. Filing false protection order petitions and declarations.

b. Preparing and recording a fraudulent quitclaim deed to strip Plaintiff's housing rights.

c. Submitting perjured statements and fabricated evidence in Snohomish County Superior Court.

d. Making repeated false 911 calls resulting in Plaintiff's wrongful arrests and incarceration.

e. Coordinating harassment campaigns including stalking, nighttime surveillance, vehicle vandalism, and Firearms violence resulting in 7 bullet holes through her vehicle after coordinating to have her arrested.

Defendants' coordinated conduct constitutes an agreement and overt acts in furtherance of the conspiracy, satisfying the elements of **§ 1985(3)**.

The conspiracy was motivated by animus toward Plaintiff's status as a pro se litigant and by retaliatory intent to punish her exercise of First Amendment rights.

As a direct and proximate result of the conspiracy, Plaintiff suffered loss of liberty, deprivation of property, reputational injury, and severe emotional distress.

Plaintiff is entitled to compensatory damages, punitive damages against individual actors, and equitable relief to redress the ongoing effects of this unlawful conspiracy

# PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, jointly and severally, and grant the following relief:

**a. Compensatory Damages**

1. Award Plaintiff compensatory damages in the amount of **not less than $18,000,000**, representing damages for:

   ◦ Unlawful search and seizure;

   ◦ Wrongful arrests and loss of liberty;

   ◦ Malicious prosecutions and abuse of process;

   ◦ Retaliation for protected First Amendment activity;

   ◦ Deprivation of due process and equal protection under the Fourteenth Amendment;

   ◦ Severe emotional distress, trauma, and reputational injury;

   ◦ Loss of employment and economic opportunities, including Plaintiff's career at Boeing;

   ◦ Damage to property, including vehicles and personal property vandalized or seized by Defendants.

## b. Enhanced Statutory Relief

1. Award Plaintiff **treble damages** under 18 U.S.C. § 1964(c) for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), increasing the Civil RICO award to **no less than $9,000,000**.

2. Award Plaintiff **punitive damages** under 42 U.S.C. § 1983 and Washington common law against Defendants Justice Clark, Marlene Sprague, Darlene Rosenquist, and Does 1–10, in their individual capacities, in an amount sufficient to punish willful misconduct and deter future violations.

### c. Real World Harms and Ongoing Violations

- Systemic retaliation and procedural hostility
- Harassment and forced isolation
- Danger to family relationships and support systems
- Ongoing threats to safety, Liberty, and property
- Employment and educationional losses
- Fabricated and submission of false documents
- Active and unresolved criminal coonduct affecting Plaintiff

### State-Created Danger Doctrine

- Defendants created or exacerbated a dangerous situation by knowingly enabling retaliatory conduct, failing to intervene, and actively suppressing Plaintiff's access to protection.
- Under the "**state-created danger**" doctrine recognized by the Ninth Circuit, Plaintiff alleges that Defendants' actions placed her in foreseeable harm, violating her rights under the **Fourteenth** Amendment. See *Wood v. Ostrander*, 879 F.2d 583 (**9th Cir. 1989**); **Kennedy v. City of Ridgefield**, 439 F.3d 1055 (**9th Cir. 2006**).

### d. Declaratory Relief

1. Enter declaratory judgment that Defendants' conduct violated Plaintiff's rights under the **Fourth, Fifth,** and **Fourteenth Amendments** to the United States Constitution, as well as her **First Amendment** rights to free speech and to petition the government for redress of grievances.

2. Enter declaratory judgment that the conspiracy among Justice Clark, Marlene Sprague, Darlene Rosenquist, and affiliated public actors constituted a **violation of 42 U.S.C. § 1985(3).**

3. Declare that Snohomish County and Skagit County's **customs, practices, and failures to train or supervise constituted** deliberate indifference in violation of *Monell.*

## D. Injunctive Relief

### 1. Non-Retaliation Order

Prohibit Defendants and their agents, officers, employees, successors, and all persons acting in concert with them from:

- ∘ Retaliating against Plaintiff for pursuing this litigation or engaging in other constitutionally protected activity;
- ∘ Initiating or pursuing baseless criminal or civil proceedings against Plaintiff;
- ∘ Interfering with Plaintiff's housing rights, property rights, or employment opportunities.
- ∘ *Practical Impact:* This ensures Plaintiff can live and work without the constant threat of police stops, retaliatory court filings, or sudden loss of housing. It restores the foundation of personal safety and stability.

### 2. Cessation of Unlawful Prosecution (Snohomish County)

- ∘ Direct Snohomish County to immediately cease its current criminal prosecution efforts based on items seized pursuant to the defective September 2022 search warrant.
- ∘ *Practical Impact:* Ends ongoing criminal jeopardy tied to unconstitutional evidence, sparing Plaintiff from being forced to defend against charges that should never have been brought.

### Cessation of current Civil Ejectment and removal of the Eviction and both Ejectments (Snohomish County)

- ∘ Direct Snohomish County to immediately cease its current civil actions for ejectment on plaintiff because it is a product of or direct result of the actions described here in this complaint.
- ∘ remove both of the ejectments now on plaintiffs record preventing her from finding housing and impacting her long term life goals.
- ∘ remove the Eviction also on her record due to it being a part of the pattern of racketeering and conspiracy describer here in this complaint.
- ∘ declare the defendants in this case can not continue to pursue this enterprise of campaign against plaintiff stephanie farler.
- ∘

### 3. Vacatur / Expungement of Skagit Felony Conviction

- ∘ Order the vacatur, expungement, or removal of Plaintiff's Skagit County felony conviction from her record, as it was obtained through malicious prosecution, coercion, and unconstitutional process.
- ∘ *Practical Impact:* Clearing Plaintiff's record restores her ability to seek and maintain meaningful employment, including resuming her career at Boeing or comparable opportunities. This relief eliminates the barrier of a tainted felony record and directly restores her economic independence as it was before the racketeering enterprise began.

### 4. Return of Personal Property

- Order Defendants to return Plaintiff's property unlawfully seized and still held in police evidence storage, including her **laptop, cell phone, and purse**, and any other unlawfully retained items.

- *Practical Impact:* Restores access to essential communication devices, work-related materials, and personal effects, allowing Plaintiff to fully function, work, and litigate without ongoing deprivation.

### 5. Constitutional Safeguards Through Training & Supervision

- Require Snohomish County and Skagit County to implement constitutional training and supervisory reforms designed to prevent future misconduct of the type Plaintiff has endured, including unlawful searches, misuse of protection orders, retaliatory charges, and tolerance of harassment by private actors.

- *Practical Impact:* Provides systemic protection against recurrence of misconduct — not only safeguarding Plaintiff from repeated harm, but ensuring broader community benefit by addressing the root causes of constitutional violations.

### E. Equitable Relief

1. Order the **return of Plaintiff's property** unlawfully seized pursuant to the defective Snohomish County warrant.

2. Order that Plaintiff's **Skagit County felony conviction be vacated or expunged**, given the malicious prosecution, constitutional violations, and taint of unlawful evidence.

3. Restore Plaintiff's record to reflect the expungement, so as not to impede her ability to seek employment at Boeing or elsewhere.

4. Order the Defendants to amend and expunge any public records containing defamatory, false, or retaliatory information about the Plaintiff, including all evictions and criminal marks directly resulting from the abuse described herein.

### F. Costs and Fees

1. Award Plaintiff her reasonable costs of litigation, including transcript costs, and service fees.

2. Award Plaintiff reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1964(c), or, if proceeding pro se, equitable compensation for the extraordinary burden of prosecuting this action.

### G. Additional Relief

1. Grant such other and further relief as this Court deems just, proper, and equitable, including but not limited to structural reform orders, oversight mechanisms, or appointment of a special master to monitor compliance with injunctive relief. This Court's intervention is the only barrier between unchecked retaliation and constitutional accountability, embodying the urgent need for equal justice.

Respectfully submitted,

Stephanie Farler, Pro Se

425-268-0129